UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

MASTERCARD INTERNATIONAL
INCORPORATED,

                   Plaintiff,

      v.

FÉDÉRATION INTERNATIONALE DE
FOOTBALL ASSOCIATION,

               Defendant.

------------------------------------------------------X

JUDGE PRESKA

06 CV 3036 (LAP) (RLE)

ECF CASE

**COMPLAINT**



MasterCard International Incorporated ("MasterCard"), by and through its attorneys, Golenbock Eiseman Assor Bell & Peskoe LLP, for its Complaint against Fédération Internationale de Football Association ("FIFA"), alleges, on knowledge as to its own status and actions, and otherwise upon information and belief, as follows:

### Nature of the Action

1.    This is an action to enjoin a blatant and deceitful violation of a right of first refusal granted to MasterCard in a written sponsorship agreement pursuant to which MasterCard has paid tens of millions of dollars to be, and to have the option to continue being in the future, an official sponsor of World Cup soccer. That sponsorship agreement grants to MasterCard the right to be offered, before any other party, any future World Cup sponsorship rights, with respect to the payment solutions category, offered by the governing body of soccer, FIFA, and prohibits FIFA from granting such rights to any other entity if MasterCard has exercised its right of first refusal.

2.    In plain derogation of these rights, FIFA recently has confirmed that it has entered into a sponsorship agreement with MasterCard's arch-competitor, VISA International, notwithstanding the undeniable fact that MasterCard timely accepted a written offer of terms -- indeed MasterCard signed a 96-page, heavily-negotiated agreement -- delivered to it by FIFA

with respect to sponsorship of the FIFA World Cup from January 1, 2007 through December 31, 2014.   If FIFA is not enjoined from proceeding with its purported sponsorship agreement with VISA and directed instead to perform its obligations to MasterCard, MasterCard will be deprived of a unique asset (FIFA World Cup sponsorship) and will suffer irreparable harm for which monetary damages, even of hundreds of millions of dollars, will not adequately compensate it.

**Jurisdiction and Venue**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action between a citizen of a state and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this district under (i) 28 U.S.C. § 1391(d), because the defendant is an alien, and (ii) under 28 U.S.C. § 1391(a), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

**The Parties**

5.      Plaintiff MasterCard is a corporation organized under the laws of the State of Delaware and having its principal place of business at 2000 Purchase Street, Purchase, New York.  MasterCard is a leading global payment solutions company that provides a broad variety of innovative services in support of its member institutions' credit, deposit access, electronic cash, business-to-business and related payment programs.   Its branded cards, including MasterCard, Cirrus and Maestro, are used around the globe.   There are more than 1.3 billion MasterCard, Cirrus and Maestro cards in circulation, issued by approximately 25,000 member financial institutions and accepted at more than 24 million locations, worldwide.  MasterCard's renowned "Priceless" advertising campaign has run in over 105 countries in 48 languages.

6.      Defendant FIFA is an association organized under the laws of Switzerland and having its principal place of business at Hitziweg 11, CH-8032 Zurich, Switzerland.  FIFA is the worldwide governing body of soccer (known outside the United States as "football").  Its membership is comprised of the national soccer federations of more than 200 countries.  FIFA is

also the organizer of, and owner of the worldwide rights with respect to, the FIFA World Cup and Women's World Cup soccer tournaments held once every four years.

### The Centrality of Sponsorships to MasterCard's Worldwide Effort to Promote Its Brands

7.     Sponsorship platforms are a critical part of the MasterCard marketing mix. MasterCard's marketing objectives are to increase brand preferences and usage.   This overarching goal enables both MasterCard and its member financial institutions to benefit from the growth of one of the world's best known brands.  From the perspective of its member banks, sponsorships translate into increased card acquisition, activation and usage.  From MasterCard's perspective, sponsorships mean increasing the transaction flow through the MasterCard network, as well as continuing to build the value of the brand.

8.     Sponsorships also provide MasterCard with content for many of the marketing programs that it executes.   For example, MasterCard has leveraged its well known "Priceless" campaign to feature its sports sponsorships, including, among others, Major League Baseball, World Cup soccer and UEFA European Football, in commercials that are recognized and enjoyed throughout the world.   Sponsorships thus provide assets and associations for MasterCard that cannot be found elsewhere.

### The Unique Sponsorship Opportunity Associated with FIFA World Cup Soccer and MasterCard's Longstanding Sponsorship of the FIFA World Cup

9.     There is no sponsorship platform anywhere in the world that rivals the FIFA World Cup in terms of the global reach and breadth of penetration it affords to its sponsors. Indeed, FIFA touts on its website that the World Cup "is *the most* effective international marketing platform, reaching millions of people in over 200 countries, throughout the world." The only sponsorship platform that even comes close to the FIFA World Cup is the Olympics, and that sponsorship, in the category applicable to MasterCard of payment solutions, is unavailable (reportedly having been committed to VISA) through 2012.

10. Statistics demonstrating the overwhelming popularity of FIFA World Cup soccer are staggering. The World Cup is the most-viewed sporting event in the world. The last FIFA World Cup tournament, in 2002, had a cumulative television audience of 28.8 billion viewers in a total of 213 countries. A total of 41,435 hours, covering 64 World Cup matches, were broadcast worldwide. (In contrast, during the last Summer Olympics in Athens in 2004, a worldwide total of 35,000 hours of coverage was broadcast.) The 2002 World Cup finals, between Germany and Brazil, had an official global television audience of 1.1 billion viewers.

11. FIFA World Cup sponsorships traditionally have been based on a quadrennial structure, comprising a four-year event cycle. In addition to the right to associate themselves with the tournament, sponsors of World Cup soccer receive exclusive marketing opportunities within their designated product category. Such opportunities include, among other things, (i) use of the official FIFA World Cup marks, (ii) the posting of signage and other advertising in and around host stadiums, in official FIFA publications and on FIFA's website, (iii) the planning and execution of World Cup-related hospitality events, (iv) the enjoyment of preferential advertising on World Cup broadcasts and (v) exclusive programs, such as, in the category of payment solutions, the right to be the exclusive credit card accepted for on-line ticketing.

12. For the past 16 years, MasterCard has paid substantial sums of money for the unique benefits of World Cup sponsorship. MasterCard began its alliance with FIFA in 1990 as the Official Card of World Cup Italia. Since then, MasterCard has been an Official Sponsor of the 1994 FIFA World Cup (USA), 1998 FIFA World Cup (France), 2002 FIFA World Cup (Korea/Japan) and 1999 and 2003 FIFA Women's World Cup (USA). MasterCard is also an Official Sponsor of the 2006 FIFA World Cup to be held in Germany this summer. In return for this unique sponsorship opportunity, MasterCard has paid to FIFA, in the aggregate, scores of millions of dollars.

13. MasterCard's ongoing sponsorship of FIFA World Cup soccer has been critical to it, because the only other worldwide sponsorship platform that even comes close to

World Cup soccer in global reach, *i.e.*, the Olympics, belongs to MasterCard's principal competitor, VISA, which has been and will continue to be an official Olympic sponsor in the category of payment solutions from 1986 through 2012.

### The 2002-06 World Cup Sponsorship Agreement

14.     MasterCard's rights and obligations as an Official Sponsor of the 2006 World Cup are set out in a written Official FIFA Partner Agreement between FIFA and MasterCard made as of November 26, 2002 (the "2002-06 Sponsorship Agreement" or "Agreement").

15.     The 2002-06 Sponsorship Agreement was the product of many months of negotiation between representatives and agents of FIFA and MasterCard. Those negotiations, and the agreement in which they culminated, involved substantial contacts with the State of New York. During the course of negotiations, representatives and agents of FIFA traveled to, and met with representatives of MasterCard at, MasterCard's corporate headquarters in Purchase, New York on one or more occasions. Furthermore, most of the negotiations took place by telephone and e-mail communication between representatives and agents of MasterCard in Purchase and representatives and agents of FIFA in Zurich. In that regard, representatives and agents of FIFA regularly and knowingly placed telephone calls, and sent e-mails, to MasterCard representatives and agents in New York in order to negotiate and consummate the multi-million dollar commercial transaction. Significant aspects of performance under the 2002-06 Sponsorship Agreement also have taken place in New York: MasterCard has exploited certain of the rights afforded to it under the Agreement within, among other places, the State of New York; payments due to FIFA under the Agreement have originated from within the State of New York; and, in order to perform various aspects of the contract, FIFA representatives and agents have knowingly and regularly initiated telephone and e-mail communications to representatives and agents of MasterCard in New York.

16.    FIFA's substantial contacts with the State of New York have not been limited to its dealings with MasterCard.   In connection with the exploitation of its rights to FIFA World Cup and Women's World Cup soccer over the years, FIFA's representatives and agents repeatedly have held meetings in, transmitted telephonic, e-mail and facsimile communications to, and otherwise conducted business within, the State of New York.   In connection with the 2003 Women's World Cup tournament, held in the United States, FIFA temporarily maintained an office within the State of New York.   And at least one member of FIFA's Executive Committee currently maintains an office within the State of New York.   In addition, FIFA has been sued previously within this District, and has not contended that personal jurisdiction over it is lacking.

17.    Under the 2002-06 Sponsorship Agreement, the financial terms of which are confidential, FIFA granted to MasterCard exclusive sponsorship rights, in the category of "real and/or virtual payment and/or account access systems," during the term of the Agreement (approximately January 1, 2003 through December 31, 2006), with respect to the 2006 FIFA World Cup, 2003 Women's World Cup, FIFA World Youth Championships, FIFA Under-17 Youth Competitions, FIFA Futsal (indoor soccer) Competitions, FIFA Federations Cup Competitions and FIFA Under-19 Women's World Championships.   Such rights include the right to (i) use the designation of official sponsor, partner, supplier or product of FIFA World Cup soccer, (ii) use FIFA's official World Cup marks, (iii) display advertising boards, and advertise on giant video screens, within the stadiums hosting World Cup events, (iv) advertise, free of charge, in official FIFA World Cup programs sold during the event, (v) hospitality facilities in or near World Cup sites, in addition to tickets, parking passes and accreditations to attend World Cup games and events, (vi) receive exposure and advertising on FIFA's official website and (vii) receive preferential advertising arrangements with respect to World Cup broadcasts.   In return for this package of rights, MasterCard agreed to pay, and has paid, to FIFA tens of millions of dollars over the past four years.

18.    The substantial sum of money that MasterCard has paid to FIFA under the 2002-06 Sponsorship Agreement is merely a fraction of the overall amount that MasterCard has invested in the sponsorship.   In order to exploit the sponsorship, the value of which peaks with this summer's FIFA World Cup in Germany, MasterCard has paid, and will continue to pay additional tens of millions of dollars for, among other things, market research, promotions, print and broadcast media, web development and hospitality events.

19.    By its terms, the 2002-06 Sponsorship Agreement is governed by the law of Switzerland, where FIFA, the principal drafter of the Agreement, is headquartered.  It further provides that, with certain exceptions, disputes arising out of or in connection with the Agreement shall be resolved in Zurich, Switzerland by a three person tribunal conducting an arbitration in the English language in accordance with the international arbitration rules of the Zurich Chamber of Commerce.   The parties expressly exempted from arbitration, however, any claim for equitable relief based on a material breach of the Agreement.  Thus, section 22 of the 2002-06 Sponsorship Agreement provides:     "[I]f either party materially breaches this Agreement, the other party will be entitled to seek and obtain, from *any court* or arbitrator having competent jurisdiction, any and all equitable relief, including an injunction, without the need to prove special damage or provide security, and the party in breach must pay all of the other's  costs and expenses in connection with its enforcement of its rights, including all reasonable legal fees, costs and disbursements."

### The Right of First Refusal under the 2002-06 Sponsorship Agreement

20.    Among the key terms that MasterCard bargained for in the 2002-06 Sponsorship Agreement was the right to obtain future FIFA World Cup sponsorship opportunities.

21.    A critical aspect of any sponsorship, but particularly in the case of a sponsorship platform as significant as FIFA World Cup soccer, is continuity and the building of equity acquired over time.   In order to maximize the substantial investment that a sponsor makes in connection with a sponsorship, it is essential that the sponsor retain the ability to build on the

brand recognition and business development achieved, at a significant cost, through an existing sponsorship by obtaining the opportunity to renew or otherwise continue the sponsorship in future periods. There is a natural tendency as a sponsorship platform like a major sporting event winds down for the event's owner, sponsors and viewers to begin looking ahead with anticipation to the next staging of the event. An existing sponsor that exercises the right to continue its sponsorship in the future can build on that anticipation and both maximize the value of its current sponsorship and begin to promote its sponsorship of the next iteration of the event. In contrast, where a sponsor cannot exercise future sponsorship rights concerning a major sporting event, or, worse, where it has lost future sponsorship to a competitor, the conclusion of the sporting event, and anticipation of the next staging of the event, provides no value to the existing sponsor. In fact, the loss of a future sponsorship to a competitor can undermine the existing sponsorship. Indeed, it is for these reasons that MasterCard has paid huge sums of money to be the exclusive payment solutions sponsor of FIFA World Cup soccer for the past 16 years and of Major League Baseball for the past nine years (in addition to other longstanding sponsorships, such as the National Hockey League and UEFA European Football).

22.     During the negotiation of the 2002-06 Sponsorship Agreement, representatives and attorneys of MasterCard indicated to their counterparts at FIFA that the option to continue as the official payment solutions sponsor of FIFA World Cup soccer was critical to MasterCard. Thus, during the Agreement's drafting phase, MasterCard's representatives and attorneys proposed that a right to renew the sponsorship during the next contemplated sponsorship cycle (2007-2010) on the same terms that the parties had agreed to with respect to the 2002-06 period be expressly provided for in the Agreement. That proposal, however, was rejected by FIFA, which stated that it was in the process of restructuring its future sponsorship programs and thus could not commit to a right of renewal under the same terms. FIFA countered with what it referred to as its "standard option clause" concerning future sponsorships, but that was not acceptable to MasterCard. After multiple rounds of negotiation

and drafting concerning the matter, the parties settled on providing MasterCard with a right of first refusal with respect to FIFA's next sponsorship cycle (2007-2010).

23.     That right of first refusal is set out in section 9.2 of the 2002-06 Sponsorship Agreement, which provides:

> In the event that MASTERCARD has not materially breached this AGREEMENT, MASTERCARD will have the first right to acquire, with respect to PRODUCTS [a defined term that includes "[a]ll real and/or virtual payment and/or account access systems"], the package of advertising and sponsorship rights offered by FIFA, if any, in connection with the football competitions that are the subject of this AGREEMENT and which will be held during the period 2007-2010. Such right is to be exercised by MASTERCARD within ninety (90) days of receipt of the written offer from FIFA setting out the terms and consideration payable for such package of rights. Thereafter, FIFA will be free to grant to any entity such rights on comparable terms for such football competitions with respect to PRODUCTS. Ninety (90) days prior to FIFA sending MASTERCARD the written offer detailed above, FIFA shall notify MASTERCARD, in writing, that it intends to send out such an offer.

24.     By its plain terms, therefore, section 9.2 operates both to (a) confer on MasterCard the first right to acquire any package of advertising and sponsorship rights, with respect to the payment solutions category, offered by FIFA in connection with the World Cup, Women's World Cup and other FIFA competitions to be held during the 2007-2010 quadrennial cycle, and (b) prohibits FIFA from granting such rights to any entity other than MasterCard, under any terms, until and unless: (i) FIFA provides 90 days' notice of its intention to send MasterCard a written offer concerning the package of rights to be granted by FIFA, (ii) sends to MasterCard a written offer setting forth the terms and consideration payable for such rights, (iii) within another 90 days thereafter, MasterCard does not exercise its right to acquire such package of rights, and (iv) the terms granted to the other entity are "comparable" to the terms declined by MasterCard.

### FIFA's Initial Proposal to MasterCard
### Concerning the Next World Cup Sponsorship Cycle

25.     In accordance with the right of the first refusal in section 9.2 of the Agreement, FIFA, by letter dated July 14, 2004, gave "90 days' notice of its intention to present

an offer to MasterCard for sponsorship rights to the competitions outlined in the Agreement." In February 2005, FIFA then presented to MasterCard a package of sponsorship rights that FIFA proposed to offer (but did not actually put in the form of a written offer, as required by section 9.2) with respect to payment solutions products and services for the next sponsorship cycle. FIFA did so on the soil of New York State, at MasterCard's offices, where representatives and agents of FIFA traveled to meet with, and to present the rights package to, representatives of MasterCard.

26.    As FIFA had indicated might be the case during the negotiation of the 2002-06 Sponsorship Agreement, the sponsorship package that FIFA presented to MasterCard reflected a substantial restructuring of FIFA's sponsorship program. Whereas FIFA now has 15 "Official Partners" with respect to the current sponsorship cycle, which concludes after this summer's FIFA World Cup in Germany, under its new structure, FIFA is to have only six "Official Partners" during the next sponsorship cycle. In effect, FIFA has substantially decreased the number and expanded the scope of the top tier sponsorship categories that it is offering. At the same time, FIFA has expanded the sponsorship cycle by an extra four years, in order to encompass the next two World Cup soccer tournaments. By increasing both the duration of the sponsorship cycle and the scope of each top tier sponsorship category, FIFA also has multiplied by several times the financial burden to any existing sponsor that wishes to continue its sponsorship into the next cycle.

27.    The package of future sponsorship rights that FIFA proposed to offer to MasterCard in February 2005, accordingly, differed dramatically from the sponsorship rights that MasterCard currently owns and which it previously had acquired from FIFA over the prior 16 years. First, FIFA's proposal reflected that FIFA had eliminated the "payment and account access systems" (e.g., credit and debit card) category and replaced it with a far broader "financial services" category, which covered numerous retail banking products and services beyond those offered by MasterCard and from which MasterCard, even on a "pass through" basis with its member banks, could derive no more than limited value. Second, because of the expanded scope

and lengthened duration (which doubled to eight, from four, years) of the new sponsorship structure, the cost of acquiring the rights offered by FIFA was more than quadruple the cost of MasterCard's current sponsorship rights.

28.    After much analysis and deliberation, MasterCard concluded that the maximum value it and its member institutions could derive from FIFA's new sponsorship structure could not justify the enormous price of the sponsorship. Thus, on or about May 11, 2005, MasterCard informed FIFA that MasterCard could not accept the structure that FIFA had posited. Confident that the sponsorship structure that FIFA had proposed would not, without substantial revision, be accepted by any of its competitors, at least one MasterCard representative suggested to his counterpart at FIFA that FIFA test the market with its new sponsorship structure. At the same time, however, MasterCard indicated to FIFA that MasterCard remained firmly committed to continuing as an official sponsor of FIFA World Cup soccer and to work with FIFA on a revised sponsorship structure that would satisfy the objectives of both MasterCard and FIFA.

<strong>FIFA's Revised Proposal to MasterCard</strong>

29.    Having apparently tested the market and confirmed that its new "financial services" structure was not appealing to other prospective sponsors, FIFA re-approached MasterCard (as FIFA was required to under section 9.2 of the 2002-06 Sponsorship Agreement), in late May 2005, with a revamped sponsorship structure involving a diminished scope and a decreased cost. By the terms of section 9.2 of the Agreement, FIFA was obligated at that point, having determined to offer a new "package of advertising and sponsorship rights" encompassing the payment solutions category, to provide MasterCard with 90 days' written notice of its intent to present MasterCard with a written offer setting forth the terms and consideration payable for that (new) package. FIFA, however, did not adhere to that requirement. Instead, on May 30, 2005, it provided MasterCard with a three-page memorandum summarizing the reaction to FIFA's original proposal and outlining the basic elements of a revised sponsorship "model," for which FIFA sought MasterCard's "initial feedback." In fact, FIFA's revised structure hewed

more closely to MasterCard's business objectives, and, though not constituting an offer, provided a meaningful starting point for further discussion.

30.     Over the course of the next several months, representatives and agents of MasterCard and their counterparts at FIFA negotiated, in good faith, over the terms of a revised sponsorship package.  Like the negotiations concerning the 2002-06 Sponsorship Agreement, the negotiations with respect to a sponsorship arrangement for the 2007-2014 time period also involved substantial contacts with the State of New York.  In addition to traveling to, and meeting with MasterCard, within the State in February 2005, representatives and agents of FIFA, over the course of months of negotiation, knowingly and regularly transmitted telephone calls and e-mail communications to representatives and agents of MasterCard located in New York.

31.     Notwithstanding that the parties were involved in ongoing, good faith discussions, FIFA was not prohibited, by the plain terms of section 9.2 of the Agreement, from discussing with, or even soliciting offers from, other prospective sponsors in the "financial services" category at the same time that it was negotiating with MasterCard.  In fact, at some point during the course of the parties' negotiations, MasterCard learned that FIFA was discussing terms with VISA concerning a 2007-14 World Cup sponsorship.  Those discussions with VISA were permitted under the plain terms of section 9.2. What was not permitted by the Agreement's plain terms, however, was for FIFA to go beyond discussions and actually to grant advertising and sponsorship rights to VISA, or any other entity in the "financial services" category, without first presenting to MasterCard, on 90 days' notice, "comparable" terms and affording MasterCard an additional 90 days to accept those terms.  Indeed, FIFA expressly acknowledged this fact.  Thus, while FIFA admitted, in response to MasterCard's inquiries, that it was in discussions with VISA, FIFA's representatives nevertheless confirmed, and assured MasterCard, both orally and in writing in an e-mail dated September 16, 2005, that *"we will not sign a deal with anybody before knowing whether we can reach an agreement with you."*

**MasterCard's Acceptance of a Written Offer of Terms from FIFA**
**And Exercise of MasterCard's Right of First Refusal**

32.     After negotiating for several months over the terms of a sponsorship arrangement that would be acceptable to both parties, FIFA, on March 3, 2006, delivered to MasterCard a written offer, in the form of a 96-page written agreement, setting out the terms and consideration payable for the package of advertising and sponsorship rights that FIFA was prepared to grant to MasterCard in connection with the 2007-2014 time period.

33.     The offer contained no "open" terms and left no details for future negotiation.   Indeed, Messrs. Jérôme Valcke and Tom Houseman, the authorized FIFA representatives who negotiated and conveyed the terms of the offer, acknowledged to MasterCard, both orally and in e-mails, that: "all was now agreed"; "we are done" with negotiations; and the written agreement delivered on March 3, 2006 to MasterCard for execution was the "FINAL version." As Mr. Valcke put it, the next item of business was to "decide on the timing for the announcement" of the agreement.

34.     In an e-mail sent three days after the agreement was provided to MasterCard, the director of FIFA's television and marketing division, declared that FIFA's negotiations with MasterCard were "always . . . in a very good spirit and I am very pleased our partnership will have such good start." He requested that his counterpart at MasterCard "send the agreement [after it is signed by MasterCard] to my attention" and assured him that it then "will [be] countersigned by [FIFA's President, Joseph] Blatter."

35.     In accordance with FIFA's instructions, MasterCard, by its Chief Operating Officer, executed the "FINAL version" of the 2007-14 sponsorship agreement and delivered the signed contract to FIFA.

36.     The agreement that MasterCard was asked by FIFA to, and did, sign grants to MasterCard exclusive "FIFA Partner" rights with respect to the expanded category of payment solutions and retail banking during the period January 1, 2007 through December 31, 2014.   Such rights include the right to (i) use, either on its own account or jointly with its

member banks, the designation of "Official FIFA Partner," as well as other acceptable designations, (ii) exploit FIFA's marks in connection with the advertisement and promotion of payment solutions and/or retail banking products and services, (iii) receive both exclusive and non-exclusive advertising exposure on rotating boards located inside host stadiums, (iv) free advertising in various FIFA print publications, as well as exposure on FIFA's official website, (v) dozens of complementary tickets, as well as an extensive allotment of tickets to purchase, to each match in an expanded roster of FIFA competitions, including the FIFA World Cup, FIFA Women's World Cup, FIFA Confederations Cup, FIFA Club World Championship, FIFA World Youth Championship, FIFA Under-17 World Championship, FIFA Under-20 Women's World Championship, FIFA Futsal World Championship and FIFA Beach Soccer World Championship and (vi) complimentary hospitality packages with respect to the World Cup and Women's World Cup tournaments.  In return for this enhanced package of rights, MasterCard agreed to pay more than three times the amount it agreed to pay for the rights granted to it under the 2002-06 Sponsorship Agreement, albeit for an eight-year period in place of four years.

37.     With FIFA having (i) prepared an agreement containing 96 pages of detailed terms, (ii) delivered the agreement to MasterCard for execution, (iii) requested that MasterCard return the signed original of the agreement to FIFA and (iv) represented in writing that FIFA's President would countersign the agreement, MasterCard believed at the time, and still maintains, that its execution of the 2007-14 sponsorship agreement constituted an acceptance of a written offer and thereby formed a binding enforceable contract.  Regardless, by executing the agreement and returning it signed to FIFA, MasterCard, at the very minimum, undeniably exercised its rights under section 9.2 of the 2002-06 Sponsorship Agreement to acquire the package of advertising and sponsorship rights offered by FIFA, with respect to the payment solutions and retail banking category, for the 2007-14 time period, and thereby prevented FIFA from granting such rights to any other entity.

**FIFA's Stunning Bad Faith Breach of the Right of First Refusal**

38.    After having stated, in writing, that the 2007-14 sponsorship agreement "will be countersigned" by FIFA's President, Mr. Valcke, in an abrupt about face (and with professed "embarrass[ment]"), contacted MasterCard's Senior Vice President for Global Sponsorships to report that FIFA's Executive Committee had declined to sign, and would not sign, the agreement.

39.    The FIFA representative stated that FIFA's Executive Committee, whose review of the contract was represented by FIFA's authorized negotiators to be merely for informational purposes, had not "ratified" the contract, notwithstanding that the terms had been agreed to in all respects by the authorized representatives of both parties after a period of extensive negotiations.  FIFA's pretext for this abrupt turnaround was a trademark dispute concerning one of FIFA's more than 100 trademark filings in the United States, which dispute had been ongoing for almost two years.  The particular FIFA mark in question had never been a subject of prior sponsorship agreements between FIFA and MasterCard.  Nevertheless, FIFA had insisted that this issue be referenced in the 2007-14 sponsorship agreement.  Although the dispute had been stayed by the parties and contractual language on this subject had been agreed to and incorporated into the new agreement, FIFA's legal counsel wrote to MasterCard, in an e-mail, that, "unfortunately," the issue had become an "emotive one" for certain members of FIFA's Executive Committee and that FIFA had been directed to "revert to MasterCard" to determine whether different terms "would be acceptable to MasterCard."

40.    FIFA's counsel concluded that "I look forward to hearing from you once you [MasterCard] have discussed the [trademark] issue internally," while privately expressing doubt that FIFA's sudden reversal had anything to do with "trademark" issues and admitting that FIFA's President had been fully apprised of the issue and nevertheless had authorized FIFA to proceed with the negotiations that resulted in the March 3 written offer to MasterCard.

41.    Notwithstanding that MasterCard firmly believed that it had a binding contract with FIFA by virtue of signing the 2007-14 sponsorship agreement, MasterCard nevertheless indicated to FIFA that, in the spirit of good faith, it would internally review the matter, consider whether some other approach could be taken with respect to the trademark issue and inform FIFA of its position.    In that vein, MasterCard's Senior Vice President of Global Sponsorships sought on multiple occasions to arrange a meeting in Switzerland between MasterCard's Chief Marketing Officer and FIFA's President to resolve the issue.    After MasterCard was strung along by FIFA for 10 days, that meeting never took place, through no fault of MasterCard, for reasons that shortly thereafter would become clear.

42.    Stunningly, on March 30, 2006, shortly after FIFA's legal counsel wrote that he "look[ed] forward to hearing" from MasterCard "once you have discussed the [trademark] issue internally," FIFA's television and marketing director -- in an astonishing display of bad faith, and in direct violation of MasterCard's right of first refusal -- "confirm[ed] FIFA's decision to finalize with *VISA* for the financial services category for 2007/2014." Prior to sending this remarkable transmittal, he candidly admitted that he asked FIFA's President to "give MasterCard a chance" before concluding an agreement with VISA, but Mr. Blatter flatly rejected that request.

43.    Upon being informed of this shocking betrayal, MasterCard immediately put both FIFA and VISA on notice that proceeding with their proposed sponsorship agreement would violate MasterCard's right of first refusal in the 2002-06 Sponsorship Agreement, and demanded that FIFA honor its obligations to MasterCard and not proceed with the proposed VISA agreement.

44.    In spite of the resulting clear violation of MasterCard's rights, FIFA's President indicated, by letter dated April 5, 2006, that FIFA already had "entered into a sponsorship agreement with VISA International covering the years 2007-2014" and that "FIFA will not, therefore, be in a position to extend the current agreement with MasterCard."    That same day, Associated Press newswire publicly reported that "VISA and FIFA will sign a

sponsorship agreement worth an estimated US $150 million -- US $200 million." VISA officially announced the 8-year sponsorship agreement with FIFA in a press release dated April 10, 2006.

45.     That FIFA has entered into a sponsorship agreement with VISA constitutes an egregious breach of both the letter and spirit of MasterCard's right of first refusal in the 2002-06 Sponsorship Agreement.   Indeed, after confirming in writing (the obligation set out in section 9.2 of the 2002-06 Sponsorship Agreement) that *"we will not sign a deal with anybody before knowing whether we can reach an agreement with you,"* FIFA did exactly that which it was contractually and ethically prohibited from doing and which it specifically represented it would not do.

### The Irreparable Harm to MasterCard
### In the Absence of Injunctive Relief

46.     Unless enjoined, the harm that FIFA will inflict on MasterCard from proceeding with a World Cup sponsorship agreement with VISA, in violation of FIFA's obligations to MasterCard under the right of first refusal, as well as the covenant of good faith and fair dealing, in the 2002-06 Sponsorship Agreement, will be irreparable and incapable of being remedied adequately through monetary damages.

47.     As set forth above, FIFA World Cup soccer is a sponsorship platform that is unrivaled in terms of the global reach and depth of penetration it affords to its sponsors.   That is especially so now, given that the only other worldwide sponsorship platform that even comes close to FIFA World Cup soccer, *i.e.*, the Olympics, has no sponsorships available in MasterCard's category until 2013.   Unless injunctive relief is granted, therefore, MasterCard will be deprived of a unique asset for which no replacement is available.

48.     In fact, the injury that MasterCard would suffer in the absence of an injunction would exceed the loss of the FIFA World Cup sponsorship.  Even more injurious is the fact that FIFA granted the sponsorship to MasterCard's arch-competitor, VISA, which would have a monopoly on the only two "worldwide" sponsorship platforms that exist.  The ability to

avoid this result is precisely what MasterCard bargained for in the right of first refusal in the 2002-06 Sponsorship Agreement. An award of monetary damages, even if substantial, thus cannot adequately compensate MasterCard for the full extent of the harm it would suffer, in the absence of an injunction, due to the erosion of its competitive position vis-à-vis VISA globally.

49.    Furthermore, notwithstanding that certain components of MasterCard's damages can be quantified and are estimated to exceed tens of millions of dollars, the full extent of all such damages that MasterCard would suffer in the absence of an injunction is not readily calculable. The hundreds of millions of dollars that MasterCard, and apparently VISA, agreed to pay for FIFA World Cup sponsorship from 2007-2014 is merely a proxy for the value of the sponsorship. It cannot be used to measure the full extent of the harm that MasterCard would suffer if deprived of its bargained-for World Cup advertising and sponsorship rights over the next eight years. As just one example, with the reasonable and foreseeable expectation that its FIFA World Cup sponsorship would continue into the next cycle, MasterCard has leveraged its current sponsorship of the 2006 World Cup by developing more than 300 marketing programs with its member financial institutions that involve future returns during the next World Cup cycle and thus require continuity to achieve maximum market impact. The mere announcement by VISA that it has acquired the World Cup and associated rights from FIFA for 2007-14, together with a flood of announcements and quotes from VISA officials to various media around the world, already have seriously undermined MasterCard's marketing efforts and jeopardized its other soccer-related sponsorships. The enormous damage to MasterCard from being rendered unable to fully leverage and exploit its existing FIFA sponsorship and otherwise satisfy its member institutions' marketing expectations, as a result of FIFA's conduct, cannot be quantified with reasonable precision. Nor would monetary damages designed to compensate MasterCard for the erosion of its worldwide competitive position vis-à-vis VISA be readily quantifiable.

## CAUSE OF ACTION
### (For Injunctive Relief for Breach of the Right of First Refusal)

50.     MasterCard realleges paragraphs 1 through 49 hereof, as if fully set forth herein.

51.     Under the law of Switzerland, which governs the 2002-06 Sponsorship Agreement, the terms of a contract are enforceable by discerning and effectuating the mutual intention of the contracting parties. (*See, e.g.,* Swiss Code of Obligations ("S.C.O."), Articles 2, 11 and 18.)   Contracting parties, by law, are obligated to act in good faith when performing under the contract. (*See, e.g.,* Swiss Civil Code ("S.C.C."), Article 2.)   Furthermore, a party may by contract bind itself to enter into a future contract. (*See* S.C.O., Article 22).

52.     Pursuant to the law of Switzerland, the 2002-06 Sponsorship Agreement, and the right of first refusal set out in section 9.2 thereof, constitute binding and enforceable contractual obligations between FIFA and MasterCard.

53.     Under the terms of section 9.2 of the 2002-06 Sponsorship Agreement, FIFA agreed that MasterCard "will have the first right to acquire," with respect to the payment solutions category, "the package of advertising and sponsorship rights offered by FIFA, if any, in connection with the football competitions" organized by FIFA during the 2007-10 time period, which right MasterCard could exercise "within ninety (90) days of receipt of [a] written offer from FIFA setting out the terms and consideration payable for such package of rights." FIFA further agreed that, if MasterCard timely exercised its right to acquire the "package of advertising and sponsorship rights," FIFA was prohibited from granting such rights to any other entity.

54.     FIFA has materially breached section 9.2 of the Agreement, and its obligation of good faith and fair dealing thereunder, by entering into a World Cup sponsorship agreement with VISA for the next sponsorship cycle, from January 1, 2007 until December 31, 2014, after MasterCard accepted, within 90 days of receipt, FIFA's written offer of terms concerning advertising and sponsorship rights, in the payment solutions category, in connection

with World Cup and other FIFA soccer tournaments to be held in 2007-2014.    MasterCard, in contrast, has not breached any of its contractual obligations under the 2002-06 Sponsorship Agreement.

55.    Under the law of Switzerland, the terms of a contract are at the parties' discretion, and, so long as the terms did not violate a mandatory rule of law or offend against public policy, good morals or individual rights, contractual terms that vary from codified legal requirements are valid and enforceable (*See, e.g.,* S.C.O., Article 19.)  In this instance, FIFA and MasterCard expressly contracted, in section 22 of the Agreement, that "if either party materially breaches this Agreement, the other party *will be entitled to seek and obtain, from any court or arbitrator having competent jurisdiction, any and all equitable relief,* including an injunction, without the need to prove special damage or provide security, and the party in breach must pay all of the other's costs and expenses in connection with its enforcement of its rights, including all reasonable legal fees, costs and disbursements."

56.    MasterCard would suffer irreparable harm for which it could not be adequately compensated if FIFA is not (i) preliminarily and permanently enjoined from consummating, effectuating or performing under its purported sponsorship agreement with VISA in material breach of MasterCard's right of first refusal in the 2002-06 Sponsorship Agreement and (ii) directed specifically to perform its binding obligation to grant to MasterCard the package of advertising and sponsorship rights, in connection with FIFA World Cup and other FIFA soccer competitions to be held during the 2007-14 time period, set out in the 96-page written agreement/offer delivered to, and accepted by, MasterCard on or about March 6, 2006.

57.    MasterCard is therefore entitled to a preliminary and permanent injunction (i) enjoining FIFA from consummating, effectuating or performing under a purported sponsorship agreement with VISA or any other "financial services" partner other than MasterCard in connection with FIFA World Cup and other FIFA soccer competitions to be held during the period January 1, 2007 to December 31, 2014, and (ii) directing FIFA to specifically perform its obligation to grant to MasterCard the package of advertising and sponsorship rights,

in connection with World Cup and other FIFA soccer competitions to be held during the 2007-14 time period, set out in the 96-page written agreement/offer delivered to, and accepted by, MasterCard in March 2006.

WHEREFORE, plaintiff MasterCard International Incorporated requests judgment as follows:

A.      Granting preliminary and permanent injunctive relief:  (i) enjoining FIFA from consummating, effectuating or performing under a purported sponsorship agreement with VISA or any other "financial services" partner other than MasterCard in connection with FIFA World Cup and other FIFA soccer competitions to be held during the period January 1, 2007 to December 31, 2014; and (ii) directing FIFA to specifically perform its obligation to grant to MasterCard the package of advertising and sponsorship rights, in connection with FIFA World Cup and other FIFA soccer competitions to be held during the 2007-14 time period, set out in the 96-page written agreement/offer delivered to, and accepted by, MasterCard in March 2006;

B.      Awarding MasterCard its costs and disbursements in connection with this action, including its reasonable attorneys' fees; and

C.      Granting MasterCard such other and further relief as the Court deems just and proper.

Dated: New York, New York          GOLENBOCK EISEMAN ASSOR BELL
       April 20, 2006                   & PESKOE LLP

                                   By: _____
                                        Martin S. Hyman (MH-4131)
                                        Adam C. Silverstein (AS-4876)

                                   437 Madison Avenue, 35th Floor
                                   New York, New York 10022
                                   (212) 907-7300

                                   Attorneys for plaintiff
                                   MasterCard International Incorporated

Of Counsel:

Noah Hanft
Colm Dobbyn
Cheryl Givner
MASTERCARD INTERNATIONAL
INCORPORATED
Legal Department
2000 Purchase Street
Purchase, New York 10577
(914) 249-2000