UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                      :
MASTERCARD INTERNATIONAL      :
INCORPORATED,                :     06 Civ. 3036 (LAP)
                      :
              Plaintiff,   :
                      :
        v.              :
                      :
FÉDÉRATION INTERNATIONALE DE   :
FOOTBALL ASSOCIATION,      :
                      :
             Defendant. :
                      :
--------------------------------------------------------------X

Goldenbock Eiseman Assor Bell & Peskoe
  Attorneys for Plaintiff
Martin S. Hyman
Adam C. Silverstein
Shira Franco
Elizabeth Jaffe
(212) 907-7300

MasterCard International, Inc.
  General Counsel for Plaintiff
Noah Hanft
Eileen S. Simon
Cheryl Givner
(914) 249-2000

Curtis Mallet-Prevost Colt & Mosle
  Attorneys for Defendant
Turner P. Smith
(212) 696-6000

Fox Horan & Camerini
  Attorneys for Defendant
William D. Brodsky
V. David Rivkin
Kathleen Kundar
(212) 480-4800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                      :

MASTERCARD INTERNATIONAL
INCORPORATED,
                                                      :

                      Plaintiff,       :

                                                       :

            v.                             :

FÉDÉRATION INTERNATIONALE DE
FOOTBALL ASSOCIATION,
                                                     :

                      Defendant.   :

------------------------------------------------------------X

06 Civ. 3036 (LAP)

**<u>FINDINGS OF FACT AND
CONCLUSIONS OF LAW</u>**

*Introduction*

          Fédération Internationale de Football Association ("FIFA") is the worldwide

governing body of soccer and the organizer of the FIFA World Cup, a once-every-fourth-year

tournament that its president calls "the world's largest and most beloved sporting event."  As

befits a sporting organization of this stature and renown, FIFA's slogan is "fair play."

          MasterCard, the payment card services provider, has sponsored the World Cup in

the financial services category for the last four cycles or sixteen years.  Section 9.2 of

MasterCard's most recent sponsorship contract with FIFA gave MasterCard the first right to

acquire the FIFA World Cup sponsorship for the next cycle.  As is set out in detail below, FIFA

breached its obligation under Swiss contract law to give MasterCard the first right to acquire the

next round of sponsorship.  In addition, FIFA's conduct in performing its obligation and in

negotiating for the next sponsorship cycle was anything but "fair play" and violated the

heightened obligation of good faith imposed by the applicable Swiss law (as well as FIFA's own

notion of fair play as explained by its president).  For example:

> FIFA's negotiators lied repeatedly to MasterCard, including when they assured MasterCard that, consistently with MasterCard's first right to acquire, FIFA would not sign a deal for the post-2006 sponsorship rights with anyone else unless it could not reach agreement with MasterCard.

> FIFA's negotiators lied to VISA when they repeatedly responded to the direct question of whether MasterCard had any incumbency rights by assuring VISA that MasterCard did not.

> FIFA's negotiators provided VISA with blow-by-blow descriptions of the status of the FIFA-MasterCard negotiations while concealing from its long-time partner MasterCard both the fact of the FIFA-VISA negotiations as well as the status of those negotiations – an action VISA's president admitted would not be "fair play."

> FIFA's marketing director lied to both MasterCard, FIFA's long-time partner, and to VISA, its negotiating counterparty, to both of which FIFA, under Swiss law, owed a duty of good faith.  When, pursuant to his engineering, VISA raised its bid to the same level as MasterCard's, he declined his subordinates' suggestion to give MasterCard the opportunity to submit a higher bid based on his concern for his own reputation with the FIFA Board.  He also declined his subordinates' recommendation that he recommend to the FIFA Board that it continue with its prior approval of MasterCard as the post-2006 sponsor.  Instead, he told the board it was difficult for him to make a recommendation and never mentioned MasterCard's first right to acquire the post-2006 sponsorship.

> On the morning of the first of March 2006 FIFA board meetings and after all three FIFA boards had previously approved MasterCard as the post-2006 sponsor, FIFA's marketing director called VISA to say that if VISA increased its cash bid by $30 million to the level of MasterCard's bid, VISA "would be the partner."

> Even after MasterCard had signed the "FINAL version" of the post-2006 sponsorship agreement and returned it to FIFA, FIFA's negotiators delayed telling MasterCard that the FIFA Board had chosen VISA; instead they waited for the VISA board to ratify the VISA agreement.

3

After the FIFA boards had approved MasterCard as post-2006 sponsor and after MasterCard had agreed to FIFA's asking price and agreement had been reached on all other terms and after FIFA's in-house counsel had solicited FIFA members for items that might be used to claim that MasterCard breached the Agreement, FIFA pointed to a trademark issue that had been present since 2000 or 2001 to justify granting the post-2006 sponsorship to VISA and sent a letter to MasterCard -- after the commencement of this lawsuit -- purporting to terminate the Agreement and thus MasterCard's first right to acquire.

After MasterCard and FIFA waived, under Swiss law, both the 90-day time periods set out in section 9.2 by their "conclusive conduct," FIFA now seeks retroactively to revive one of the 90-day periods, but not the other, to justify its choice of VISA for the post-2006 sponsorship.

While the FIFA witnesses at trial boldly characterized their breaches as "white lies," "commercial lies," "bluffs," and, ironically, "the game," their internal emails discuss the "different excuses to give to MasterCard as to why the deal wasn't done with them," "how we (as FIFA) can still be seen as having at least some business ethics" and how to "make the whole f***-up look better for FIFA." They ultimately confessed, however, that "[I]t's clear somebody has it in for MC."

Thus, as set out in detail below, FIFA has breached its obligation under section 9.2 to give MasterCard the first right to acquire the post-2006 sponsorship, both under the applicable Swiss contract law and the applicable Swiss law requiring good faith. Because section 22 of the parties' Agreement permits the Court to grant equitable relief upon a finding of breach, the only equitable result is that FIFA be prohibited from proceeding with the subsequent FIFA-VISA agreement and be required to proceed with the 2007-2014 MasterCard Agreement that the parties agreed to and MasterCard signed and returned to FIFA.

***The Parties***

1.     MasterCard is a corporation organized under the laws of the State of Delaware and having its principal place of business in Purchase, New York. (Complaint ¶ 5; Answer ¶ 5). MasterCard provides an inter-face for credit, deposit, electronic cash, business-to-business and other payment transactions between the over 25,000 financial institutions in its

network and those institutions' customers.  (Declaration of John Stuart, executed on June 6, 2006 ("Stuart Decl."), ¶ 5).

2.       Defendant FIFA is an association organized under the laws of Switzerland and having its principal place of business in Zurich.  (Complaint ¶ 6; Answer ¶ 6; Pl. Ex. 421). FIFA is the worldwide governing body of soccer, known outside the United States as "football." It also is the organizer of, and owner of the rights with respect to, the FIFA World Cup, the famous worldwide soccer tournament.  (Complaint ¶ 6; Answer ¶ 6; Pl. Ex. 422).

3.       The predominate language in which business is transacted at FIFA is English, (Trial Tr. p. 48, l. 1-3), and each of the FIFA witnesses who testified at trial was completely fluent and sophisticated in English.

4.       As determined by the history of negotiations and series of sponsorship contracts, FIFA and MasterCard have roughly equal bargaining power.

***MasterCard's Use of and Reliance on Sports Sponsorships***

5.       Sports sponsorships are an important part of MasterCard's global marketing effort.  MasterCard utilizes sports sponsorships around the world to increase public awareness of, preference for and usage of its brand.  (Stuart Decl. ¶ 8).

6.       Through advertising rights associated with a given sponsorship, MasterCard is able to promote its brand to target audiences.  Furthermore, through the development and execution of marketing programs tied to the sponsorship, MasterCard and its member institutions are further able to leverage the sponsorship directly into increased card issuances and usage.  Sponsorships also provide MasterCard with content for many of its advertising campaigns.  For example, MasterCard's sponsorships of Major League Baseball, golf, football, hockey and soccer have all been featured in "Priceless" commercials broadcast

throughout the world.   (Stuart Decl. ¶¶ 8-10).


***The Uniqueness of the FIFA World Cup and of FIFA World Cup Sponsorship***

       7.    The FIFA World Cup, the once-every-fourth year worldwide soccer tournament held most recently in Germany this past summer, is the most widely watched, fanatically followed sporting event in the world.   (Complaint ¶ 10; Answer ¶ 10; Blatter Tr.[1] 134/17-135/1, 135/9-135/15; Houseman Tr. 44/14-44/22; Lampman Tr. 58/23-59/4).

       8.    FIFA concedes, and indeed capitalizes on, this fact.  FIFA touts on its official website, www.fifa.com, and its representatives admitted under oath that:

       a.   "The FIFA World Cup is the world's largest and most beloved sporting event." (Blatter Tr. 133/2-133/6;  Lampman Tr. 54/9-54/12; Schuster Tr. 53/9-53/12; Pl. Ex. 5; <u>See</u> <u>also</u> Blatter Tr. 135/9-135/15);

       b.   "The FIFA World Cup enjoys the undisputed status as the greatest single sporting event of the modern world." (Lampman Tr. 55/19-55/22; Schuster Tr. 53/19-53/22; Pl. Ex. 5);

       c.   "No other sporting event captures the world's imagination like the FIFA World Cup." (Lampman Tr. 54/13-54/16; Schuster Tr. 53/13-53/15; Pl. Ex. 5);

       d.   "Every four years, the FIFA World Cup holds the entire global public under its spell." (Schuster Tr. 53/23-54/1; Pl. Ex. 5); and

       e.   "Every four years, the spotlight of world attention focuses on the month-long FIFA World Cup when billions of people in more than 200 countries around the world tune in to watch arguably the biggest show on earth."  (Schuster Tr. 55/11-55/16; Pl. Ex. 5).

---

[1] "_____ Tr." refers to the deposition transcript of the named witness.

9.     Statistics confirm the immense world-wide popularity of the FIFA World Cup (Complaint ¶ 10; Answer ¶ 10):

a.   An accumulated television audience of more than 30 billion people around the globe watched the 1998 (France) FIFA World Cup tournament. (Schuster Tr. 54/25-55/1; Pl. Ex. 5);

b.   More than 28 billion viewers in 213 countries collectively watched on television the 2002 (Korea/Japan) FIFA World Cup tournament . (Complaint ¶ 10; Answer ¶ 10; Schuster Tr. 55/24-56/4; Pl. Ex. 5); and

c.   FIFA estimates that more than 30 billion people in the world collectively watched this year's 2006 (Germany) FIFA World Cup tournament on television, with more than one billion people watching the final match alone.  (Schuster Tr. 56/13-56/17, 56/25-57/4).

10.    Because, as FIFA acknowledges, the event "reaches an audience of a size and diversity that is unrivaled by any other single sports body," the FIFA World Cup is "a sporting, social and marketing phenomenon" that FIFA itself describes as "*the* most effective international marketing platform" in the world, "more valuable than the Olympics."  (Blatter Tr. 134/17-135/1; Schuster Tr. 55/3-55/6, 55/17-55/23; Pl. Ex. 5; Pl. Ex. 340) (emphasis added).

11.    For all of these reasons, sponsorship of the FIFA World Cup is -- to quote FIFA's co-Head of Business Development & Sales -- a "unique property."  (Schuster Tr. 279/11-280/8; *See also* van der Noll Tr. 20/1-20/3).   In the words of FIFA and its representatives, "the FIFA World Cup is a five-star sponsorship that gives its sponsors *unrivaled* exposure."  (Blatter Tr. 134/7-134/9; Schuster Tr. 55/5-55/10; Pl. Ex. 5) (emphasis added).

***MasterCard's Long-Running Sponsorship of FIFA World Cup Soccer***

12.     Because of the unique benefits it provides, MasterCard has paid nearly $100 million in the aggregate to be an official sponsor of the FIFA World Cup for the past 16 years.  (Complaint ¶ 12; Answer ¶ 12; Stuart Decl. ¶¶ 14, 17; Pl. Ex. 94).   Throughout that time and up through the filing of this action, FIFA and MasterCard have enjoyed a "strong partnership" and an "extremely successful" and "long-term" relationship.  (Pl. Ex. 86; Pl. Ex. 27; Pl. Ex. 4; Valcke Tr. 59/15-59/20).

13.     MasterCard began its affiliation with the FIFA World Cup in 1990 as the Official Card of World Cup Italia.  Since then, MasterCard has been an Official Sponsor of the 1994 FIFA World Cup (USA), 1998 FIFA World Cup (France), 2002 FIFA World Cup (Korea/Japan) and 2006 FIFA World Cup (Germany) tournaments.  MasterCard also has sponsored the 1999 and 2003 FIFA Women's World Cup tournaments.  (Stuart Decl. ¶ 14).

14.     MasterCard derives numerous benefits from its long-running sponsorship of the FIFA World Cup.   The sponsorship provides a platform for MasterCard to promote its brand to a worldwide audience through in-stadium and broadcast advertising.  (Stuart Decl. ¶ 15).  Through various marketing programs that it develops and implements, both alone and in conjunction with various financial institutions in its network, MasterCard is able to increase the circulation and usage of its branded cards, thereby generating revenues both for itself and the financial institutions in its network.  (Declaration of Rogerio Bonfiglioli, executed on June 7, 2006 ("Bonfiglioli Decl."), ¶¶ 9-12; Stuart Decl. ¶ 16).   Additionally, MasterCard's association with the world's most popular sporting event has been critical to its ability to compete globally with its larger competitor, VISA International ("VISA"), which has  long been a sponsor of the Olympic Games.  (Bonfiglioli Decl. ¶ 17; Stuart Decl. ¶ 16).

***MasterCard's Ongoing Insistence on a Right of First Refusal or Right of Renewal in Its
World Cup Sponsorship Agreements***

15.     MasterCard's 16-year sponsorship of the FIFA World Cup has been

effectuated pursuant to a series of written agreements.  Prior to 2002, those agreements were

between MasterCard and ISL Marketing AG ("ISL"), a sports licensing and marketing company

in Europe that served as the exclusive sponsorship sales agent for FIFA.  After ISL declared

bankruptcy in mid-2001, FIFA decided to handle the negotiation and sale of World Cup

sponsorship rights in-house, through its subsidiary FIFA Marketing AG and, later, FIFA

Marketing & TV AG.[2]  (Declaration of Carl Munson, Jr., executed on June 8, 2006 ("Munson

Decl."), ¶ 5; see also ¶¶ 7-11 & Pl. Exs. 238-40).  Thereafter, any World Cup sponsorship

agreement into which MasterCard entered was with FIFA.  (Munson Decl. ¶ 5).

16.     As set out in detail in the unimpeached testimony of Carl Munson, Jr.,

Associate General Counsel of MasterCard, whose testimony I credit, until 2005, Mr. Munson

"negotiated every one of MasterCard's FIFA World Cup sponsorship agreements, dating back to

1988."  (Munson Decl. ¶ 4).

17.     Mr. Munson traces the genesis of Section 9.2 at issue in this action "back

to the very first FIFA World Cup sponsorship agreement into which MasterCard entered in 1988.

In negotiating that agreement (relating to the 1990 FIFA World Cup in Italy), MasterCard

insisted – as a condition of acquiring sponsorship rights (in other words, as a 'deal breaker') –

---

[2]   For purposes of this action, the parties have drawn no distinction between FIFA and FIFA
Marketing & TV AG.   FIFA's President, Joseph Blatter, testified that the Director of FIFA
Marketing & TV AG "has not only the authority [but] he had the right and responsibility" to
negotiate sponsorship agreements on FIFA's behalf.  (Blatter Tr. 158/2-158/7).   Additionally, in
their testimony, the staff of FIFA Marketing & TV AG consistently identified their employer as
"FIFA."  (Houseman Tr. 10/1-10/3; Lampman Tr. 25/19-25/ 20; Schuster Tr. 7/14-7/17; Valcke Tr.
11/24-11/25).  (See also Trial Tr. p. 187, l. 14 – p. 189, l. 2)  (Mr. Schuster is unsure of whether his
employer was, at various times, FIFA or FIFA Marketing & TV AG).

that it receive a right of first refusal with respect to sponsorship of the 1994 FIFA World Cup.  A

telex from Alan Shulteis, then Head of Marketing at MasterCard, dated May 25,

1988 . . . demonstrates this.  In this telex, Schulteis wrote:

> Notwithstanding the verbal statements made by ISL supporting our
> desire and requirement for a 'right of first refusal' for 1994 they
> are unwilling to provide such protection of our investment in Italia
> 1990.  After reviewing this with Russ Hogg and others *we cannot
> go forward without this protection or assurance.  To proceed
> without a 'right of first refusal' for 1994 [the year of the next FIFA
> World Cup] would violate our responsibility to our worldwide
> membership.  Simply put, we and the members would build and
> invest in Italia 90, potentially to the benefit of a competitor . . . All
> I can do is apologize to you and your company but we cannot go
> forward without this protection.*  (emphasis added)."

(Munson Decl. ¶ 6).

18.     As Mr. Munson explained in detail, in each of the five World Cup

sponsorship agreements into which it has entered (either with ISL or FIFA), MasterCard has

bargained for rights with respect to the next World Cup cycle, either in the form of a right of

renewal or a right of first refusal.  (Munson Decl. ¶¶ 6-11; Houseman Tr. 31/14-31/19).

### The 2006 World Cup Sponsorship Agreement and Section 9.2 Thereof

19.     The contract at issue in this proceeding and pursuant to which MasterCard

recently sponsored the 2006 FIFA World Cup is entitled the Official FIFA Partner Agreement

between FIFA and MasterCard, made as of November 26, 2002 (the "2006 World Cup

Sponsorship Agreement" or the "Agreement").   (Pl. Ex. 61; Stuart Decl. ¶ 21).

20.     Under the Agreement, FIFA granted to MasterCard exclusive sponsorship

rights, in the category of "real and/or virtual payment and/or account access systems" (*e.g.*, credit

cards, debit cards and ATMs), with respect to the 2006 FIFA World Cup and other enumerated

FIFA competitions, including the FIFA Women's World Cup, held during the term of the

Agreement, commencing on January 1, 2003 and concluding three months after the conclusion of the 2006 FIFA World Cup.  (Pl. Ex. 61; Stuart Decl. ¶ 21).  In return for such rights, MasterCard agreed to pay a total of $50 million over the course of four years.  (Pl. Ex. 61).

21.     The exclusive sponsorship rights that MasterCard acquired under the Agreement include the right to (i) use the designation of the official sponsor, partner, supplier or product of FIFA World Cup soccer, (ii) use FIFA's official World Cup marks, (iii) display advertising boards, and advertise on giant video screens, within the stadiums hosting World Cup events, (iv) advertise, free of charge, in official FIFA World Cup programs sold during events, (v) receive hospitality facilities in or near World Cup sites, in addition to tickets, parking passes and accreditations to attend World Cup games and events, (vi) receive exposure and advertising on FIFA's official website and (vii) receive preferential advertising arrangements with respect to World Cup broadcasts.  (Pl. Ex. 61; Stuart Decl. ¶ 21).

22.     In addition, MasterCard received the "first right to acquire" any package of advertising and sponsorship rights that FIFA offers, in MasterCard's product category, during the next World Cup cycle.  Section 9.2 of the Agreement states:

> In the event that MASTERCARD has not materially breached this AGREEMENT, MASTERCARD will have the first right to acquire, with respect to PRODUCTS, the package of advertising and sponsorship rights offered by FIFA, if any, in connection with the football competitions that are the subject of this AGREEMENT and which will be held during the period 2007-2010.  Such right is to be exercised by MASTERCARD within ninety (90) days of receipt of the written offer from FIFA setting out the terms and consideration payable for such package of rights.  Thereafter, FIFA will be free to grant to any entity such rights on comparable terms for such football competitions with respect to PRODUCTS.  Ninety (90) days prior to FIFA sending MASTERCARD the written offer detailed above, FIFA shall notify MASTERCARD, in writing, that it intends to send out such an offer.

(Pl. Ex. 61).

23.     As the Court previously has found, "the right of first refusal [in section 9.2] was bargained for, was hard bargained for, and MasterCard paid more for the bundle of rights including the right of first refusal than it would have paid without such a right."  (7/27/06 Tr. of Decision Denying Defendant's Motion to Compel Arbitration, at p. 8).   Likewise, FIFA's co-Head of Business Development & Sales admitted that MasterCard's "first right to acquire" is a "significant" and "important" right in the Agreement. (Schuster Tr. 8/14-8/17, 178/18-178/24).

***The Parties' Mutual Understanding of the Operation of Section 9.2 and***
***The Negotiation and Drafting History of the Section***

24.     There is no dispute between the parties as to the operation of section 9.2, although they differ as to its nomenclature.  MasterCard refers to its right under section 9.2 as a "right of first refusal"; FIFA calls it a "first right to acquire."  (Compare Munson Decl. ¶ 2, with Houseman Tr. 163/10-164/3; see also Answer ¶¶ 22-23).

25.     The parties agree that section 9.2 does not require FIFA to offer to MasterCard a package of advertising and sponsorship rights, in MasterCard's product category, with respect to the next World Cup cycle, unless FIFA, of its own volition, has determined to grant rights in that category.  The parties further agree that, in the event that FIFA has determined to grant such rights, FIFA is obligated, under section 9.2, to afford MasterCard the first right to acquire such rights.   FIFA must send to MasterCard a "written offer" of the package of rights, setting out the terms and consideration for such package.   (Munson Decl. ¶ 32; Houseman Tr. 60/7-60/9).  The written offer must be in a form that, if accepted by MasterCard, would constitute a binding agreement between the parties.  (Munson Decl. ¶¶ 34-40; Houseman Tr. 55/20-56/12, 83/17-83/20, 84/4-84/8).

26.     At least 90 days prior to making such an offer, FIFA must notify MasterCard in writing of FIFA's intent to make the offer.  (Munson Decl. ¶ 32; Pl. Ex. 97;

Houseman Tr. 63/5-63/24; Schuster Tr. 194/13-194/190).  The notice requirement is intended, in part, to make it transparent to both parties that FIFA has "start[ed] the clock ticking" under section 9.2.  (Pl. Ex. 97; Munson Decl. ¶ 32; Houseman Tr. 84/4-84/8, 342/25-343/7).

        27.    If, within 90 days after receiving the "written offer," MasterCard exercises its rights under section 9.2, then MasterCard has acquired the package of rights offered by FIFA, and FIFA is prohibited from granting the rights to a third party.  (Stuart Decl. ¶ 2; Houseman Tr. 139/15-140/20).   On the other hand, if, after 90 days of receiving the written offer, MasterCard does not exercise its rights, then FIFA is free to grant such package of rights to a third party, but only on terms "comparable" to those offered to, and declined by, MasterCard.  (Munson Decl. ¶ 24; Pl. Ex. 97; Houseman Tr. 80/5-80/18; Lampman Tr. 202/9-202/14, 203/21-204/8, 204/19-205/2; Schuster Tr. 23/1-23/7; Valcke Tr. 97/5-97/20).

        28.    If no third party accepts the package, and thereafter FIFA determines to revise the package of rights and grant a different set of rights or terms from those previously offered to MasterCard, then the requirements of section 9.2 apply anew, and, as the Head of FIFA's Commercial Legal Department described it in his testimony, "the whole process effectively starts again":  FIFA would be obligated to offer the revised package of rights to MasterCard in a written document setting forth the terms and consideration for such package; FIFA would be required to precede the offer with no less than 90 days written notice of its intent to offer a revised package of rights; and, if after 90 days of MasterCard's receipt of the revised offer, MasterCard does not exercise its rights, FIFA would then be free to grant such package of revised rights to a third party, but only on comparable terms.   (Munson Decl. ¶ 24; Houseman Tr. 82/2-82/24, 116/22-117/3; Lampman Tr. 216/13-217/2; Schuster Tr. 22/16-24/8, 144/20-145/3).

29.     The parties' positions with respect to the operation of section 9.2 are

consistent with the negotiation and drafting history of the provision, which, under Swiss law (which

governs the Agreement), may be considered by the Court.

30.     The initial draft of the section, prepared by FIFA and circulated to

MasterCard on September 6, 2002, provided:

> 9.2     In the event that FIFA continues to hold the necessary advertising and
> sponsorship rights and MASTERCARD has not materially breached this
> AGREEMENT, MASTERCARD will have the first right to acquire, with respect
> to PRODUCTS, the package of the same or similar advertising and sponsorship
> rights offered by FIFA, if any, in connection with the football competitions that
> the subject of this AGREEMENT which will be held during the period 2007-
> 2010.  Such right is to be exercised by MASTERCARD within 60 days of receipt
> of the written offer from FIFA setting out the terms and consideration payable for
> such package of rights.  Thereafter, FIFA will be free to grant to any entity any
> rights for such football competitions with respect to PRODUCTS.

(Munson Decl. ¶ 16; Pl. Ex. 242).

31.     At an all-day negotiating session on September 11, 2002, at MasterCard's

offices in Purchase, New York, Mr. Munson negotiated significant changes to this language.  Mr.

Munson negotiated that, after the time expired for MasterCard to exercise its right to acquire the

package of sponsorship rights offered to it, FIFA would be free to grant "such" rights to a third

party only "on comparable terms." (Munson Decl. ¶¶ 22-24).   He further negotiated that the 60-

day exercise period proposed by FIFA be expanded to 90 days and that FIFA be required, at least

90 days before offering rights to MasterCard, to notify MasterCard, in writing, of FIFA's intent

to make an offer.  (Munson Decl. ¶¶ 25-27).

32.     These negotiated changes were reflected in the next draft contract

circulated by FIFA on October 8, 2002, which provided:

> 9.2     In the event that FIFA continues to hold the necessary advertising and
> sponsorship rights and MASTERCARD has not materially breached this
> AGREEMENT, MASTERCARD will have the first right to acquire, with respect

to PRODUCTS, the package of the same or similar advertising and sponsorship rights offered by FIFA, if any, in connection with the football competitions that are the subject of this AGREEMENT which will be held during the period 2007-2010.  Such right is to be exercised by MASTERCARD within *90* days of receipt of the written offer from FIFA setting out the terms and consideration payable for such package of rights.  Thereafter, FIFA will be free to grant to any entity *such* rights *on comparable terms* for such football competitions with respect to PRODUCTS.  *90 Days prior to FIFA sending out the written offer detailed above, FIFA shall notify MASTERCARD¸ in writing, that it intends to send out such an offer.*

(Munson Decl. ¶ 28; Pl. Ex. 244) (emphasis added).

33.    After receipt of the October 8 draft, Mr. Munson negotiated additional changes to the language of section 9.2.  Most notably, Mr. Munson negotiated that MasterCard shall have the first right to acquire "*the* package of advertising and sponsorship rights offered by FIFA," and not merely a package that is "similar" to that offered by FIFA.  The first sentence of section 9.2 was thus changed from "MASTERCARD will have the first right to acquire . . . the package of the same or similar advertising and sponsorship rights offered by FIFA" to "MASTERCARD will have the first right to acquire . . . the package of advertising and sponsorship rights offered by FIFA."  (Munson Decl. ¶¶ 29-30).

34.    The drafting changes set out above support the common understanding of the parties that the obligations of section 9.2 were ongoing and that the procedures of section 9.2 applied anew each time FIFA offered a package of rights to MasterCard.

**FIFA Determines to Revise Its Sponsorship Structure**

35.    Within several months after the parties' execution of the 2006 World Cup Sponsorship Agreement, FIFA began to explore possible changes to its sponsorship structure to be implemented in connection with the sponsorship cycle following the 2006 World Cup. (Lampman Tr. 27/9-27/20, 28/3-28/9, 29/6-29/13, 64/8-65/24; Valcke Tr.12/5-12/18, 24/24-25/22).  It hired Jérôme Valcke as Director of FIFA Marketing & TV in September 2003 to,

among other things, review and, if appropriate, restructure FIFA's sponsorship program in time for the sponsorship cycle following the 2006 World Cup.  (Blatter Tr. 31/25-32/11; Valcke Tr. 12/1-12/18).

    36.  Mr. Valcke determined that, given the changed business environment where numerous of FIFA's then 15 sponsors had expanded their lines of business so as to overlap with each other, it was no longer possible for FIFA to grant "exclusive" sponsorship rights to that many sponsors.  He concluded that FIFA had to reduce the number of top level sponsors from 15 down to six.  (Blatter Tr. 31/25-32/23; Valcke Tr. 24/24-25/22; Pl. Ex. 77). Because, at the same time, revenue from sponsors is critical to FIFA's ability to meet its budgetary needs, Mr. Valcke understood that the reduction in the number of top level sponsors would require FIFA significantly to increase the price of sponsorship.  (Valcke Tr. 24/24-25/22). Mr. Valcke figured that the price of a top level or "Tier 1" sponsorship would have to be increased to at least $100 million per four-year FIFA World Cup cycle and that sponsorships should be sold for two four-year terms instead of one four-year term.  (Valcke Tr. 24/24-25/22, 38/24-39/8).   In Mr. Valcke's view, there were only a small handful of product categories in the world that could afford that price.  "Financial services," a combination of two then existing product categories (payment services and banking services), was one of those categories. (Lampman Tr. 70/25-71/17, 75/9-75/15; Valcke Tr. 29/3-29/11; Pl. Ex. 77).

    37.  After determining that one of the product categories FIFA would seek to exploit in its revised sponsorship structure would be "financial services," Mr. Valcke and a team working under him (referred to as the "Beyond 2006" team) set out to identify companies in the financial services industry that would be interested in the sponsorship.  In addition to the incumbent sponsor, *i.e.,* MasterCard, Mr. Valcke identified a number of other credit card

companies and banks that could be interested in the sponsorship.  (Valcke Tr. 29/3-29/19).   At the top of the list was VISA.   As Mr. Valcke testified, "if . . . you have to think about various companies potentially who could have an interest or are already in the world of sport[,] [y]ou're thinking about MasterCard and VISA, that's it."  (Valcke Tr. 34/5-34/14; see also Valcke Tr. 49/8-50/2).

***FIFA Reviews Its Obligations to Incumbent Sponsors***

38.     In connection with its internal review of FIFA's sponsorship program and how to restructure the program, Mr. Valcke and his team analyzed the renewal rights, if any, that FIFA's then 15 existing sponsors had under their contracts.  (Houseman Tr. 29/3-29/15, 30/7-30/9; Valcke Tr. 39/20-40/18).  In considering any new sponsorship platform, Mr. Valcke wanted to know if FIFA was operating with a clean slate or whether there were obligations to existing sponsors that would constrain FIFA's restructuring efforts.  (Valcke Tr. 40/5-40/18).   In late 2003, Mr. Valcke thus asked the Head of FIFA's Commercial Legal Department, Tom Houseman, to prepare a written analysis of the renewal rights, if any, in FIFA's sponsorship contracts.  (Pl. Ex. 97; Houseman Tr. 45/4-45/20; Valcke Tr. 41/2-41/22, 42/2-42/5, 42/9-42/11, 43/2-43/3).

39.     Mr. Houseman, who holds himself out as "legal counsel" but is not authorized to practice law in any jurisdiction, prepared a six-page document entitled "Official Partner Renewal Rights," analyzing the renewal rights, if any, of FIFA's 15 then-sponsors. (Houseman Tr. 33/11-33/18, 34/15-34/19, 219/15-219/19, 220/2-220/4).   Among the "renewal clauses" that Mr. Houseman addressed was section 9.2 of the Agreement, which, in Mr. Houseman's opinion, required FIFA, "before it grants any rights with respect to the products within MC's product category, [to] keep open for 90 days the opportunity to acquire any package

of sponsorship rights in relation to <u>ANY</u> MC products" and to "give MC 90 days notice that it will make MC an offer, which means that 180 days must elapse between the original notice and the expiry of the offer period."  (Pl. Ex. 97; Pl. Ex. 56).

        40.     In his written analysis, Mr. Houseman concluded that, notwithstanding these constraints, FIFA is "not restricted from approaching or making presentations to third parties prior to a MC decision."  (Pl. Ex. 97; Pl. Ex. 56).   As he explained in testimony, section 9.2, in his view, meant that FIFA was "free to offer, but not free to sell" a sponsorship in MasterCard's product category at any time prior to or during the 180 day period set out in the clause.  (Houseman Tr. 64/10-64/12, 85/17-85/24).   When asked what would happen if a third party that had been offered the sponsorship by FIFA proceeded to accept the offer prior to MasterCard exercising its rights under section 9.2, Mr. Houseman responded:  "We might have had a problem;"  namely, "MasterCard would be entitled to claim that we'd breached their first right to acquire."  (Houseman Tr. 66/4-66/13).   In that scenario, according to Mr. Houseman, it would be a "passive breach" on the part of FIFA, because "[i]t ended up that FIFA was, by virtue of the actions of a third party, unable to give the benefit of the first right to acquire."  (Houseman Tr. 69/3-69/11).  Mr. Houseman acknowledged that under his interpretation, MasterCard's rights under section 9.2 were therefore "contingent on the fortuitousness of a third party not accepting the offer from FIFA" or, in other words, "MasterCard's rights under section 9.2 were a matter of luck."  (Houseman Tr. 69/16-70/4, 114/24-115/1).    In that regard, Mr. Houseman's conclusions were accepted by Mr. Valcke and his sponsorship team and became the basis for FIFA's conduct described below.  (Schuster Tr. 24/3-24/8, 132/24-133/4; Valcke Tr. 55/7-56/2).

        41.     With respect to section 9.2's "restriction relating to 'comparable terms,'" Mr. Houseman wrote in his analysis that:  "*if FIFA wants to appoint VISA in relation to any of*

*MC's products,* it can only do so if the terms are comparable to the terms offered to MC."  (Pl.

Ex. 97; Pl. Ex. 56) (emphasis added).    VISA is the only company other than FIFA's then-

existing sponsors mentioned by name in Mr. Houseman's analysis.  Neither Mr. Houseman nor

Mr. Valcke could recall whether Mr. Valcke specifically asked Mr. Houseman to opine on

whether FIFA could enter into a sponsorship contract with VISA.  (Houseman Tr. 75/15-75/24,

76/5-76/7, 76/23-76/25, 77/13-77/21; Valcke Tr. 47/6-48/2). Mr. Valcke testified:  "Either it's:

yes, I have clearly asked him to put VISA in or he put VISA because it was the only one

competitor of MasterCard able to reach an agreement with FIFA."   (Valcke Tr. 47/6-48/2).

***FIFA Solicits VISA's Interest in a World Cup Sponsorship -- March 2004***

42.     While Mr. Valcke and his "Beyond 2006" team were in the later stages of

restructuring FIFA's sponsorship program, they decided to pursue VISA's interest as a potential

sponsor of the FIFA World Cup.  (Lampman Tr. 130/8-130/14).

43.     In or around March 2004, Robert Lampman, then a Sales Director of FIFA

Marketing & TV (and now co-Head of Business Development & Sales at FIFA) and a member

of Mr. Valcke's "Beyond 2006" team, without solicitation, called Michael Lynch, a VISA

representative involved in sports marketing, to arrange a meeting with him at an upcoming sports

marketing conference in California that both men were scheduled to attend.  (Lampman Tr. 78/9-

78/15, 81/14-82/10, 82/21-83/13, 85/2-85/18).

44.     Messrs. Lampman and Lynch met during the first week of March at the

conference in California.  (Pl. Ex. 55).  During the meeting, Mr. Lampman informed Mr. Lynch

that FIFA was restructuring its sponsorship structure and inquired about VISA's interest in

pursuing a World Cup sponsorship.  Mr. Lynch said that he was not certain but that the

opportunity to sponsor the FIFA World Cup would be one that would certainly elicit discussion

internally within VISA.  (Lampman Tr.  87/20-88/7, 88/11-88/18).   Mr. Lampman told Mr. Lynch that once FIFA had completed the restructuring of its sponsorship program, he would be back in touch to discuss sponsorship in more detail.  (Lampman Tr. 91/14-91/23).

        45.    Mr. Lampman followed up the meeting with an e-mail to Mr. Lynch on March 12, 2004 in which he thanked Mr. Lynch for meeting with him and confirmed FIFA's "interest in developing a relationship with VISA on an informal basis."  (Pl. Ex. 55).

***FIFA Sends Notice of Its Intent to Make an Offer to MasterCard -- July 2004***

        46.    In accordance with the provisions of section 9.2 of the Agreement, FIFA notified MasterCard, by letter dated July 14, 2004, of its intent to send out an offer concerning "marketing rights in relation to FIFA properties for the term 2007-2014" in not less than 90 days. (Pl. Ex. 86).

        47.    The letter, co-signed by Mr. Valcke and Eelco van der Noll, a former MasterCard employee who left to become Head of Marketing & Sponsorships at FIFA, acknowledged that "[i]n accordance with Section 9.2 of our agreement dated 26 November 2002, FIFA is required to give MasterCard 90 days' notice of its intention to present an offer to MasterCard for sponsorship rights to the competitions outlined in the agreement."  (Stuart Decl. ¶ 26; Pl. Ex. 86).   It then stated that "[t]herefore, this letter is intended to provide MasterCard with written notice that FIFA intends to make an offer to MasterCard outlining the package of marketing rights, the events covered, and the product category which FIFA proposes to offer" and "that this offer will not be made to MasterCard prior to 90 days from today."  (Stuart Decl. ¶ 26; Pl. Ex. 86).

        48.    During a meeting between Messrs. Valcke, Lampman and Van der Noll of FIFA, and Deborah Hughes of MasterCard, Ms. Hughes requested, and FIFA consented, to

postpone the time FIFA would present its written offer to MasterCard.  The reason Ms. Hughes

gave was that MasterCard needed preparation time so that it could respond to the expected

written offer within the 90-day time frame prescribed by Section 9.2.

     49.    In a September 30, 2004 e-mail, Ms. Hughes requested that FIFA "extend

you[r] visit date as far as you can" – meaning the date on which FIFA would arrive in New York

to deliver the written offer to MasterCard.  (Valcke Decl. ¶¶ 13-14).

### *FIFA and VISA Meet in Athens -- August 2004*

     50.    About a month after FIFA gave notice of its intent to make an offer to

MasterCard, on August 20, 2004, three senior members of FIFA's sponsorship team, Messrs.

Valcke, Lampman and van der Noll, met with Tom Shepard, Executive Vice President, Global

Merchant Partnerships & Global Sponsorship, of VISA, in Athens in the midst of the Olympic

Games.  (Lampman Tr. 92/18-92/25, 93/19-94/19).   The meeting was initiated by the FIFA

representatives, who were "pursuing to find out whether VISA had an interest" in a FIFA World

Cup sponsorship.  (Lampman Tr. 130/8-130/18).

     51.    The FIFA team explained to Mr. Shepard the nature of FIFA's new

sponsorship structure (consisting of three "Tiers" of sponsorship), the expected length of

sponsors' commitments (eight years) and the expected cost of the sponsorship ($225 million over

eight years).  (Lampman Tr. 94/25-95/9, 95/22-96/15; Pl. Ex. 142).

     52.    Mr. Shepard stated that VISA had been "burnt" in the past when pursuing

sponsorship of the FIFA World Cup and asked the FIFA representatives, "[w]hy VISA, why

now?"  (Pl. Ex. 142).  He told the FIFA team that FIFA should not pursue a relationship with

VISA unless there is a genuine opportunity for VISA to acquire the sponsorship.  (Pl. Ex. 142;

Lampman Tr. 96/25-97/11, 124/5-124/11).   Mr. Shepard specifically asked the FIFA

representatives whether MasterCard had any incumbency rights of which VISA should be aware. (Lampman Tr. 190/23-191/7).

53.     Mr. Valcke and his colleagues assured Mr. Shepard that "FIFA [is] free to engage in any commercial relationship it desires post 2006 for [television] and sponsorship" and that VISA would have a "genuine opportunity" to acquire the sponsorship.  (Pl. Ex. 142; Lampman Tr. 98/7-98/14).   They made no mention, even generally, of MasterCard's "first right to acquire,"  although they well understood that section 9.2 of the 2006 World Cup Sponsorship Agreement posed a legal impediment to FIFA's granting rights to VISA.  (Lampman Tr. 98/11-98/14, 98/21-100/2, 100/15-100/25, 101/15-101/22).   Mr. Lampman, who admitted that the FIFA team "misrepresented the truth" to Mr. Shepard, explained that he and his colleagues were "interested in ensuring that Mr. Shepard was interested in pursuing a partnership with FIFA" and thus "were not about to tell Mr. Shepard that MasterCard had any rights with respect to future sponsorship." (Lampman Tr. 127/4-127/25, 190/23-191/8).   According to Mr. Valcke, telling VISA that "FIFA was free to engage in any commercial relationship it desired" was a "commercial lie" that enabled FIFA to "keep the door open" with VISA.  (Valcke Tr. 73/3-73/23).

54.     Mr. Lampman followed up the Athens meeting with an e-mail three days later, thanking Mr. Shepard for meeting him and his colleagues in Athens and, on the assumption that VISA has "an appetite to further pursue a relationship with FIFA," proposing that their two teams meet in San Francisco the last week of November or first week of December.  (Pl. Ex. 53).

***FIFA "Offers" Sponsorship in the "Financial Services" Category to VISA -- December 2004***

55.     On December 9, 2004, Mr. Valcke (Director of FIFA Marketing & TV), Mr. Lampman (then Sales Director of FIFA Marketing & TV) and Stefan Schuster (then also FIFA Marketing & TV Sales Director and now co-Head of Business Development & Sales for

FIFA) met at VISA's offices in San Francisco with Mr. Shepard, Mr. Lynch and several other

VISA representatives.  (Lampman Tr. 160/22-163/13; Schuster Tr. 92/23-94/3; Pl. Ex. 69).

56.     During the meeting, the FIFA team made a slide and video presentation

promoting the benefits of sponsoring the FIFA World Cup, in general, and the 2010 FIFA World

Cup in South Africa, in particular.  (Schuster Tr. 94/4-94/25; Pl. Ex. 67).  The FIFA

representatives also presented to VISA the package of World Cup sponsorship rights in the

"financial services" category for the next eight years.  (Lampman Tr. 172/19-173/6; Schuster Tr.

95/7-95/14; Pl. Ex. 68).   The presentation, as FIFA co-Head of Business Development & Sales,

Mr. Schuster, admitted in testimony, was an "offer" by FIFA to VISA to be the "Tier 1" World

Cup sponsor in the "financial services" category for the period 2007 to 2014 at a price of $225

million.  (Schuster Tr. 95/18-95/23).  In his direct written trial testimony, Mr. Schuster testified

that "FIFA's negotiation team traveled to San Francisco to present FIFA's sponsorship strategy

to VISA," (Declaration of Stefan Schuster, executed on September 21, 2006 ("Schuster Decl.),

¶ 39), not to make an offer.  On cross-examination at trial, he was evasive but, after being

confronted with his deposition testimony, finally admitted that an offer had been made to VISA

on December 9, 2004.  (Trial Tr. p. 110, l. 12 – p. 115, l. 13).[3]

57.     In view of MasterCard's "first right to acquire," the Head of FIFA's

Commercial Legal Department, Tom Houseman, conceded under oath that it was a "mistake" for

FIFA to have offered the financial services category to VISA before FIFA offered it to

MasterCard.  (Houseman Tr. 108/13-108/16, 109/4-109/8, 109/22-110/2).

---

[3] As set out in part in these Findings of Fact, FIFA's witnesses were impeached time and time again.
Only the most egregious examples have been commented upon, but the trial transcript discloses
many others.  Although, as noted herein, portions of the FIFA witnesses' testimony were credible,
their testimony was generally not credible, based on their attitude and demeanor and the varying
degrees of impeachment they suffered.  In contrast, the MasterCard witnesses were credible, based
on their attitude and demeanor and all the other evidence in the case.

58.     Nevertheless, at no point during the meeting did anyone from FIFA alert the VISA team to MasterCard's "first right to acquire" and the impediment such right imposed on FIFA's ability to deliver the package of rights being offered to VISA. (Lampman Tr. 174/13-175/11; Schuster Tr. 96/3-96/6; Pl. Ex. 67).

***FIFA Misrepresents to VISA the Nature of MasterCard's Rights --Early January 2005***

59.      Following the meeting on December 9, 2004, the parties arranged to meet again in mid-January at VISA's offices in San Francisco.

60.     In advance of that meeting, on January 6, 2005, Christopher McCleary, an in-house attorney at VISA and one of the attendees at the December 9, 2004 meeting, called Robert Lampman, then Sales Director of FIFA, to assure himself that FIFA had no contractual obligations to MasterCard that might impede FIFA's ability to do a deal with VISA.  (Lampman Tr. 178/10-178/17; Pl. Ex. 26).

61.     As reflected in an e-mail that Mr. Lampman wrote the same day in which he recounted the conversation, Mr. McCleary directly asked Mr. Lampman what incumbency rights MasterCard had in its contract with FIFA and whether there were any rights of which VISA should be aware.  (Pl. Ex. 26).  Mr. Lampman responded:  "Our partner agreements do not provide for incumbency rights.  We have an obligation to present to MasterCard and we will, but there is nothing in our agreement with MasterCard that would prohibit us from doing a deal with VISA should we choose to do so."  (Pl. Ex. 26; Lampman Tr. 181/10-183/7, 192/4-192/21).

62.     As FIFA's representatives readily admitted under questioning, Mr. Lampman's statements to Mr. McCleary were simply false.  (Houseman Tr. 103/13-104/3; Lampman Tr. 181/10-183/7).   At trial, Mr. Schuster characterized the statements as a "white lie," (Trial Tr. p. 130, l. 3-11) adding that, in his opinion, "VISA does not even want . . . to know

the exact truth" because "if we tell him that there are incumbent rights and what it is, then he will

never get approval from any of his boss[es] to talk to us."  (Trial Tr. p. 130, l. 17 – p. 131, l. 5).

In any event, Mr. Schuster testified that "we wouldn't have told him anyways."  (Trial Tr. p. 131,

l. 11).

       63.    Yet at no time did any of FIFA's representatives -- Mr. Valcke, Mr.

Houseman or Mr. Schuster, who were recipients of Mr. Lampman's e-mail recounting the

conversation and who all were in frequent contact with VISA in the following days and months

-- ever disabuse VISA of the false impression that nothing in FIFA's agreement with MasterCard

constrained FIFA's ability to grant sponsorship rights to VISA.  (Houseman Tr. 96/21-98/23).

When asked why he "misrepresent[ed] the truth to Mr. McCleary," Mr. Lampman testified:  "it

was because it was beneficial to my commercial cause at that point in time." (Lampman Tr.

183/17-183/21).  At trial, Mr. Valcke conceded that he never instructed Mr. Lampman to correct

the falsehood because "it was the game."  (Trial Tr. p. 385, l. 13-24).

### FIFA Foresees No "Roadblocks" to Signing a Binding Letter of Intent with VISA -- Mid-January 2005

       64.    On January 14, 2005, the FIFA and VISA negotiating teams met again to

discuss FIFA World Cup sponsorship in the financial services category.  (Houseman Tr. 187/12-

187/25; Schuster Tr. 96/19-97/14).   Messrs. Valcke, Schuster and Houseman, for FIFA, and

Messrs. Shepard, McCleary and Christopher Katsuleres, for VISA, attended the meeting.

(Houseman Tr. 187/12-187/25; Schuster Tr. 96/19-97/14).

       65.    According to "minutes" of the meeting taken by Mr. Schuster, the

"meeting was held in a very good atmosphere and with a positive and productive spirit" and

"[d]iscussions about key matters . . . showed a very good common understanding on both sides."

(Pl. Ex. 70; Schuster Tr. 98/18-99/8).   Based on the "positive and productive" discussions, Mr.

Schuster concluded that he foresaw no "major roadblocks to possibly concluding a deal with VISA" -- notwithstanding that FIFA had yet to even offer the "financial services" package of rights to MasterCard, as required under section 9.2.  (Schuster Tr. 100/2-100/16, 101/7-101/12). When asked whether "by the end of your meeting with VISA on January 14th 2005, you saw no obstacles to doing a deal with VISA before you ever even presented the Financial Services category to MasterCard," Mr. Schuster testified:  "Yeah.  Absolutely correct."  (Schuster Tr. 101/7-101/12).

66.     In fact, the FIFA representatives told the VISA representatives that their objective was to have a "binding letter of intent signed" with VISA by June 2005.  (Houseman Tr. 189/1-189/4; Schuster Tr. 99/9-99/18; Pl. Ex. 70).

67.     As was the case in each of the prior meetings with VISA, no one from FIFA disclosed the fact that MasterCard had a "first right to acquire" the sponsorship rights that FIFA was seemingly committing to VISA.  (Schuster Tr. 101/24-102/2, 102/20-102/23).

68.     At the request of Mr. Shepard of VISA, the two teams agreed to arrange a meeting between FIFA's President, Joseph S. Blatter, and VISA's President, Christopher Rodrigues, in the near future.  (Schuster Tr. 102/20-104/5; Pl. Ex. 70).

***FIFA's and VISA's Top Executives Meet -- Late January 2005***

69.     Mr. Blatter and Mr. Rodrigues met in late January 2005 in Zurich around the time of the World Economic Forum in Davos, Switzerland.  (Blatter Tr. 26/7-28/23; Schuster Tr. 104/6-104/16, 105/3-105/6; Pl. Exs. 145 & 400).  The two executives had long known each other through activities with the Olympic Games.  Mr. Blatter is a member of the International Olympic Committee, and VISA has been a long-standing Olympics sponsor.  (Blatter Tr. 23/17-24/12).

70.     The two executives, joined by their respective senior sponsorship executives, Messrs. Valcke and Shepard, met over dinner.  (Blatter Tr. 26/7-28/23, 35/2-35/6, 36/5-36/21; Valcke Tr. 114/22-115/3, 115/23-116/6; <u>See</u> <u>also</u> Shepard Tr. 61/24-63; Pl. Ex. 400).  They met for about two hours to discuss their mutual interest in a partnership.   (Pl. Ex. 145).  Toward the end of the dinner, Mr. Blatter "expressed support" for the parties' discussions and "said that the potential of VISA being a partner would be welcomed." (Shepard Tr. 63/22-63/7).

71.     Following the meeting, Mr. Valcke wrote to Mr. Shepard that he believed the meeting "went well" and expressed his "hope" that "we share the same wish, to be partners soon!"  (Pl. Ex. 145; Valcke Tr. 122/12-122/23, 123-5-123/8).   It was clear, as Mr. Valcke admitted, that "things were falling into place between VISA and FIFA."  (Valcke Tr. 126/2-126/4).

***FIFA "Offers" Sponsorship in the "Financial Services" Category to MasterCard -- February 2005***

72.     After FIFA gave notice to MasterCard in July 2004 of its intent to make an offer, representatives of FIFA, from time to time, provided MasterCard with a "few details" about the new FIFA sponsorship structure, but did not present, as it had done to VISA, the package of rights.  (Valcke Tr. 87/10-87/20).

73.     In early February, 2005, more than 210 days after FIFA gave notice of its intent to make an offer to MasterCard and after FIFA had had at least five meetings with VISA, FIFA sent its sponsorship team to MasterCard's offices in Purchase, New York to present the "financial services" package of rights.

74.     On February 8, 2005, Messrs. Valcke, Schuster, Lampman and van der Noll met with John Stuart, Senior Vice President, Global Sponsorships of MasterCard, and his colleagues in the Global Sponsorship group, Deborah Hughes and Geraldine Cooper, to unveil officially FIFA's revised sponsorship structure and to "offer" sponsorship of the next two World

Cups in the "financial services" category to MasterCard.  (Stuart Decl. ¶¶ 1, 28; Schuster Tr. 86/12-86/16).

75.     The meeting was similar in substance to FIFA's meeting with VISA in December 2004.  The FIFA representatives presented largely the same multi-media presentation highlighting the benefits of sponsoring the FIFA World Cup, in general, and the 2010 FIFA World Cup in South Africa, in particular, that FIFA had presented to VISA.  (Schuster Tr. 88/22-89/5, 89/14-89/15, 89/17-89/21, 90/3-90/10, 90/22-90/24, 94/4-94/10; compare Pl. Ex. 65, with Pl. Ex. 67; Stuart Decl. ¶¶ 29-30).   They then presented to the MasterCard team the same package of sponsorship rights in the "financial services" category that they earlier had presented to VISA.  (Schuster Tr. 91/12-92/5, 95/7-95/14; compare Pl. Ex. 66, with Pl. Ex. 68; Stuart Decl. ¶ 31).

76.     The rights package was presented in the form of a document entitled "The FIFA Sponsorship Program 2007-2014," which, following a lengthy introduction, broadly outlined the "tangible benefits delivered by the FIFA Partnership, intended for inclusion in the FIFA Partnership Agreement."  (Pl. Ex. 66, § 5.2).   A copy of the FIFA Partnership Agreement was not attached.  Nor was any such agreement provided to the MasterCard representatives at or following the meeting.  (Schuster Tr. 92/6-92/10).   The document that the FIFA representatives did provide, "The FIFA Sponsorship Program 2007-2014," was not denominated an "offer," was not signed by anyone at FIFA and contained no signature line for acceptance by anyone at MasterCard.  Nor did it even outline such basic items as the definition of the "financial services" category for which the sponsorship opportunity was being presented.

77.     Nevertheless, the combination of the FIFA representatives' oral presentation, coupled with their written materials, made clear that the package of sponsorship rights that was being presented at the meeting differed significantly from the sponsorship rights

that had been granted to MasterCard in the 2006 World Cup Sponsorship Agreement.   (Stuart Decl. ¶¶ 31-32).

78.     The product category of "financial services" was far broader than the product category of "real and/or virtual payment and/or account access systems" in which MasterCard was sponsoring the 2006 FIFA World Cup.  The "financial services" category included not only payment cards but also core banking services, such as current accounts and commercial and mortgage lending, which were outside MasterCard's line of business.  (Stuart Decl. ¶ 31).  The length of the sponsorship commitment (eight years) was twice the length of the commitment for the 2006 FIFA World Cup.  (Stuart Decl. ¶¶ 31-32).  And, as a result of the broadening of the product category and lengthening of the term, the fee being sought, $225 million, was more than four times the amount that MasterCard agreed to pay in the 2006 World Cup Sponsorship Agreement.  (Stuart Decl. ¶¶ 31-32).  The rights being offered were also somewhat expanded in that, for example, they included certain rights to use FIFA's logo.[4]

79.     At some point during the course of the meeting, the FIFA representatives suggested that MasterCard would have 90 days to make its decision regarding the sponsorship package.  (Stuart Decl. ¶ 33).   The MasterCard representatives resisted that suggestion, telling

---

[4] As memorialized in Mr. Schuster's April 15, 2005 memorandum to Ms. Hughes:

> "You have clearly expressed your wish to enter into a single-term, 4-year deal, with a renewal right built in, and based upon your current renewal rights.  FIFA's view is that the terms of its offer with regard to 2007-2010 include an obligation to acquire 2011-2014, especially given the deep, long-term nature of the proposed involvement of MasterCard in the future."

(D. Ex. 24).  As the documents and the parties' subsequent conduct confirmed, FIFA required, and MasterCard acquiesced in, the application of section 9.2 to the package of advertising and sponsorship rights offered by FIFA in the "financial services" and "financial services light" packages, which were different from those granted in the Agreement and which were offered in connection with football competitions which will be held during the period 2007-2014, instead of in 2007-2010 as stated in section 9.2.

the FIFA team that, because of the expanded scope, length and price of the proposed sponsorship, the MasterCard team would have to undergo a substantial amount of work to analyze the proposal and could not be expected to receive a signed contract within 90 days.  In response, the FIFA representatives assured them that FIFA did not expect a signed contract within 90 days, but needed only an indication of MasterCard's assent to the proposal and its willingness to enter into good faith contract negotiations within the 90-day timeframe.  (Stuart Decl. ¶ 33).

80.    At no time during the meeting did anyone on the FIFA team disclose that they earlier had met with, let alone presented the "financial services" package to, VISA. (Schuster Tr. 44/12-44/14, 199/11-199/15; Valcke Tr. 145/9-145/18).

### FIFA Specifically Invokes MasterCard's 90-Day Exercise Period Under Section 9.2

81.    Prior to the February 8 meeting with MasterCard, FIFA's team gave careful consideration to section 9.2 and what FIFA was obliged to do under the clause in order trigger MasterCard's 90-day exercise period in connection with the "financial services" package.

82.    On the one hand, Mr. Valcke and his team wanted to "make it clear" to MasterCard, so that there would be "no confusion in MasterCard's mind," that the "clock would start to run on the 90 days" for MasterCard to exercise its right to acquire the "financial services" package.  (Valcke Tr. 146/2-147/2, 147/13-147/24).   Mr. Houseman thus advised Mr. Valcke that, at the meeting, the FIFA representatives should provide a "leave behind" that specifically "use[s] the word 'offer.'"  (Pl. Ex. 146).    Mr. Houseman explained that this step was "important because we needed MasterCard . . . to understand that the process we were pursuing was as defined in the contract."  (Houseman Tr. 342/25-343/11).

83.     On the other hand, there was concern within Mr. Valcke's group that if FIFA "explicitly reference[s] the word 'offer' on the leave behind, and MC [MasterCard] accept[s] the 'offer,' what MC will be accepting is what is set out in the leave behind, and, accordingly, the leave behind as a whole will become a binding contract between FIFA and MC."  (Pl. Ex. 147).   As Mr. Valcke admitted, he and his team did not want the "leave behind" to be "legally binding on FIFA."  (Valcke Tr. 448/8-448/16; See also Pl. Ex. 147).   One of Mr. Valcke's team members thus advised that the "way forward in this instance . . . [should be] to write a letter to MC making them an offer in accordance with clause 9.2 of the current Agreement which would  . . . set out the 'terms' and 'consideration' of the package of rights" to thus start the clock ticking.  (Pl. Ex. 147).

84.     As a result of these internal deliberations, and in an effort to make it clear to MasterCard that its rights were being triggered, about a week after the February 8 meeting, FIFA delivered a letter to MasterCard notifying it that the presentation of the rights package at the meeting constituted an "offer" and that, under section 9.2 of the Agreement, MasterCard would have 90 days from the date of the meeting to acquire the package of rights.

85.     The letter, from Jérôme Valcke to John Stuart dated February 14, 2005, acknowledged that "[i]n accordance with Section 9.2 of our existing agreement, FIFA must give MasterCard notice of its offer, setting out the terms and consideration payable in relation to the package of rights to be offered to MasterCard, for its product category, for the Partnership Agreement beyond the 2006 FIFA World Cup" and that "MasterCard shall have 90 days, from the date of the offer, to exercise its right to acquire the rights offered by FIFA."  (Pl. Ex. 27).   It then stated:  "This letter is therefore intended to provide MasterCard with written confirmation of

FIFA's offer, as presented to MasterCard on the 8th February 2005 in Purchase.  MasterCard's right to acquire the relevant rights expires on 8th May 2005."  (Pl. Ex. 27).

86.     Consistent with what the FIFA representatives told the MasterCard representatives during the February 8 meeting, Mr. Valcke's letter made clear that acceptance of the "offer" did not require the execution of a long-form contract.  Rather, the letter indicated that the rights being offered would be more specifically set out in a long-form agreement "should MasterCard accept FIFA's offer set out herein."  The letter did not specify, however, by what means MasterCard could "accept" FIFA's offer.   (Pl. Ex. 27).

87.     Mr. Houseman testified with respect to the February 14, 2005 letter that "it was important for MasterCard to understand that FIFA was pursuing the process under Section 9.2, that he "wanted to be clear that MasterCard would have 90 days from receipt of an offer to exercise its rights," that it was "important that both sides understood that [they] were operating under Section 9.2" and that he "wanted there to be no mistakes about it."  (Trial Tr. p. 313, l. 13-23).

88.     Internally, FIFA's team kept careful track of the 90-day period.   Messrs. Schuster and Lampman, then the two Sales Directors handling the negotiations, recorded the 90-day period in a "progress chart" they maintained concerning their dealings with MasterCard.  (Pl. Ex. 96; Lampman Tr. 231/19-232/23; Schuster Tr. 291/16-291/18, 293/15-293/22).   Next to the date, "8 February 2005," they noted:  "The 90 days notice of FIFA's offer in relation to the Tier 1 FIFA Partner rights package for the period 2007-2014 was given to MC orally on the date of the presentation."  (Pl. Ex. 96).   Across from the date, "14 February 2005," they wrote:  "Offer open for 90 days."  (Pl. Ex. 96).

89.     In fact, so closely did they follow the 90-day period that Messrs. Schuster and Lampman were able to recall at their depositions, without any refreshment of their recollections, the precise date (May 8, 2005) and day of the week (Sunday) on which the 90-day period was set to expire.  (Lampman Tr. 232/11-232/18; Schuster Tr. 31/17-31/24).

***FIFA Negotiates Along Two Tracks with VISA and MasterCard, Yet Misleads MasterCard Into Believing that MasterCard Had an "Exclusive Negotiation" Period -- February to May 2005***

90.     During the weeks following the February 8 meeting in Purchase, the FIFA sponsorship team of Messrs. Valcke, Schuster, Lampman and Houseman proceeded on two fronts.  (Valcke Tr. 144/3-144/20).

91.     Negotiations progressed rapidly with VISA, such that, on February 17, 2005, less than ten days after MasterCard was first presented with the "financial services" package, Mr. Valcke wrote to Mr. Shepard of VISA that "[s]hould negotiations continue along the lines as they have until now I could expect, and strongly recommend, that VISA and FIFA enter into an agreement."  (Pl. Ex. 415).   On February 25, Mr. Valcke followed up with Mr. Shepard: "Waiting to receive your confirmation we have a deal!!!!" (Pl. Ex. 149).   To his colleagues at FIFA, Mr. Valcke trumpeted:  "Soon we will receive a call asking for a signature date!!!!"  (Pl. Ex. 150; See also Schuster Tr. 123/19-123/25).   At the same time, Mr. Valcke cautioned:  "But a deal is not done or can collapse before, so yes we have to play careful with MC [MasterCard]."  (Pl. Ex. 150).   Mr. Valcke explained that what he meant was, "we have to be careful in the way we are dealing with VISA to make sure that if MasterCard finally say: no, we have no interest, VISA will not use that fact we are pushing away the date of the signature to say: oh guys, sorry but the deal is over."  (Valcke Tr. 144/3-144/15).

92.     Meanwhile, consistent with Mr. Valcke's direction to "play careful with" MasterCard until "a deal is . . . done" with VISA, FIFA's representatives responded to the ongoing inquiries of MasterCard concerning the specifics of the sponsorship proposal, while MasterCard -- completely unaware of FIFA's negotiations with VISA -- engaged in the process of internally analyzing and reviewing with the financial institutions in its network, the new "financial services" package.  (Stuart Decl. ¶ 36).

93.     Not once during this time did any of the FIFA representatives disclose to their counterparts at MasterCard that FIFA had offered and was negotiating with VISA over the same rights package that FIFA had presented to MasterCard.   (Schuster Tr. 199/11-199/15).

94.     Instead, FIFA's negotiating team misled Mr. Stuart and his team into believing that MasterCard was in a 90-day "exclusive negotiation period" with FIFA.   Mindful of the 90-day exercise period that FIFA had invoked in Mr. Valcke's February 14, 2005 letter and that the deadline FIFA imposed was a Sunday, May 8, 2005, Mr. Stuart requested that the 90-day "exclusive negotiation" period be extended by three days, until May 11, 2005, so that MasterCard could respond to the "financial services" package during a business day.  (Stuart Decl. ¶ 37; Houseman Tr. 154/19-155/2, 156/13-157/3; Schuster Tr. 31/17-31/22, 253/25-253/254/8).   FIFA's response to this request was to send a letter -- prepared by Mr. Houseman, signed by Mr. Valcke and transmitted by Mr. Schuster -- under the subject heading "Exclusive Negotiation Period," stating that "FIFA agrees to your request to extend MasterCard's exclusive negotiation period under our current agreement."  (Pl. Ex. 28; Pl. Ex. 76; Houseman Tr. 155/3-155/13; Schuster Tr. 131/15-132/12; see also Pl. Ex. 79 (referring to "an exclusive negotiation period over the last three months")).

95.     In fact, as FIFA's representatives admitted, MasterCard was not in any "exclusive negotiation period" because FIFA was simultaneously and aggressively negotiating with VISA.  (Schuster Tr. 132/13-132/15, 148/1-148/13; Houseman Tr. 155/7-155/9; Valcke Tr. 466/8-467/5).   Nevertheless, the FIFA negotiators referred to the period as such because they did not want to disabuse Mr. Stuart of the "error of his ways" in believing that MasterCard was enjoying  "exclusive" negotiations with FIFA.  (Houseman Tr. 155/18-155/22).

96.     In contrast to what Mr. Stuart was led to believe, the reality was that during the 90-day period from February 8 to May 8, 2005 when MasterCard was contractually entitled to a "*first* right to acquire" the "financial services" package, Mr. Valcke "had two negotiations to run."  (Valcke Tr. 144/3-144/20).   His goal, he admitted, was "to go to the [FIFA Marketing & TV] Board with two signed agreements" from VISA and MasterCard and enable the Board to choose which agreement to accept.  (Valcke Tr. 135/18-137/14).   Mr. Valcke conceded, however, that he would be unable to achieve that goal during MasterCard's 90-day exercise period.  (Valcke Tr. 136/20-137/14).  So he and his team, as he admitted, "wanted to stall everything until the 90 days had run."  (Valcke Tr. 136/13-136/15; see also Pl. Ex. 291). In the case of VISA, with which negotiations were proceeding rapidly, Mr. Valcke admitted that he wanted to "keep them hot, keep them interested, keep them enthusiastic, be encouraging, but slow them down until the 90 days expired."  (Valcke Tr. 145/3-145/8; see also Pl. Ex. 148 ("Let's hope VISA . . . will not speed up their internal process")).

**Both VISA and MasterCard Reject the "Financial Services" Package; So FIFA Revises the Package -- May 2005**

97.     On May 11, 2005, the date to which MasterCard's response period had been extended, Mr. Stuart and Ms. Hughes of MasterCard met in Zurich with Messrs. Valcke,

Schuster, Houseman and Lampman to discuss MasterCard's response to the 'financial services" proposal.  (Stuart Decl. ¶ 37; Lampman Tr. 207/10-208/10; Schuster Tr. 124/4-124/20).

98.     Mr. Stuart explained that the combination of doubling the term of the sponsorship from four to eight years and expanding the scope of the product category to "financial services," which included products and services not offered by MasterCard, had made MasterCard's task in evaluating the sponsorship proposal more difficult and time-consuming than in years past.  (Stuart Decl. ¶ 31; Lampman Tr. 208/11-208/19).  He related that the new structure effectively required MasterCard to syndicate the banking services component of the sponsorship to its associated banks and that, therefore, MasterCard had devoted almost the entire 90-day period to discussions with banks.   (Stuart Decl. ¶ 31; Lampman Tr. 208/11-208/19).  The problem with syndication, he explained, is that MasterCard could "pass through" rights to some, but not all, of its member banks.  (Pl. Ex. 79).

99.     Mr. Stuart told the FIFA representatives that, after undertaking an extensive evaluation, MasterCard determined that it could not adequately exploit the "financial services" category to justify the price of the sponsorship.  (Stuart Decl. ¶ 31; Lampman Tr. 208/11-208/19).   Accordingly, Mr. Stuart informed the FIFA team that MasterCard was rejecting the "financial services" proposal.  (Lampman Tr. 208/20-208/24, 209/14-209/18; Schuster Tr. 124/21-124/24, 125/3-125/11).  Thus, MasterCard requested the extension in the response period in order to reject the offer in a timely manner.  (See Trial Tr. p. 138, l. 8 (Mr. Schuster so acknowledging)).

100.     Nevertheless, Mr. Stuart made it clear to Messrs. Valcke, Schuster, Houseman and Lampman that MasterCard was still interested in continuing its relationship with FIFA.  (Stuart Decl. ¶ 37).  He suggested that the parties arrange to meet again to discuss an

alternative proposal that would exclude banking services from MasterCard's category and thus would allow MasterCard to buy only that which it could use, while, at the same time, enabling FIFA to exploit separately, on a region by region basis, the banking services sub-category. (Stuart Decl. ¶ 37).

101.    Both sides agree in this proceeding, and understood at the time, that once MasterCard rejected the "financial services" package of rights, FIFA was free, at that point, to grant the rights on comparable terms to another party.  (Stuart Decl. ¶ 40; Houseman Tr. 145/10-145/14; Schuster Tr. 125/25-126/3).   By that time, however, the only other party to which the "financial services" package had been presented, VISA, also had rejected the proposal, for the same reasons as MasterCard.  (Pl. Ex. 77; Lampman Tr. 210/6-210/24; Schuster Tr. 129/5-129/13, 130/4-130/8).

102.    In light of the rejections from both VISA and MasterCard, FIFA's sponsorship team determined to "refine [its] approach to the Financial Services category."  (Pl. Ex. 77; Schuster Tr. 135/10-135/20).  They explored a number of options.  (Pl. Ex. 77).  Within a matter of days, Mr. Valcke's team decided that the best approach would be to restructure the rights package, such that FIFA would retain the right to exploit banking services in the country hosting the FIFA World Cup.   By restructuring the package, which they denominated "financial services light,"  FIFA was able to reduce significantly the rights fee being sought from the category sponsor to $180 million from $225 million, eliminate the sponsor's responsibility to syndicate host country banking rights and give FIFA the ability to exploit the host country banking rights separately.  (Schuster Tr. 145/12-146/4; Pl. Ex. 77).   Mr. Valcke's team decided to present the revised package, which drew largely upon Mr. Stuart's comments, to both VISA and MasterCard.

***Section 9.2's Applicability to the "Financial Services Light" Package***

103.    Both parties agree in this proceeding that the "financial services light" package was a "new offer" or "second offer."  (Stuart Decl. ¶ 41; Houseman Tr. 145/22-145/24; Schuster Tr. 22/6-24/8, 145/1-145/3).  They also agree that because it was a new offer, MasterCard's rights, and FIFA's obligations, under section 9.2 were re-triggered, including FIFA's obligation to give MasterCard 90 days written notice of its intent to make a new offer. (Stuart Decl. ¶ 41; Houseman Tr. 116/22-117/3; Lampman Tr. 216/13-217/6); Schuster Tr. 23/8-23/15, 145/4-145/9, 194/13-194/19).

***FIFA Meets with VISA and "Offers" It the "Financial Services Light" Package -- May 2005***

104.    On May 23, 2005, Messrs. Valcke and Schuster met with Messrs. Shepard and McCleary at VISA's offices in San Francisco to present or "offer" the "financial services light" package to VISA.  (Schuster Tr. 155/2-155/16, 155/20-156/5; Pl. Ex. 81).

105.    As he did with respect to the "financial services" offer, in his written direct testimony Mr. Schuster did not say that FIFA "offered" the "financial services light" package to VISA at the May 23, 2005 meeting in San Francisco.  Instead, he stated that the FIFA team met with the VISA team "to put the revised Financial Services Light concept under the microscope."  (Schuster Decl. ¶ 61).  Upon cross examination, he was confronted with his deposition testimony wherein he testified that FIFA did "offer" the "financial services light" package to VISA on May 23 and that offering it to VISA before offering it to MasterCard was somehow for MasterCard's benefit.  In response, although conceding that an "offer" was made to VISA (Trial Tr. p. 117, l. 1-5), he testified evasively, saying, for example, that FIFA "verbally guided VISA through these revised changes," (Trial Tr. p. 119, l. 1-2), and that "I said ultimately I think it was to MasterCard's benefit that we did that.  It is also – as I said, it's also to FIFA's

benefit to understand what is in the market, and with what kind of position we can talk to our partners at MasterCard."  (Trial Tr. p. 120, l. 8-12.)  Mr. Schuster's credibility was damaged by this testimony resisting the concession that FIFA in fact made an "offer" to VISA on May 23 and by his incredible testimony to the effect that it was for MasterCard's benefit that FIFA "offered" the "financial services light" package to VISA first.  (See Trial Tr. p. 117, l. 1 – p. 120, l. 12).

106.    The meeting, from the FIFA team's perspective, "went quite well."  (Pl. Ex. 85).    After discussing the scope and price of the new package and VISA's initial reaction to it, the FIFA team told Messrs. Shepard and McCleary that if they could get approval from VISA management of the package before the next meeting of the Board of Directors of the FIFA Marketing & TV (the "FIFA Board") on June 27, 2005, the FIFA Board "could approve the deal."  (Pl. Ex. 85; Schuster Tr. 169/8-169/12, 169/16-169/21, 169/24-170/18).

107.    Under questioning, Mr. Schuster admitted that, in light of MasterCard's rights under section 9.2 of the Agreement, the FIFA Board, in fact, could *not* approve a deal with VISA at the Board meeting on June 27, 2005 and that his and Mr. Valcke's assurances to the contrary were "not correct."  (Schuster Tr. 168/22-169/6, 171/4-171/19).  When asked if he was aware, when he told Mr. Shepard that the FIFA Board could approve a deal with VISA on June 27, that section 9.2 prohibited such approval, Mr. Schuster responded:  "I didn't think about it." (Schuster Tr. 174/2-174/8).

108.    Mr. Houseman, Head of FIFA's Commercial Legal Department, added that, in light of MasterCard's rights under section 9.2, it was a second "mistake" for FIFA to offer the "financial services light" package (as it had offered the "financial services" package) to VISA before offering the package to MasterCard.  (Houseman Tr. 113/18-114/3).

***FIFA Meets with MasterCard and Offers It the "Financial Services Light" Package -- May 2005***

109.    On May 25, 2005, two days after presenting the package to VISA, Messrs. Schuster and Lampman met with John Stuart and Deborah Hughes in Istanbul, Turkey, to "verbally convey" the $180 million "financial services light" package to MasterCard. (Schuster Tr. 144/7-144/25, 162/22-162/25; Stuart Decl. ¶ 43).

110.    The FIFA representatives made no mention of their earlier meeting with VISA.  (Schuster Tr. 163/5-163/8, 199/11-199/15).  In fact, they led Mr. Stuart and Ms. Hughes to believe that they were presenting the "financial services light" package exclusively to MasterCard.   For example, in a follow-up memo to Mr. Stuart several days later, Mr. Schuster explained that FIFA had developed the "financial services light" proposal with the specific assumptions in mind that "MasterCard is seriously interested in a Tier 1 FIFA Partnership," that "FIFA highly values the long-standing partnership with MasterCard" and that FIFA, thus, "is interested in finding the best possible solution for both parties."  (Pl. Ex. 79).

111.    The MasterCard team informed Messrs. Schuster and Lampman that they were encouraged by FIFA's changes to the rights package but they would need to evaluate the concept further before giving FIFA a response. (Stuart Decl. ¶ 43).  Mr. Schuster and Mr. Lampman requested that "within a week or 10 days we should have their feedback."  (Schuster Tr. 160/22-161/4.    They imposed no other deadline on a response from MasterCard to the revised package.  (Schuster Tr. 160/22-161/4.  Unlike what they had told the VISA team two days earlier, the FIFA representatives did not tell the MasterCard team that their goal was to present an agreement to the FIFA Board by the June 2005 meeting.   (Compare Pl. Ex. 81, with Pl. Ex. 79).

***FIFA Does Not Give Notice of Its Intent to Make a Revised Offer or of Any Intent to Invoke MasterCard's 90-Day Exercise Period under Section 9.2***

112.   In contrast to FIFA's conduct in connection with the "financial services" package, FIFA did not invoke, and took no visible steps to comply with, section 9.2 in connection with the "financial services light" package.

113.   As set out above, prior to presenting the "financial services" package to MasterCard at the February 8, 2005 meeting, FIFA, specifically citing section 9.2, provided to MasterCard written notice of its intent to make an offer.  In connection with the "financial services light" package, in contrast, while FIFA's representatives conceded that section 9.2 required FIFA to give MasterCard 90 days' written notice of its intent to make an offer, no such notice was given. (Houseman Tr. 116/22-117/3; Schuster Tr. 192/6-192/20, 194/13-194/19; Stuart Decl. ¶ 45).

114.   Likewise, as set out above, in connection with the "financial services" package, FIFA deliberated over how to "make it clear" to MasterCard when the "clock would start to run on the 90 days" for MasterCard to exercise its right (under section 9.2) to acquire the package because it "was important for MasterCard to understand that FIFA was pursuing the process under Section 9.2" and FIFA "wanted it to be clear that MasterCard would have 90 days from receipt of an offer to exercise its rights" and decided to deliver to MasterCard a letter specifically confirming that the presentation at the February 8 meeting was an "offer" under section 9.2 and that MasterCard would have 90 days within which to exercise its rights to acquire the package.   No such letter was delivered to MasterCard following presentation of the "financial services light" package at the May 25, 2005 meeting.  (Houseman Tr. 145/25-146/6, 148/5-148/10, 150/17-150/23; Stuart Decl. ¶ 45).

115.   FIFA did follow up the May 25 meeting, as it did its meeting with VISA on May 23, with a letter.  (Pl. Ex. 79).  But the letter makes no reference to section 9.2.  Nor does

it indicate that MasterCard would have any deadline, let alone 90 days, for accepting the package

of rights.  It merely echoes the statements made by Messrs. Schuster and Lampman at the

meeting that they were "looking forward to receiving [MasterCard's] initial feedback" within a

matter of days.  (Pl. Ex. 79).   When asked why neither that letter nor any other letter notified

MasterCard that it would have 90 days to acquire the "financial services light" package, the Head

of FIFA's Commercial Legal Department, Tom Houseman, could provide no explanation.

(Houseman Tr. 145/25-145/6, 149/4-149/8, 149/23-150/5, 150/12-150/16).

116.    Section 9.2's "90+90" day period simply was not discussed between the

parties in connection with the "financial services light" package.  (Lampman Tr. 224/3-224/12,

229/14-229/20, 231/9-231/19, 240/6-240/11; Schuster Tr. 26/19-27/13, 160/22-161/4; Stuart

Decl. ¶¶ 45-47).   As the witnesses on both sides explained, the parties' silence regarding the

"90+90" day period was a function of changed circumstances.

117.    From FIFA's perspective, as Mr. Lampman testified, FIFA was "less

bullish . . . as to what was in the marketplace."  (Lampman Tr. 233/24-234/16).   Despite their

earlier optimism that VISA would agree to become the "financial services" sponsor for

$225 million, Mr. Valcke and his team learned that VISA was not as committed to the

sponsorship, at least not at FIFA's asking price, as they initially believed.  Thus, in contrast to

the situation in February 2005, when Mr. Valcke and his team expected, at the time they

presented the "financial services" package to MasterCard, "that VISA and FIFA [would] enter

into an agreement" after MasterCard's 90-day exercise period expired, the situation in late May

2005, when the FIFA team presented the "financial services light" package to MasterCard, was

that the FIFA negotiators "didn't at that point in time have a view that there was another party

we were interested in contracting with" when MasterCard's 90-day "clock expired."  (Lampman Tr. 232/24-233/12).

118.     Accordingly, as Mr. Lampman explained, FIFA was "in a position where we felt that it was not of great benefit to hamper discussions or cloud discussions by pointing out to a partner [MasterCard], by the way, we're working against this clock."  (Lampman Tr. 232/24-233/12).   Or, as Mr. Schuster put it in his testimony:  "It would be rather counterproductive, from a sales and relationship perspective to again rub it and say:  there's a certain deadline, hurry up."  (Schuster Tr. 27/25-28/20).   The bottom line, as Mr. Lampman admitted, was that "it was not in FIFA's commercial interests to notify MasterCard that MasterCard had 90 days within which to accept the . . . financial services light offer." (Lampman Tr. 235/17-235/22).  Moreover, as Mr. Schuster admitted, "given the circumstances after the second offer, . . . FIFA had no intention of holding MasterCard to the 90-day deadline." (Schuster Tr. 181/6-181/16; see also 180/3-180/5).

119.     Mr. Schuster was entirely impeached with respect to his testimony that the 90-day acceptance period for MasterCard was applicable to the "financial services light" package, and his attitude and demeanor while testifying was unconvincing.  For example, in May, at the time that package was offered to MasterCard, Mr. Schuster did not understand Section 9.2 to be applicable at all, did not think about Section 9.2 when the offer was made to MasterCard on May 25, and it was only upon receiving Mr. Stuart's June 19, 2005 e-mail that he even considered that possibility.  (See Trial Tr. p. 140-144).

120.     Mr. Stuart's testimony that when he wrote in his June 19, 2005 e-mail that "our evaluation process this time around will be entirely different than that of round 1 when the entire 90-day period was taken up with the bank solicitation process," he was referring to the 90-

day period from February 8 to May 8, 2005, (Tr. 18-19) that is, the acceptance period applicable to the "financial services" offer, is entirely credible.

121.    In light of Mr. Schuster's unconvincing testimony on this topic and the other undisputed facts, Mr. Schuster's testimony to the effect that MasterCard acknowledged the applicability of the 90-day acceptance period in Mr. Stuart's June 16, 2005 e-mail is rejected. (Schuster Decl. ¶ 54, Trial Tr. p. 134-144).

122.    Mr. Schuster's testimony that "when we made the 'Financial Services Light' offer, the situation was different than towards the end" (Trial Tr. p. 137, l. 21-22), that the first meeting to discuss the "financial services light" package was scheduled for a month after Mr. Schuster now says the 90-day deadline had passed (Trial Tr. p. 139, l. 1-6), and that "[f]or [FIFA] it was better to have it this way," that is, without a 90-day period in which MasterCard had to accept the offer, because [w]e felt by that time, end of August, mid of August, end of August, that we're on track . . . " does lend itself to belief.  (Trial Tr. p. 139, l. 11-17).

123.    Similarly, because he was impeached on this issue, Mr. Houseman's trial testimony to the effect that FIFA did not send a letter to MasterCard invoking Section 9.2 with respect to the "financial services light" offer because MasterCard had requested an offer is not credible.  (Trial Tr. p. 314-316).

124.    From MasterCard's perspective, there also was no reason for it to raise section 9.2's 90+90-day period.    Mr. Stuart reasonably believed that FIFA was presenting the "financial services light" package exclusively to MasterCard.  (Stuart Decl. ¶ 46).   And because, in contrast to February 2005, FIFA did not invoke section 9.2's 90-day exercise period or impose any other deadline on MasterCard when FIFA presented the revised package, Mr. Stuart did not even consider whether section 9.2's 90-day exercise period applied.  (Stuart Decl. ¶ 45).

125.   Mr. Stuart's testimony that he was not aware of any 90-day limit on the time for MasterCard to accept the "financial services light" offer because the negotiations were in an "entirely different" context is entirely credible (Trial Tr. pp. 20-24) as is his testimony that the "context was entirely different" because FIFA had gone to the open market, and the financial services offer had not been accepted, because FIFA "came back and said to me clearly, we listened to you, we want to do business with you, you've been our partner for all these years, we want to go ahead" and because of "the body language [and] the conversations." (Trial Tr. pp. 21-23). Also credible was his testimony that "[i]f [FIFA] had taken any steps to invoke a 90-day process, we certainly would have reacted to it." (Trial Tr. p. 21, l. 17-19).

126.   Mr. Schuster's testimony that at no time did anyone from FIFA tell him that MasterCard had 90 days to accept the "financial services light" offer or otherwise mention section 9.2 with respect to the "financial services light" offer is entirely credible. (Trial Tr. p. 67-68).

127.   Mr. Schuster's testimony to the effect that there was no reason for Mr. Stuart and his team to think about section 9.2's 90-day acceptance period is credible.  Mr. Schuster testified:  "Because we had an ongoing business relationship. We know there is an interest from MasterCard.  We knew we had put forward a package that was interesting for them. We had all the positive feedback.  We had no intention to sell to anybody else." (Schuster Tr. 32/22-33/6).  "Because there was no -- at the time, there was no intention . . . to do anything else but do a deal with MasterCard, . . . the 90 days were not so relevant for us." (Schuster Tr. 23/16-24/2, see also 180/6-180/20).

128.    In contrast to their actions in connection with the "financial services"

package, the parties simply did not contemplate, and FIFA did not invoke, any 90-day deadline

for acceptance of the "financial services light" package.[5]

**_FIFA Delivers Draft Long-Form Agreements, first to VISA then to MasterCard -- August 2005_**

129.    Following a period of several months during which both VISA and

MasterCard internally reviewed FIFA's revised sponsorship package, FIFA circulated, for the

first time, draft long-form agreements to both companies.  Consistent with its prior pattern of

conduct, FIFA provided the draft long-form agreement to VISA before it provided it to

MasterCard.  (Schuster Tr. 167/1-167/5).

130.    FIFA delivered the first draft of a long-form agreement to VISA on

August 22, 2005. (Schuster Tr. 165/21-166/14; Pl. Ex. 84).  Several days later, on August 26,

2005, FIFA transmitted the first draft long-form agreement to MasterCard.  (Schuster Tr. 164/9-

165/7; Pl. Ex. 83), three days before FIFA now contends MasterCard's 90-day acceptance period

---

[5]  Thus, in contrast to their earlier behavior, Messrs. Schuster and Lampman did _not_ note in their MasterCard "progress chart" that the May 25, 2005 presentation of the "financial services light" package triggered a 90-day exercise period.  (Schuster Tr. 292/15-294/3).  And, whereas they knew and were able freely to recall in deposition testimony the exact date when the 90-day period following the "financial services" presentation expired, neither Mr. Schuster nor Mr. Lampman could identify the specific date when the 90-day period following the "financial services light" package was supposed to expire, (Lampman Tr. 231/20-232/6, 232/11-233/12; Schuster Tr. 31/17-32/11, 48/16-49/1), and Mr. Schuster was not able to identify any indication, other than Mr. Stuart's June 16, 2005 e-mail on which Mr. Schuster was impeached, that MasterCard was aware of any 90-day acceptance period as to the "financial services light" package.  (See Trial Tr. p. 135, l. 13-18).  Likewise, while Mr. Stuart took the deliberate step of seeking a three-day extension of the 90-day period following the presentation of the "financial services" package, he never requested any extension in connection with the "financial services light" package.  (Schuster Tr. 253/25-254/16).  As Mr. Stuart attested, "[h]ad Mr. Schuster or anyone with FIFA ever indicated, as they did earlier in the year in connection with the original 'financial services' package, that MasterCard had 90 days to accept the 'financial services light' package, I and my team would have ensured, as we did earlier, that MasterCard either complied with that time frame or received an extension of time from FIFA."  (Stuart Decl. ¶ 48).

expired.  Mr. Schuster confirmed at trial that FIFA controlled when draft contracts were sent out.

His testimony that in sending the first draft long-form agreement to MasterCard three days

before the supposedly applicable 90-day deadline expired FIFA intended in good faith that the

deadline apply was wholly incredible.  (See Trial Tr. p. 168, l. 5 – p. 170, l. 2).

   131. Mr. Stuart's testimony that the various dates for "next steps" (e.g., Trial

Tr. 33, 39, 42-43, 44-45, 71-74) given by FIFA to MasterCard with respect to the "financial

services light" offer were "movable target date[s], (Trial Tr. p. 39, l. 15), not drop dead dates,

and that FIFA was well aware and accepted that the reason the dates were not complied with was

because the legal terms were still working was entirely credible.  (Trial Tr. 45, 72-74).

### FIFA's Double Standard of Disclosing to VISA Negotiations with MasterCard but Concealing from MasterCard Negotiations with VISA -- August and September 2005

   132. During the months of contract negotiations that followed FIFA's

circulation of a draft long-form agreement, FIFA applied a clear double standard with respect to

the information it disclosed to VISA and MasterCard concerning the existence and status of its

negotiations with the other company.   Whereas Mr. Valcke and his team consistently were open

with VISA regarding the status of their negotiations with MasterCard, they did not disclose to

MasterCard that FIFA was engaged in contract negotiations with VISA.

   133. The next meeting of the FIFA Board following circulation of the draft

long-form agreements was scheduled to take place on October 26, 2005.  In advance of that

meeting, as Mr. Valcke testified, Mr. Shepard and his colleagues at VISA "kn[e]w exactly where

we are with MasterCard; that we're in negotiations with MasterCard and that MasterCard will

also have an agreement signed on the table and will have to make a choice."  (Valcke Tr. 171/5-

171/15; Pl. Ex. 152).

134.    MasterCard was given none of this information.   Prior to the parties' first contract negotiation session in Brussels in late September 2005, no one from FIFA had disclosed to Mr. Stuart or his team that FIFA was engaged in sponsorship discussions with VISA.  (Schuster Tr. 199/11-199/15).  Mr. Schuster recommended to his team that FIFA be frank with MasterCard about their discussions with VISA, but, after internal discussions, Mr. Schuster "was easily convinced that it's not a good idea" (Trial Tr. p. 152, l. 18-21), and the FIFA negotiating team decided not to disclose their VISA discussions to MasterCard.  (Schuster Tr. 202/3-202/11; Pl. Ex. 151).

135.    When asked to explain FIFA's decision, Mr. Schuster likened the situation to a marital infidelity.  He testified:  "Well, if you tell your wife that you're cheating on her, it's a disruption of your marriage.  If she doesn't know about it until the end, and you live happily until 90 and it was just one occasion, then maybe it's the better way.  And we choose this one. Whether it's something that higher forces will one day see as: you should have been more honest maybe, I don't know.  In our [sic], we felt we do not have to tell it.  We don't have to, there is no obligation to.  I thought -- as you rightly stated, I thought it would be better to tell it.  The majority of our team:  no, maybe it's not better to do it or if then in a subtle way.  So we decided not to."  (Schuster Tr. 202/24-203/18; Trial Tr. p. 153, l. 1-15).

***MasterCard Confronts FIFA with Rumors of a VISA Deal and Receives Assurances that FIFA "Will Not Sign a Deal with Anybody" -- September 2005***

136.    Despite FIFA's decision to conceal its discussions with VISA from MasterCard, by September 2005, rumors of FIFA's and VISA's dealings began to circulate in the marketplace.   Mr. Stuart became aware of those rumors, for the first time, in the beginning of that month.    Mr. Stuart read or heard a report originating from Asia that FIFA and VISA had signed a sponsorship deal for the 2010 and 2014 World Cups, and he confronted Mr. Valcke with

that rumor.  (Stuart Decl. ¶ 53).    This was the first time that VISA was discussed between the two parties.  (Schuster Tr. 207/24-208/2).

137.    Mr. Valcke told Mr. Stuart that there was no truth to the rumor and that FIFA was looking forward to its first contract negotiation with MasterCard on September 26 in Brussels, (Stuart Decl. ¶ 53), a month after FIFA now contends MasterCard's 90-day acceptance period expired.   As he admitted in his testimony, Mr. Valcke also assured Mr. Stuart that "FIFA would not enter into an agreement with regard to the Financial Services package for 2007-2014 unless and until it concluded that it could not reach an agreement with MasterCard."  (Valcke Tr. 176/18-176/23; Trial Tr. p. 380, l. 15-20).  Mr. Valcke then said to Mr. Stuart "[l]et's just keep negotiating in good faith until we reach a deal," and "by October 31, 2005, MasterCard was at [FIFA's] asking price of 180 million dollars," and "VISA was nowhere near that figure." (Trial Tr. p. 380, l. 21 – p. 381, l. 3).

138.    Mr. Valcke's assurance was reiterated by Mr. Schuster several days later in writing.  On September 15, 2005, Mr. Stuart sent an e-mail to Mr. Schuster regarding the parties' upcoming negotiation in Brussels.  (Stuart Decl. ¶ 27; Pl. Ex. 87).  Mr. Stuart recounted the rumor he had heard regarding VISA and Mr. Valcke's denial of it.  (Stuart Decl. ¶ 27; Pl. Ex. 87).  Mr. Stuart wrote that, while he could understand that "VISA may have placed a bid," he considered that MasterCard and FIFA were "in negotiations" and trusted that such was Mr. Schuster's view, as well.  (Stuart Decl. ¶ 27; Pl. Ex. 87).

139.    Mr. Schuster responded by e-mail the next day.   After cryptically stating that "we are now in a kind of open market situation," Mr. Schuster confirmed that "we definitely do not have a signed deal with any other company for the remaining sixth [and final Tier 1 sponsorship] spot."  (Stuart Decl. ¶ 54; Pl. Ex. 88).  He then reiterated:  "As Jérome has

confirmed to you on the phone, we will not sign a deal with anybody before knowing whether we can reach an agreement with you."  (Stuart Decl. ¶ 54; Pl. Ex. 88; Schuster Tr. 204/24-205/23, 207/24-209/6).

      140.   Mr. Schuster testified that, when he made that representation to Mr. Stuart, he was giving Mr. Stuart both his and Mr. Valcke's "word."  (Schuster Tr. 205/9-205/15; see also Trial Tr. p. 172, l. 7-22).  When asked whether he "stood behind th[e] statement," Mr. Schuster responded: "Absolutely."  (Schuster Tr. 205/9-205/23).

**The FIFA Board Approves MasterCard as the Financial Services Sponsor and MasterCard Confirms Its Acceptance of the "Financial Services Light" Package -- October 2005**

      141.   By the time the FIFA Board met on October 26, 2005, MasterCard and FIFA had held two positive contract negotiation sessions.  (Stuart Decl. ¶¶ 56-59).

      142.   Mr. Schuster, in his testimony, described the first session in Brussels on September 26, 2005 as "[f]antastic."  (Schuster Tr. 212/16-212/18).  According to Mr. Schuster, "we thought we are on track to a very good partnership [and] we kept on working like crazy and pushing."  (Schuster Tr.212/16-213/8).

      143.   Because of the substantial progress the parties had made, following the September meeting and in advance of the next contract negotiation session in Frankfurt on October 24, representatives of MasterCard proposed that the parties enter into a letter of intent to reflect their mutual commitment to signing the long-form agreement.  On October 21, 2005, MasterCard's outside counsel sent an e-mail to the Head of FIFA's Commercial Legal Department, Mr. Houseman, indicating that "MasterCard proposes (as John [Stuart] has already mentioned to Stefan [Schuster]) on their conference call yesterday that we consider entering into a letter of intent (provided, of course, that our Monday discussions are successful), while we continue to fine tune this long form agreement."  (Stuart Decl. ¶ 57; Pl. Ex. 31).

144.   Mr. Houseman assured MasterCard's counsel that, given the relationship of the parties, a letter of intent was entirely unnecessary.   He explained that "our relationship with MasterCard is strong enough for us to be able to lend credibility, weight and support in our Board presentations to reflect what will hopefully be a broad understanding across all key business points."  (Stuart Decl. ¶ 57; Pl. Ex. 31).   He further added that "there is a certain amount of reticence on the side of the Board to enter into LOI's on complex deals such as this."  Thus, "we do not feel that an LOI [letter of intent] is necessary."  (Stuart Decl. ¶ 57; Pl. Ex. 31).

145.   In fact, Mr. Houseman was misleading Mr. Stuart.   Mr. Blatter, President of FIFA and Chairman of the FIFA Board, testified that, in fact, the FIFA Board was not reluctant or reticent to approve letters of intent with prospective sponsors.  (Blatter Tr. 45/3-45/6).   Indeed, as described above, the FIFA negotiators earlier had informed VISA that their goal was to sign a "binding letter of intent" with VISA.  The reason that FIFA was reluctant to enter into a binding letter of intent (obvious in hindsight, but, at the time, unbeknownst to MasterCard) was to keep open its options with VISA.   Even Mr. Houseman had to concede that fact when shown his own e-mail stating that the response to MasterCard's request for a letter of intent was  "[n]o, yes or maybe depending on VISA."  (Houseman Tr. 355/14-356/5; <u>see</u> <u>also</u> Pl. Ex. 292).

146.   Mr. Schuster's testimony to the effect that MasterCard's offering to enter into a letter of intent with FIFA indicated that "MasterCard knew that FIFA could choose VISA as its partner at any time it chose to after MasterCard's first right to acquire period expired" is ludicrous and incredible.  Rather, FIFA declined MasterCard's offer of a letter of intent because of the status of FIFA's negotiations with VISA, hoping to delay MasterCard in favor of VISA.  (<u>See</u> Trial Tr. p. 174, l. 10 – p. 186, l. 6).  Also without credibility is Mr. Schuster's testimony

about the supposedly risky situation FIFA was in in September and October of 2005 in light of MasterCard's offer to enter into a binding LOI.  (See Trial Tr. p. 214, l. 23 – p. 216, l. 4, p. 225, l. 13 – p. 226, l. 3).

147.    The negotiations continued to be positive through the second session in Frankfurt on October 24, as well.  (Stuart Decl. ¶ 58).   That night, after the Frankfurt meeting, Mr. Stuart called Mr. Valcke and told him that MasterCard's senior management had approved going forward with the deal, but that management believed that the asking price was too high. Mr. Stuart told Mr. Valcke that MasterCard believed that an appropriate price for the sponsorship was $170 million rather than $180 million.  (Stuart Decl. ¶ 59).   Unlike Mr. Stuart's response to the "financial services" package on May 11, 2005, he did not indicate to Mr. Valcke that MasterCard was rejecting the "financial services light" package.   It also did not suggest that the $170 million figure was MasterCard's bottom line or that FIFA had to "take it or leave it." Rather, Mr. Stuart left open the possibility that MasterCard could still accede to FIFA's $180 million asking price.   Mr. Valcke told Mr. Stuart that he would discuss MasterCard's position at the FIFA Board meeting on October 26 and get back to him.  (Stuart Decl. ¶ 60).

148.    In spite of Mr. Stuart's suggestion that MasterCard might not be willing to pay the $180 million asking price for the sponsorship, Mr. Valcke clearly understood from Mr. Stuart's comments that, in fact, MasterCard would be willing to pay the full price, because, at the FIFA Board meeting two days later, Mr. Valcke told the Board that MasterCard's price commitment was $180 million.  (Valcke Tr. 185/15-186/7; Pl. Ex. 184).   Neither party considered Mr. Stuart's inquiry to be a counteroffer, a rejection of the "financial services light" package or anything other than an inquiry whether the package could be had for less than $180 million.  In contrast to MasterCard's willingness to pay $180 million, VISA, which

submitted a multi-part counter-proposal to the "financial services light" package on October 21, 2005, proposed to pay $140 million in cash, with the potential for more in "incentive fees," in addition to "Value in Kind" programs supposedly worth $15 million.  (Pl. Ex. 107).   At the October 26, 2005 meeting of the FIFA Board, Mr. Valcke presented VISA's offer as a total of $170 million, consisting of $154 million in cash, plus $16 million in "promotional value."  (Pl. Ex. 184; Pl. Ex. 96; Blatter Tr. 190/1-190/6, 190/23-191/19; Lampman Tr. 252/16-253/3).

          149.    Based on Mr. Valcke's presentation, the FIFA Board, chaired by Mr. Blatter, President of FIFA, "unanimously agreed to proceed with the final agreement with MasterCard" and declared that the final Tier I sponsorship had been "sold to" MasterCard.  (Pl. Ex. 184).[6]  The minutes of that meeting, which FIFA withheld for months in discovery, state:

> The remaining Financial Services Category in Tier 1 (FIFA Partners) was presented with the following two offers for the period 2007-2014:
>
> | MasterCard | USD 180 mio. cash |
> | Visa | US 154 mio. cash + USD 16 mio. promotional value (Total USD 170 mio). |
>
> The category is newly split into Payment Services (Credit cards) and Retail Banking whereas FIFA will carve out the retail banking rights in the host country (20% reduction of the rights fee for the FIFA Partner) and will sell these rights as a National Supporter package (Tier 3).  The host country bank does not necessarily have to be a FIFA Partner's bank.
>
> Resolution
>
> It was unanimously agreed to proceed with the final agreement for MasterCard.
>
> After only one year the top level Tier 1 of 6 FIFA Partners has been sold to: adidas, Hyundai, Sony, Coca-Cola, Emirates, MasterCard

(Pl. Ex. 184).

---

[6] In light of the FIFA Board's decision to proceed with the final agreement with MasterCard, Mr. Schuster's testimony to the effect that at that juncture in late October, 2005, FIFA was in a position to grant to any company, including VISA, the "financial services light" package is wholly without credibility.  (See Schuster Decl. ¶ 108; Trial Tr. p. 186, l. 13 – p. 191, l. 12).

150.    The day after the FIFA Board meeting, on October 27, 2006, Mr. Valcke called Mr. Stuart and told him that the price that Mr. Stuart had quoted a few days earlier of $170 million was the same price that VISA had bid.  (Stuart Decl. ¶ 60).   He then added that, in light of MasterCard's long-standing partnership with FIFA, the FIFA Board had voted to proceed with MasterCard instead of VISA, so long as MasterCard agreed to pay the full asking price.   (Stuart Decl. ¶ 60; Valcke Tr. 188/5-188/12.)  Mr. Valcke also said that the decision was reflected in the minutes of the meeting.  (Stuart Decl. ¶ 60).  Mr. Stuart responded that he would relate the information to MasterCard's senior management and that he would get back to Mr. Valcke by October 31, 2005, which Mr. Stuart did.  (Stuart Decl. ¶ 60).  On that date (less than 180 days after being presented with the "financial services light" package), Mr. Stuart called Mr. Valcke and confirmed that MasterCard agreed to pay the $180 million asking price for the "financial services light" package.  (Stuart Decl. ¶ 60; Blatter Tr. 170/25-171/7; Lampman Tr. 252/8-252/15; Schuster Tr. 216/1-216/7; Valcke Tr. 188/13-188/18).

151.    Accordingly, as FIFA's witnesses admitted, they "knew, by the end of October 2005, that MasterCard had accepted the Financial Services 'Light' package."  (Schuster Tr. 216/8-216/13).  As Mr. Valcke conceded, all the parties had to do, at that point, "was get it on paper, get it signed and it was over."  (Valcke Tr. 189/2-189/8).   In fact, Mr. Lampman admitted that it was his "feeling at the time" that "FIFA was within a couple of weeks of signing an agreement with MasterCard."  (Lampman Tr. 253/8-253/12).   Furthermore, according to Mr. Blatter, FIFA's President and Chairman of the FIFA Board, "if the FIFA Board approves entering into a contract with somebody," Mr. Blatter or another authorized signatory, at that point, "is obligated to sign that contract on behalf of FIFA."  (Blatter Tr. 121/11-121/18, 121/23-122/5).

152.     When asked whether Mr. Stuart's confirmation of MasterCard's willingness to pay $180 million for the "financial services light" package should have thus been "the end of the matter," Mr. Valcke testified:  "I would say potentially, yes . . . ."  (Valcke Tr. 188/17-188/18 ).  Due to FIFA's actions described below, however, it was not the end of the matter.

***FIFA Continues to Negotiate with VISA Despite FIFA Board Approval of MasterCard  -- October 2005-December 2005***

153.     Despite the clear mandate of the FIFA Board on October 26 "to proceed with the final agreement for MasterCard," Mr. Valcke lied to his staff about the results of that meeting.  Following the meeting, he reported to his two Sales Directors, Messrs. Lampman and Schuster, and to his chief legal advisor, Mr. Houseman, none of whom attended the meeting, that the FIFA Board "gave permission to close with VISA or MC, as [Mr. Valcke] sees fit."  (Pl. Ex. 57; Pl. Ex. 97; Lampman Tr. 254/21-256/16, 264/7-265/11, 267/6-267/18; Valcke Tr. 454/5-454/18).  When questioned about his misinformation to his staff, Mr. Valcke admitted that he wanted his staff, notwithstanding the FIFA Board's decision, to continue working on a long form agreement with VISA.  (Valcke Tr. 454/13-454/19; see Trial Tr. p. 388, l. 22 – p. 389, l. 5.).

154.     Mr. Valcke similarly lied about the outcome of the FIFA Board meeting to Mr. Shepard, whom Mr. Valcke told that the FIFA Board had approved consummating a transaction with *VISA*.   Mr. Valcke did not consider this to be a "commercial lie" but "just a commercial practice," "a way to keep the two [companies] in."  (Trial Tr. p. 388, l. 12-20.)

155.     Thus, on October 30, 2005, four days after the FIFA Board meeting, Mr. Shepard e-mailed Mr. Valcke to thank him for the "great news on moving forward" and to tell him that VISA is "very excited about formalizing this agreement."  (Pl. Ex. 153).   In response, Mr. Valcke tried to temper Mr. Shepard's expectations, telling him that FIFA had "[t]wo offers .

. . on the table" and that the process, at that point, was to "move on the final discussion of the agreement," with the FIFA Board's "final decision" to come "when and only when [the] agreement is signed by the company."  (Pl. Ex. 153)   Again, Mr. Valcke did not disclose the truth to Mr. Shepard that the FIFA Board had unanimously agreed "to proceed with the final agreement for MasterCard."

156.    Mr. Valcke could not, however, completely control the flow of information concerning the FIFA Board's decision.    Within days after the FIFA Board approved MasterCard as the final Tier 1 sponsor, a member of FIFA's Executive Committee, Julio Grondona, publicly "expressed his congratulations to MasterCard for their renewal with FIFA."  (Pl. Ex. 154; Valcke Tr. 189/20-190/3).   Mr. Shepard learned of Mr. Grondona's public remarks and contacted Mr. Valcke about them.  Mr. Valcke assured Mr. Shepard that Mr. Grondona had "mixed information" and that "we have not finalized and are still in the process with both of you."  (Pl. Ex. 154).    According to Mr. Valcke, he told Mr. Shepard that he would get Mr. Grondona "under control" and make sure he "shuts his mouth in the future."  (Valcke Tr. 189/20-190/13).   Mr. Valcke then contacted the Secretary General of FIFA, Urs Linsi, and urged him to tell Mr. Grondona "to stop!!," because "we want to keep both Visa and MasterCard in the race to make sure we will get the best terms."  (Pl. Ex. 155).  Again, Mr. Valcke did not disclose the truth to Mr. Shepard.

157.    Having plugged the leak concerning the FIFA Board's decision, Mr. Valcke and his staff continued to negotiate contract terms with VISA, notwithstanding that the FIFA Board unanimously resolved "to proceed with the final agreement for MasterCard."  (Pl. Ex. 42; Pl. Ex. 412; Pl. Ex. 413).

**The FIFA Finance Committee Approves MasterCard as the Financial Services Sponsor --
December 2005**

158.     As Mr. Blatter testified, approval by FIFA of a sponsorship agreement involves three steps:  first, the FIFA Board (which FIFA's President, Mr. Blatter, chairs) has to approve the contract; then, FIFA's Finance Committee (on which Mr. Blatter sits) must approve it; and, lastly, FIFA's Executive Committee (also chaired by Mr. Blatter) must also approve it.  (Blatter Tr. 45/7-45/13).   Typically, the FIFA Board, FIFA Finance Committee and FIFA Executive Committee meet on consecutive days during the same month, three or four times per year.  (Blatter Tr. 47/12-48/9).   October 2005, the month during which the FIFA Board met and approved MasterCard as the final Tier I sponsor, was an exception.  The FIFA Finance and Executive Committees did not meet that month.   Rather, those two committees did not meet until early December 2005.

159.    Between the time that the FIFA Board met in October 2005 and the meeting of the FIFA Finance and Executive Committees in early December 2005, there had been no change in the relative negotiating positions of MasterCard and VISA -- notwithstanding Mr. Valcke's and his team's effort to negotiate better terms with VISA.   As Mr. Schuster summarized in an e-mail shortly before the Finance and Executive Committee meetings, FIFA's "key issues  . . . with VISA" included that the "overall value of the offer [was] lower then [sic] competitor (i.e. USD 170 vs. 180)" and the guaranteed "cash component [was] significantly lower, i.e. USD 140 vs. 180."  (Pl. Ex. 190; *also* Valcke Tr. 200/15-200/17).

160.    The FIFA Finance Committee met on December 5, 2005.  (Pl. Ex. 190). The minutes of that meeting, which FIFA also withheld for months in discovery, state:

> The Director of Marketing & TV [Mr. Valcke] then presented the financial details for the Financial Services Category for the 2007-2014 period, recommending that an agreement with MasterCard be concluded.  He continued with an overview of the concluded FIFA Partner agreements post-2006 and a comparison of the 1999-2006 and 2007-2014 periods.

The committee took note and approved the agreement with MasterCard for the 2007-14 period.

(Pl. Ex. 182).

161.   With both the FIFA Board and FIFA Finance Committee having now approved an agreement with MasterCard (see Valcke Tr. 382/15-382/22), the next and last step in the process was for the Executive Committee to approve the agreement.   The Executive Committee met on December 7, 2005, and, consistent with FIFA's standard practice, the meeting was audio recorded.  (Pl. Ex. 12; Blatter Tr. 49/2-49/4).

162.   As he had done during the prior meetings of the FIFA Board and FIFA Finance Committee, Mr. Valcke made a presentation concerning the "financial services" category.  (Pl. Ex. 12; Pl. Ex. 419).   He explained to the Executive Committee that "VISA is coming in with an offer of 170 million USD, including 16 million promotional value" and that "negotiations with MasterCard stand at 180 million USD."  (Pl. Ex. 12; Pl. Ex. 419).   Mr. Valcke then displayed a slide demonstrating "where we will be having the Financial Services agreement closed."   (Pl. Ex. 12; Pl. Ex. 419).   That slide showed that the "financial services" agreement would close at $180 million in cash -- the amount of MasterCard's commitment.  (Pl. Ex. 94).  Mr. Valcke assured the Executive Committee that "[w]e will have the agreement closed either by the end of this week or – for sure – by the end of this year."   (Pl. Ex. 12; Pl. Ex. 419).

163.   According to the audio recording of the meeting, following Mr. Valcke's presentation, Mr. Blatter asked "[d]o you need a decision on the 'MasterCard or Visa' issue?" (Pl. Ex. 419; also Pl. Ex. 12).   Mr. Valcke then responded "[t]he decision is only to give us the 'green light' to finalize at the basis which is not less than what you have seen, than 180 million USD." (Pl. Ex. 419; also Pl. Ex. 12).   Mr. Blatter asked:  "The final decision will be taken in

March then?"  (Pl. Ex. 419; *also* Pl. Ex. 12).   To which Mr. Valcke responded, "[n]o, we can

take it now."   (Pl. Ex. 419; *also* Pl. Ex. 12).   Mr. Blatter then asked:  "We can take it now?"

(Pl. Ex. 419; *also* Pl. Ex. 12).  After Mr. Valcke replied "yeah," Mr. Blatter remarked:  "O.K.

Good. Do you agree?"  (Pl. Ex. 419; *also* Pl. Ex. 12).   On the audio recording, a faint "yes" is

then heard, Mr. Blatter makes a joking remark and then the sound goes dead.  (Pl. Ex. 419).

After several seconds of silence, the audio recording abruptly continues:  "Thank you.  Is there

any other thing marketing and television."  (Pl. Ex. 419).   Although there is static at various

points on the audio tape, it is only at this one critical moment that the sound goes completely

dead, that is, all background noise and, indeed, all sound ceases.

       164.   FIFA has provided no explanation for the mysterious gap in the audio

recording.

       165.   Despite the audible assent to "take the decision" regarding the financial

services category at the December 2005 Executive Committee meeting, the minutes of the

meeting produced in discovery make no reference to any decision being taken.   With respect to

the financial services sponsorship, the minutes state only:  "Following the completion of the new

contracts with five FIFA Partners for 2007 to 2014, discussions were being conducted with

financial services corporations MasterCard and VISA with a view to determining the sixth and

final FIFA Partner for the period by the end of 2005."  (Pl. Ex. 183).

       166.   FIFA has provided no explanation for why the written minutes it produced

do not comport with the audio recorded proceedings that took place during the December 2005

Executive Committee meeting.

167.   In summation, however, FIFA admitted that the FIFA Executive Committee, in fact, approved proceeding with MasterCard.  (Trial Tr. p. 485, l. 2-3).[7]

***FIFA and MasterCard Proceed to Finalize a Long-Form Agreement, while FIFA Continues to Negotiate with VISA -- December 2005 - January 2006***

168.   By the second week of December, 2005, the FIFA Board, FIFA Finance Committee and the Executive Committee had approved an agreement with MasterCard (*see* Valcke Tr. 382/15-382/22), and Mr. Valcke acknowleded in e-mail that FIFA was "close to finaliz[ing] [a] long form [agreement] with MC [MasterCard]."  (Pl. Ex. 51).  Nonetheless, Mr. Valcke told his staff that FIFA "can not officially make a decision" in favor of MasterCard "without having same [a long form agreement] with VISA."  (Pl. Ex. 51).

169.   Thus, Mr. Valcke and his staff continued to negotiate contract terms with VISA.  (Pl. Ex. 412; Pl. Ex. 413).  Given how close FIFA was to finalizing an agreement with MasterCard, however, as Mr. Houseman acknowledged, if FIFA were to "end up going with VISA," those two parties would "need to perform a thorough 'catch up' exercise."  (Pl. Ex. 34).

170.   The re-surfacing of a longstanding issue relating to MasterCard's long-standing challenge to FIFA's efforts to register its overlapping soccer balls logo in various categories, including credit cards, delayed the progress of FIFA's negotiations with MasterCard in late December 2005 and afforded FIFA the opportunity to "catch up" on its contract negotiations with VISA, (Stuart Decl. ¶ 61), all by FIFA's deliberate plan.

171.   By late January 2006, however, even the trademark issue had been substantially resolved (by means of "parking" the issue for the 8-year term of the sponsorship), and negotiations with MasterCard entered their final stage.  In an e-mail dated January 24, 2006,

---

[7] Because FIFA agrees that the FIFA Executive Committee approved MasterCard at the December 2005 meeting, drawing the conclusion by adverse inference is not required.

Mr. Valcke acknowledged to Mr. Stuart that he "got feed back of the last conference call and understood there is [sic] no more issue and even the trademark one is solved or at least agreed." (Pl. Ex. 157).   Mr. Valcke asked Mr. Stuart for a "timetable" as to "when the contract should be signed" and "when the announcement could take place."  (Pl. Ex. 157).   Likewise, FIFA's lead draftsperson, Mr. Houseman admitted that he "clearly believed" that, by late January 2006, "a long-form contract with MasterCard had been fully negotiated and could be accelerated to signature."  (Houseman Tr. 207/17-207/21; *also* Pl. Ex. 50).

172.    In light of their progress, FIFA's representatives targeted the next meeting of the FIFA Board, on March 14, 2006, as the date for executing the agreement.  (Stuart Decl. ¶ 63; Pl. Ex. 192).

### FIFA Presses VISA to Match MasterCard -- February 2006

173.    Even while scheduling a time to sign and announce a contract with MasterCard, Mr. Valcke and his team continued to move forward with their negotiations with VISA, scheduling to meet with VISA's negotiating team in Turin, Italy, during the Olympic Winter Games, in February 2006.  (Pl. Ex. 158).

174.    On January 25, 2006, with Mr. Houseman "looking to get the clean agreement to MC [MasterCard]" and MasterCard and FIFA being "in the very final stages, probably just a couple of days away from getting it signed," Mr. Schuster wrote to Mr. Valcke: "Jérôme, I know it's not an easy one . . . but when are you planning to talk to Tom [Shepard] about the gap of USD 30mm he has to fill?"  (Pl. Ex. 158).  Mr. Valcke responded:  "The question is good!!"  (Pl. Ex. 158).  He wondered rhetorically whether he should raise the issue then or "keep this issue for the decision period . . . as soon as we have the MC signed contract." (Pl. Ex. 158).

175.    Mr. Valcke apparently opted not to raise the shortfall in VISA's price at that time, because, on February 21, 2006, Mr. Schuster e-mailed Mr. Valcke again to "suggest that [he] inform TS [Tom Shepard] that there is a huge gap in terms of cash and that he has to come back to you with a realistic offer before the end of this week."  (Pl. Ex. 160).

176.    Mr. Valcke e-mailed Mr. Shepard the following day, continuing his practice of informing VISA of the details of FIFA's negotiations with MasterCard while hardly disclosing to MasterCard the fact of FIFA's negotiations with VISA, much less the details thereof.   After disclosing that FIFA had just sent a "clean agreement" to MasterCard, Mr. Valcke wrote:  "To be honnest [sic] there is a gap between your two offers, but you know about." (Pl. Ex. 161).  Mr. Valcke then told Mr. Shepard what the exact gap was, apprising him that MasterCard had agreed to pay the full $180 million asking price for the "financial services light" package.  Mr. Valcke wrote:  "In term of pure cash we are talking about a difference of 30 mio USD and in fact they are where we have been with both of you start the negotiation after having decided to have a category minus certain rights for the host bank in each FIFA competition." (Pl. Ex. 161).  Mr. Valcke endeavored to call Mr. Shepard that day to "talk about the financial side."  (Pl. Ex. 161).

177.    After Mr. Shepard replied in e-mail that he would talk to Mr. Valcke later, but that he did not "think the number delta is correct," Mr. Valcke explained that "FIFA's members are always sensible about the value of the agreement we are signing and cash is the main component."  (Pl. Ex. 172).

178.    In their testimony, virtually all of FIFA's witnesses dismissed the value of the "Value in Kind (VIK)" or "Marketing in Kind (MIK)" component of VISA's bid.  Mr. Valcke testified that "we don't care about VIK . . . what is important is the cash component."

(Valcke Tr.  198/7-199/6).  He explained that VIK or MIK represent amounts that a sponsor "will invest in order to promote the event," but that they have "no value" to, or "no impact on," FIFA's account.  (Valcke Tr. 198/7-199/6).   According to Mr. Houseman, he was at the time, and still is, "of the view that marketing in kind and value kind did not add much value to . . . the cash consideration that VISA had offered."  (Houseman Tr. 262/11-262/15).  Mr. Houseman testified that, in his experience, VISA's marketing in kind commitment represented "probably about a quarter of what a sponsor would normally do by way of activation" of its sponsorship rights.  (Houseman Tr. 262/16-262/22).  As Mr. Valcke summarized at trial, "Cash is king everywhere you need money."  (Trial Tr. p. 389, l. 16).

179.   Thus, in his e-mail to Mr. Shepard, Mr. Valcke elaborated that if "[y]ou would be at 180 in cash plus your MIK [marketing in kind] program there will be no discussion," "but with your current offer there is a real risk that the choice will be for the other one [referring to MasterCard]."  (Pl. Ex. 172).

180.   Even with this extraordinary advantage, bestowed on VISA by Mr. Valcke, of being able to match MasterCard's price, by the end of February 2006, VISA still remained $30 million in cash lower than MasterCard, and Mr. Shepard told Mr. Valcke that VISA had made its "final offer."  (Schuster Tr. 221/21-221/23; Valcke Tr. 235/3-235/6; Pl. Ex. 162).   Mr. Valcke testified:  "definitely it gave the lead to MasterCard."  (Valcke Tr. 235/7-235/9).

**FIFA Delivers a "Final" Contract to MasterCard to Execute and Assures MasterCard It "Will Be Countersigned by Blatter" -- March 3, 2006**

181.   FIFA's witnesses concede that, by the beginning of March 1, 2006, negotiations with MasterCard had concluded.  (Houseman Tr. 209/5-209/22, 210/5-210/9, 210/14-210/16; Schuster Tr. 221/11-221/14; Pl. Ex. 163).   In fact, referring to the negotiations

with MasterCard, Mr. Houseman declared in an e-mail on that date: "Finally, we are done!"  (Pl. Ex. 35; Houseman Tr. 209/5-209/22).   As Mr. Houseman admitted, the "FIFA negotiating team and the MasterCard negotiating team had reached agreement on all terms," including the trademark issue.  (Houseman Tr. 211/16-211/24).

182.    Likewise, on March 1, 2006, Mr. Valcke sent an e-mail to Mr. Stuart confirming his understanding that "all was now agreed" and that, while there was still some wording in the contract that had to be cleaned up, "we are done."  (Pl. Ex. 163; Stuart Decl. ¶ 64).  As Mr. Valcke described it to Mr. Stuart:  "Next steps are a final information to the BoD [FIFA Board] on March 14 and the signature by Blatter on the 16th."  (Pl. Ex. 163; Stuart Decl. ¶ 64).   Mr. Valcke noted that "[w]e will then [have] to decide on the timing for the announcement."  (Pl. Ex. 163; Stuart Decl. ¶ 64).

183.    On March 3, 2006, Mr. Houseman e-mailed to Mr. Stuart and his team the "FINAL version" of the sponsorship agreement between FIFA and MasterCard for the 2007 to 2014 time period.  (Pl. Ex. 36; Houseman Tr. 212/15-213/15; Stuart Decl. ¶ 65).   He testified that he expected and desired MasterCard to conduct a final management review of the contract, execute it and return it to FIFA.  (Houseman Tr. 213/3-213/15; *also* Lampman Tr. 274/19-275/20).   At that point, as Mr. Lampman conceded, MasterCard had "good reason to believe they reached a final agreement" that would go before FIFA's Executive Committee and be approved.  (Lampman Tr. 290/25-291/19).

184.    Nevertheless, Mr. Houseman admitted that, when he sent the contract to MasterCard, he understood that his negotiating team's objective was not just to present to the FIFA Board the MasterCard contract, but "[t]wo separate contracts" – one with MasterCard and one with VISA.  (Houseman Tr. 216/22-217/3).  As Mr. Houseman also admitted, no one from

FIFA ever told anyone from MasterCard that such was FIFA's objective.  (Houseman Tr. 216/22-217/3).

185.    Within 72 hours of receiving the "FINAL version" of the contract, Mr. Stuart apprised Mr. Valcke that he "ha[d] completed the final documents" and was bringing them to MasterCard's Chief Operating Officer, who was "standing in for the CEO," to sign.   (Pl. Ex. 164; Stuart Decl. ¶ 66).   Mr. Stuart inquired to whom at FIFA he should send the contract once it had been signed.  (Pl. Ex. 164; Stuart Decl. ¶ 66).   He concluded by commenting on how "very good" his team was feeling about the agreement and -- obviously with no clue as to the intimate dealings that FIFA had been having with VISA -- on what a "great job" Mr. Valcke's team did to "bring a fair and balanced approach to the negotiation."  (Pl. Ex. 164; Stuart Decl. ¶ 66).  Mr. Stuart was pleased that the parties "can start the next 8 years -- and end the next few months of the 2006 agreement -- in a true spirit of Partnership."  (Pl. Ex.164; Stuart Decl. ¶ 66).

186.    Mr. Valcke responded the same day, expressing his pleasure also that "our partnership will have such a good start."  (Pl. Ex. 164; Stuart Decl. ¶ 65).   He assured Mr. Stuart:  "If you could send the agreement to my attention it would be perfect and it will be countersigned by Blatter."  (Pl. Ex. 164; Stuart Decl. ¶ 65).

187.    The "FINAL version" of the sponsorship agreement that FIFA delivered to MasterCard, and which MasterCard did sign, provides for the granting to MasterCard of exclusive "FIFA Partner" rights, in an expanded category of "Products," which includes both "Payment Products" and (except within the host country) "Retail Banking Products," with respect to 44 "FIFA Competitions," including the 2010 and 2014 FIFA World Cups, during the period January 1, 2007 through December 31, 2014.  (Pl. Ex. 390, §§ 2, 9 & Appdx. A, C & G).  Such rights include the right to (i) use, either on its own account or jointly

with the financial institutions in its network, the designation of "Official FIFA Partner," as well as other acceptable designations, (ii) exploit FIFA's marks in connection with the advertisement and promotion of payment solutions and/or retail banking products and services, (iii) receive both exclusive and non-exclusive advertising exposure on rotating boards located inside host stadiums, (iv) free advertising in various FIFA print publications, as well as exposure on FIFA's official website, (v) dozens of complimentary tickets, as well as an extensive allotment of tickets to purchase, to each match in the 44 "FIFA Competitions," and (vi) complimentary hospitality packages for the FIFA World Cup and Women's World Cup tournaments.  (Pl. Ex. 390, Appdx. C).  In consideration for these rights, the agreement provides for MasterCard to pay to FIFA a total of $180 million, in unequal annual installments beginning on January 1, 2007 and concluding on January 1, 2014.  (Pl. Ex. 390, Appdx. B).

188.    MasterCard's Chief Operating Officer, Alan Heuer, executed two originals of the "FINAL version" of the 2007-2014 sponsorship agreement (the "2007-2014 MasterCard Agreement"), and Mr. Stuart couriered them to FIFA, to Mr. Houseman's attention, on March 24, 2006.  (Pl. Ex. 206).  Thus, as described below, MasterCard executed and returned to FIFA the 2007-2014 MasterCard Agreement prior to VISA's ratifying and signing its competing agreement with FIFA.

189.    To the extent that there were any blank appendicies or other omissions in the "FINAL version" of the post-2006 sponsorship agreement delivered by FIFA to MasterCard, (Pl. Ex. 258; see Trial Tr. p. 91, l. 20 – p. 97, l. 11), they were immaterial, and Mr. Munson's testimony that that document constituted an offer within the meaning of section 9.2 is wholly credible (Trial Tr. p. 95, l. 21-25).

***Messrs. Valcke and Blatter Meet and Determine to Press VISA to Match or Beat the MasterCard Deal -- March 3 – March 14, 2006***

190.    As FIFA's representatives admitted, FIFA's negotiating team continued to make "concerted efforts" to reach agreement with VISA after March 3, 2006, even though, by no later than that date, they already had reached agreement with MasterCard on all terms. (Lampman Tr. 276/9-276/12).

191.    In fact, Mr. Valcke and his team did more than negotiate with VISA. With the apparent "wishes" of Mr. Blatter, Mr. Valcke actively encouraged VISA to propose terms that he knew would be seen as equal to or better than the terms that FIFA had negotiated with MasterCard.  (Pl. Ex. 174).

192.    On March 3, 2006, the same day that Mr. Houseman delivered the "FINAL version" of the sponsorship contract to MasterCard, Mr. Valcke e-mailed Mr. Shepard to update him that he was scheduled to have a "pre Board of Directors meeting" with Mr. Blatter the following week.  (Pl. Ex. 114).   Mr. Valcke let Mr. Shepard know that his goal was to finalize a "clean version of our agreement with your final financial offer" by the time he was to meet with Mr. Blatter so that "[we] have on our table both agreements," referring plainly to agreements with both VISA and MasterCard.  (Pl. Ex. 114).   Mr. Valcke also suggested that he and Mr. Shepard arrange a call between Mr. Blatter and VISA's President, Christopher Rodrigues, within the next several days.  (Pl. Ex. 114).

193.    On March 9, 2006, after Mr. Valcke's "pre Board" meeting with Mr. Blatter, Mr. Valcke and Mr. Shepard spoke by telephone to discuss the state of their affairs.   (Pl. Ex. 174).   Mr. Valcke followed up the phone conversation that day with an e-mail to Mr. Shepard to confirm the points he made during their call.   (Pl. Ex. 174).

194.    Mr. Valcke wrote:  "Following my call I would like to confirm my point to make sure all is clear between us in regards of the decision to be made by next Tuesday on the appointment of our last FIFA Partner for the financial services category."  (Pl. Ex. 174).   He then reiterated his instruction to Mr. Shepard that, if it wishes to be the sponsor, "Visa must come with an offer and signed agreement by Monday end of business day with a financial proposal in two components, a cash of $180 million and a MIK of $15 mio."  (Pl. Ex. 174).

195.    Mr. Valcke then pointedly told Mr. Shepard: "The 180 has to be clear and not including the qualifiers condition which is not a right we, FIFA, own and again to have apple vs apple it has to be an offer with just two lines as the MC has just one with 180 cash and that's it."  (Pl. Ex. 174; Valcke Tr. 299/25-300/8, 300/15-300/24, 301/14-302/1, 302/9-302/12).   He asked Mr. Shepard to "[p]lease confirm asap."  (Pl. Ex. 174).

196.    After Mr. Shepard confirmed his receipt and understanding of Mr. Valcke's e-mail, Mr. Valcke explained in a reply e-mail that "I am giving you the wishes Blatter has expressed to finalize, now it is with you."  (Pl. Ex. 174).  At trial, Mr. Valcke testified that he told Mr. Shepard on March 9 "that it was Mr. Blatter's wish that VISA get the sponsorship," that Mr. Blatter had <u>not</u> told him that and that while it was not "a commercial lie, it was a business practice to make sure [VISA] will come up to 180."  (Trial Tr. p. 391, l. 21 – p. 392, l. 11)

***Having Learned of the Preference for VISA, Mr. Valcke's Staff Advocates for MasterCard -- March 10-13, 2006***

197.    Following Mr. Valcke's "pre Board of Directors" meeting with Mr. Blatter sometime between March 3 and 9, 2006, Mr. Valcke evidently informed his staff -- Messrs. Schuster, Lampman and Houseman -- that there was a preference for VISA, assuming VISA increased the cash component of its bid to $180 million.  Beginning on March 10, 2006, Mr. Valcke's staff suddenly began to e-mail him with their views concerning the "pros" and

"cons" of proceeding with MasterCard versus VISA and their unanimous recommendation that FIFA approve MasterCard as the sponsor.  (Pl. Exs. 58, 60 & 89; Lampman Tr. 282/23-284/3, 287/11-288/3).

198.     On March 10, 2006, Mr. Lampman sent to Mr. Valcke an e-mail setting out his thoughts "in respect of VISA and MasterCard."  (Pl. Ex. 58).  While he acknowledged that "from a branding point of view VISA is the undisputed leader" and "all things being equal . . . probably the better choice," he questioned whether FIFA was "too far down the track with MC" and cautioned that "there is no question, right or wrong, that MC believe they have a deal with us."  (Pl. Ex. 58; Lampman Tr. 290/4-290/7, 290/25-291/19).   Mr. Lampman posed the question of "[w]hat impact will us pulling back from a deal have, not so much on FIFA's reputation and our personal conduct but our collective ability to close out the remainder of the sponsorship program?"  (Pl. Ex. 58; Lampman Tr. 282/23-284/3, 284/13-284/19, 286/10-286/10-286/23).   Mr. Lampman concluded:  "In closing . . . I think MC has done everything right in this process, they are a long standing Partner that came to the party when we needed them to.  If I had a vote, I think there is something to be said for the way we conduct business therefore I vote MC."  (Pl. Ex. 58).

199.     Nevertheless, recognizing that it was the vote of Mr. Blatter that counted, and not his, Mr. Lampman advised:   "Should we decide or be forced to go with VISA," FIFA should use the "trademark issue" as the "only way out" with MasterCard.   (Pl. Ex. 58).   That way, Mr. Lampman wrote, "[w]e could then blame our change of direction on the powers that be and the trademark issue."  (Pl. Ex. 58; Lampman Tr. 295/16-296/4, 296/11-297/3).   As described below, that is precisely what FIFA did.

200.    Mr. Schuster "worked a bit more" on Mr. Lampman's points, and, on March 13, 2006, e-mailed to Mr. Valcke a more extensive comparison of "MC vs VISA – pros and cons" that, in Mr. Schuster's view, " the P [President of FIFA] and GS [General Secretary of FIFA] must understand."  (Pl. Ex. 60).   Among the "pros" of doing a deal with MasterCard that Mr. Schuster listed was that "FIFA's word is honored at MC – and in the market."  (Pl. Ex. 60). Conversely, one of the "cons" of proceeding with VISA, according to Mr. Schuster, was that FIFA's "[m]arket credibility will be lost."  (Pl. Ex. 60).

201.    With respect to the "trademark issue" that Mr. Lampman had raised in his e-mail, both he and Mr. Schuster agreed that the temporary resolution of the issue reflected in the MasterCard agreement was a "pro" of proceeding with MasterCard.  (Pl. Exs. 58 & 60).  As Mr. Lampman admitted, it was both his and the entire FIFA team's view that "if FIFA went ahead with VISA, the trademark issue would be more problematic for FIFA than if FIFA did a deal with MasterCard."  (Lampman Tr. 304/12-304/21).

202.    Mr. Valcke was unaffected by his staff's recommendations.  Despite them, he continued to actively court VISA, e-mailing Mr. Shepard on March 13, 2006, to "send me your final offer by email in a pdf or word format," because "[t]he Board is at 8am!!" and "we will receive the signed one from MC in the next 48 hours, their CEO being away the next 2 days but all has been agreed."   (Pl. Ex. 116).

***VISA's Last Minute $30 Million Increase in Price and the FIFA Board's, Finance Committee's and Executive Committee's Unanimous Approval of VISA as the Financial Services Sponsor -- March 14-16, 2006***

203.    The next meetings of the FIFA Board, FIFA Finance Committee and FIFA Executive Committee were scheduled to take place on March 14, 15 and 16, 2006.  (Blatter Tr. 83/1-83/13; Valcke Tr. 250/2-250/19).   Although the FIFA Board, FIFA Finance Committee

and the FIFA Executive Committee already had approved proceeding with MasterCard during their October and December 2005 meetings, respectively, Mr. Valcke determined to revisit the "financial services" category at these meetings.

204.   At the beginning of the day on March 14, 2006, when the first of the FIFA meetings was scheduled to take place, the status of FIFA's dealings with MasterCard and VISA were as follows:  (i) MasterCard had agreed to pay $180 million in cash for the "financial services light" package, had been approved by both the FIFA Board, the FIFA Finance Committee and the FIFA Executive Committee as the sponsor, had agreed to all terms in a final long-form contract with FIFA, had indicated its intent to sign the final long-form contract, but had not, as of that date, yet returned the signed agreement to FIFA; (ii) VISA, in contrast, was still at its bid of $150 million in cash plus $15 million of "marketing in kind" value, had not been approved by any of FIFA's governing bodies and was still in the process of negotiating contract terms with FIFA.   (See Houseman Tr. 281/25-282/8; Valcke Tr. 238/7-239/1; Pl. Exs. 417 & 418).

205.   With that being the status, Mr. Valcke called Mr. Shepard on March 14, several hours before the FIFA Board meeting, and pointedly told him, as Mr. Shepard testified, that if "we [VISA] were able to commit to the funding as requested, that we [VISA] would be the partner."   (Shepard Tr. 177/16-179/3; Pl. Ex. 118).

206.   Three hours before the start of the FIFA Board meeting, Mr. Shepard called Mr. Valcke back and confirmed that VISA would agree to pay cash of $180 million, in addition to $15 million of marketing in kind value.  (Valcke Tr. 235/3-235/18, 238/8-238/11).

207.    Further to Mr. Valcke's prior assurance to Mr. Shepard that VISA "would be the partner," Messrs. Valcke and Blatter, as described below, then engineered that result at the FIFA Board meeting.

208.    Despite admitting in his testimony that the "marketing in kind" component of VISA's bid had "no value" and that VISA's bid was no higher than MasterCard's (Valcke Tr. 198/15-199/6, 208/9-208/11), Mr. Valcke nevertheless presented to the FIFA Board a comparison of the "consideration" in the "Visa vs. MasterCard Agreement"[8] that showed that Visa's total consideration was $195 million compared with only $180 million in total consideration from MasterCard.   (Pl. Ex. 94).   Mr. Valcke told the FIFA Board that "since the last Board of Directors meeting in October 2005, Visa had increased their offer by USD 30 million to USD 180 million in cash and USD 15 million MIK (marketing in kind)," in contrast to "MasterCard's offer [of] also USD 180 million cash, whereas the promotional value is included." (Pl. Ex. 8).

209.    Mr. Valcke then noted to the Board that "Visa has an estimated market share of 65% with huge activation potential compared to MasterCard, a long-term partner, with approximately 20%."  (Pl. Ex. 8).

210.    Notwithstanding his staff's strong recommendation to proceed with MasterCard rather than VISA, Mr. Valcke, according to the meeting minutes, "found it difficult to make a recommendation" to the FIFA Board – a wholly incredible statement.  (See Pl. Ex. 8; Valcke Tr. 317/4-317/13).   He did not once mention MasterCard's "first right to acquire" the sponsorship.  (Fischer Tr. 56/21-56/24).

---

[8]   When Mr. Valcke made the presentation to the FIFA Board in October 2005, notably, the title of the comparison was reversed:  "MasterCard vs Visa."  (Pl. Ex. 94).

211.     Mr. Blatter then did his part to steer the FIFA Board's decision in favor of VISA.   Addressing the FIFA Board, he "clearly stated that he was not aware that FIFA had a partner that was attacking the organization, and that FIFA should not accept threats" (Pl. Ex. 8; Fischer Tr. 57/21-57/24) – this, despite admitting in testimony that he had been aware of the trademark dispute between MasterCard and FIFA since "about the year 2000 or 2001" and that the dispute was no obstacle to his signing the sponsorship agreement with MasterCard in 2002 for the 2006 FIFA World Cup.  (Blatter Tr. 158/6-159/14).   Urs Linsi, the General Secretary of FIFA, then interjected "that MasterCard has not always been an easy partner" and that he expected MasterCard to cease its challenges to FIFA's marks "when entering negotiations."  (Pl. Ex. 8).

212.     Based on these proceedings, the FIFA Board decided on March 14, 2006: "Subject to contract, a deal with Visa in the financial services category will be signed."  (Pl. Ex. 8).  Neither Mr. Valcke nor anyone else on his team informed Mr. Stuart of MasterCard of the FIFA Board's decision.

213.     Chuck Blazer, a member of the FIFA Executive Committee and the FIFA Marketing & TV AG Board (Trial Tr. p. 230, l. 20-22), testified as to the March 14, 2006 FIFA Marketing & TV AG Board meeting.  Mr. Blazer's testimony was generally without credibility based on his attitude and demeanor and on his evasive answers on cross-examination.[9]

---

[9] For example:

Q.  So it was okay in your view for Mr. Valcke to string John Stuart along for a few weeks until VISA ratified the deal?

A.  I think it was okay for us to come back and make a determination at some point as one might have been needed again if the circumstances had turned out differently.

Q.  Okay

A.  It's too early to know the answer to that question.  I'm not pressing it.

Q.  I have no idea what you just said, Mr. Blazer.

A.  Well, then, let me try it again for you.

Q.  Let me try the question again.

A.  I don't think I need it over again.  I understood it.  What I'm saying to you is, without

214.   More particularly, Mr. Blazer testified on direct to comments that he supposedly made at the Marketing & TV AG Board meeting about FIFA's trademark issue with MasterCard to the effect that proceeding with MasterCard with the trademark issue outstanding was "unacceptable." (Trial Tr. p. 249, l. 7).  Not only do Mr. Blazer's comments not appear in the official minutes of the meeting (Pl. Ex. 362, Bates # F15778-15801), but they do not appear in the handwritten notes from which the meeting secretary, Ms. Petra Fischer, prepared the minutes. (Pl. Ex. 362, Bates # F15802-15822).  Mr. Blazer's supposed comments were serious and substantive and not the kind of remark that would have been omitted from the minutes,

knowing the course of events over the ensuing days, it is impossible to determine how that would have turned out.  For example, had VISA not –
THE COURT:  How does that answer the question?
THE WITNESS:  How does it answer the question?  Because he wanted to know --
|THE COURT:  "Question:  So it was okay in your view for Mr. Valcke to string John Stuart along for a few weeks until VISA ratified the deal?"
THE WITNESS:  Because I don't believe --
THE COURT:  "Answer --
THE WITNESS:  I don't think he was stringing him along.
THE COURT:  Do you want to hear your answer or not?  "I think it was okay for us to come back and make a determination at some point as one might have been needed again if the circumstances had turned out differently."
THE WITNESS:  What I'm saying is I don't believe we were stringing him along.  Is that it quite possibly could have been that the matter itself would have been up for discussion had it been that VISA did not approve.
Q.  Mr. Blazer --
THE WITNESS:  In other words, the concept of stringing somebody along is that there is nothing at the end, and I don't presume that we did something bad by not telling him that VISA was in and they were going to be out based on the decision that had been taken at that point in the meeting by the executive committee.

Since until the deal with VISA would be concluded, there was no closure on any of these issues.  So it would have been required that the deal be closed for the category A to be closed and if not the category to be closed, then for any other category alternatively, but no decision had been taken with regard to any alternatives.  So you start out first, the objection I have with the problem that he's referring to it as stringing him along.  I don't believe we were stringing him along.  I believe we were dealing fairly, given the circumstances, and that's why I answered it in that way.  (Trial Tr. p.278, l. 11 – p.280, l. 11). (See also Trial Tr. p.256, l. 20 – p.259, l. 17) (where Mr. Blazer initially stated he did not "feel competent to answer" whether he considered a signed contract by a proposed sponsor as an offer that the Executive Committee is free to accept or reject but eventually conceded after being confronted with his deposition testimony).

particularly by a careful and competent secretary, as Mr. Blazer testified Ms. Fischer was. (Trial Tr. p. 261, l. 11-22).[10]   Indeed, Mr. Blazer testified that he does not recall having made any corrections to any of the minutes Ms. Fisher prepared. (Trial Tr. p. 262, l. 1-3).   Thus, for that reason and based on his evasive answers and his attitude and demeanor, Mr. Blazer's testimony as to the March 14, 2006 Marketing & TV AG Board meeting is rejected as fabricated.

215.   The next day, on March 15, 2006, the FIFA Finance Committee was scheduled to meet.   At that time, however, FIFA had not agreed on a long-form contract with VISA and had no commitment from VISA to pay the $180 million asking price other than Mr. Shepard's telephone call with Mr. Valcke the preceding day.   The two sides thus devoted much of the day to confirming and documenting VISA's commitment to do the deal that the FIFA Board had just approved.

216.   To that end, Mr. Rodrigues called Mr. Blatter to personally assure him that VISA had accepted the discussed terms.  (Pl. Ex. 92).

217.   Mr. Houseman, who the day before acknowledged "the urgency involved" and his willingness to "remain on stand-by to deal with any last minute" drafting changes (Pl. Ex. 418), and Mr. McCleary, in-house counsel of VISA, continued to negotiate the terms of the long-form agreement.   (Pl. Exs. 43 & 46).   Mr. Houseman was reluctant to agree to VISA's proposed changes, however, because, as he wrote in an e-mail to his team, FIFA's "ability to get promotional value out of the $15m MIK is doubtful" and, as drafted, the marketing in kind commitment was "pretty meaningless."  (Pl. Ex. 46).

---

[10] Given the serious nature of Mr. Blazer's supposed remarks, a review of the remarks that were recorded by Ms. Fisher in her notes confirms that if Mr. Blazer had made the remarks he testified to, they certainly would have been recorded.

218.    Tellingly, Mr. Valcke responded to Mr. Houseman, by admonishing him in e-mail that "[t]he 15 [million in marketing in kind] are part of the agreement and have to be the difference to justify Visa vs MC."  (Pl. Ex. 46).  At trial, Mr. Valcke again acknowledged telling his staff "that Visa's offer of 15 million of this MIK, marketing in kind, even though it was of little or no value to FIFA, would be needed to justify Visa over MasterCard to the Executive Committee." (Trial Tr. p. 389, l. 22 – p. 390, l. 1).

219.    With the parties unable to finalize a long-form agreement by March 15, 2006 (Valcke Tr. 238/8-239/1; Pl. Ex. 123), Mr. Shepard faxed to Mr. Valcke a previously discussed "letter of confirmation" in which Mr. Shepard confirmed that "Visa will become the FIFA Tier 1 Partner in the Financial Services category . . . for the eight year period from 2007 to 2014, on the terms reflected in the draft agreement most recently supplied from FIFA to me, including total Visa cash consideration of US$180 Million, with an additional US$15 Million in Marketing-in-Kind."  (Pl. Ex. 48).  But Mr. Shepard also disclosed that VISA would not execute a "definitive agreement" until there had been "formal ratification . . . by the Visa International Board of Directors."  (Pl. Ex. 48).

220.    That day, the Finance Committee also approved VISA as the sponsor.  (Pl. Ex. 9).   In accordance with Mr. Valcke's statement to Mr. Houseman that VISA's $15 million marketing in kind commitment "have to be the difference to justify Visa vs MC," the minutes of the meeting reflect:

> The Finance Committee supported the signing of the sixth and final FIFA Partner contract for 2007-2014 for a total return of USD 195 million.  The contract would be with a financial services corporation following lengthy negotiations between FIFA and two such companies, both of which had offered USD 180 million in cash for these commercial rights, but only one of which had also pledged an additional USD 15 million in marketing-in-kind services.

(Pl. Ex. 9).  The minutes go on to state:  "Furthermore, the unsuccessful bidder had a pending

legal dispute with FIFA regarding alleged infringement of trademark by FIFA's logo."  (Pl. Ex.

9).  No one reported the decision of the Finance Committee to MasterCard.

       221.    On March 16, 2006, while Messrs. Valcke's and Shepard's teams

continued to negotiate contract terms (Valcke Tr. 238/8-239/1),  the Executive Committee met.

The minutes of the meeting reflect what by then had become a foregone conclusion:   "The

Executive Committee took note that the sixth and final FIFA Partner (financial services) contract

for the 2007-2010 period had been completed and was ready to be signed in April 2006 (USD

195 million, including USD 15 million in marketing-in-kind)."  (Pl. Ex. 10).

       222.    The only remaining steps were to finalize the terms of the contract and for

the VISA Board to ratify it at its next meeting scheduled on March 29, 2006.

*FIFA Conceals the VISA Deal from MasterCard until the Deal Is Officially Approved by
VISA's Board -- March 16-30, 2006*

       223.    Following the Executive Committee's decision to approve VISA as the

final Tier 1 sponsor on March 16, Mr. Valcke and his staff participated by e-mail in a "chat

room"-like conversation to discuss, as Mr. Schuster admitted, "different excuses to give to

MasterCard as to why the deal wasn't done with them."  (Schuster Tr. 263/2-263/4).

       224.    Mr. Schuster began the discussion with a proposal that he believed would

enable FIFA to "still be seen as having at least some business ethics."  (Pl. Ex. 93).   Mr.

Schuster proposed that there be "[n]o further communication to anybody before we do have a

signed VISA agreement."  (Pl. Ex. 93).  Once the signed contract was in hand, then FIFA could

call Mr. Stuart and tell him that MasterCard "did not provide a signed agreement in time for the

board meetings," "VISA put -- surprisingly – forth a higher offer very last minute," and "FIFA

views the trademarks issue as a very big (decisive?) obstacle for a MC deal."  (Pl. Ex. 93).  Mr.

Schuster suggested that FIFA could then tell Mr. Stuart that "there is only one chance for MC to overcome this major issue," either "put in a higher bid (USD 20mm?)" or "drop the marks completely." (Pl. Ex. 97).

225. Mr. Valcke responded that "[i]t is too late!" to even suggest to Mr. Stuart that MasterCard be given an option to increase the price or drop its trademark opposition. (Pl. Ex. 93). At trial, Mr. Valcke acknowledged that he rejected Mr. Schuster's suggestion that he go back to MasterCard and ask it to raise its offer out of his own self-interest, <u>viz</u>., "[i]t would have been risky because if MasterCard had said yes, we're going to raise our offer, the Executive Committee might think that [Mr. Valcke] had underpriced the sponsorship and hadn't done [his] job." (Trial Tr. p. 390, l. 21- p. 391, l. 5.)

226. Mr. Schuster then clarified that he was not suggesting that FIFA actually "change the decision," "what I mean is that we make the whole f***-up look better for FIFA!" (Pl. Ex. 93). He explained that in the "unlikely" event that MasterCard actually agreed to pay an additional $20 million, then "FIFA can still stick to its decision and explain it with the trademarks issue, no problem." (Pl. Ex. 93).

227. At that point in the discussion, Mr. Valcke indicated that he would ask Mr. Blatter if he wants to give MasterCard a limited opportunity to make "a final proposal." (Pl. Ex. 93). Mr. Valcke then asked Mr. Houseman "what is the chance" that MasterCard would relinquish its challenge to FIFA's marks if given the opportunity to do so. (Pl. Ex. 93). Mr. Houseman responded "[c]lose to zero," but then added that FIFA "never presented [the trademark issue] as a deal-breaker." (Pl. Ex. 93). Mr. Houseman then suggested that by stripping MasterCard of the World Cup and giving it to VISA during a time that MasterCard was undergoing an initial public offering, MasterCard might drop the trademark challenge of its own

accord in order to avert downward price pressure on its shares.  (Pl. Ex. 93; Houseman Tr. 272/9-272/22, 273/9-273/16, 273/20-274/2).[11]

228.   After more back and forth among Messrs. Valcke, Schuster and Houseman, Mr. Lampman entered the discussion:  "Guys . . . having read all these exchanges upon wake up here it seems like a dream . . . a nightmare that is!"  (Pl. Ex. 93).  He surmised, accurately, it seems:  "It's clear somebody has it in for MC."  (Pl. Ex. 93).  Mr. Lampman then predicted that "[t]his is going to be very ugly," and advocated in favor of giving MasterCard at least "a half chance" to retain the sponsorship.  (Pl. Ex. 93).

229.   In the end, Mr. Valcke, as he admitted in his deposition, decided to "string MasterCard along and keep them in play until [he] got a call from Tom Shepard at VISA that the VISA Board had ratified the contract."  (Valcke Tr. 285/10-286/16). [12]

230.   The day after the Executive Committee's decision, therefore, Mr. Valcke called Mr. Stuart and told him that FIFA's Executive Committee had declined to ratify the sponsorship agreement because of the parties' trademark dispute.  (Stuart Decl. ¶ 68).   Mr.

---

[11] At trial, Mr. Valcke acknowledges that as early as 2004, he and his team discussed "using the threat of trademark litigation by FIFA against MasterCard as leverage to gain concessions from MasterCard in connection with the upcoming negotiations for a new sponsorship agreement."  (Trial Tr. p. 399, l. 6-11).  Nevertheless, the issue was not deemed important enough to have been included in either the "financial services" offer or the "financial services light" offer.

[12] At trial, Mr. Valcke at first purported not to understand the phrase "string him along" but, after acknowledging his deposition testimony about stringing Mr. Shepard along, went on to acknowledge that his direct testimony by declaration was saying what he had to say:

"Q.  Mr. Valcke, your declaration is just a bunch of commercial lies and bluffs, isn't it?

A.  It's just a negotiation.

Q.  Is it a bunch of commercial lies and bluffs?

A.  A negotiation?

Q.  Your declaration.

A.  No, my declaration is my declaration, and that's it.

Q.  It is what it is, right?

A.  It is what it is, and it's what I say, what I have to say."

(Trial Tr. p. 397, l. 9-17 (emphasis added)).

Stuart then called Mr. Houseman, who reiterated that it was the trademark issue that unexpectedly caused the FIFA Executive Committee not to approve the MasterCard contract. (Stuart Decl. ¶ 69).  Neither Mr. Valcke nor Mr. Houseman made any mention of VISA to Mr. Stuart.

   231. The next business day, Mr. Houseman purported to provide further explanation to Mr. Stuart by e-mail.  (Stuart Decl. ¶ 69; Pl. Ex. 32).  He told Mr. Stuart "the issue of the potentially competing trademarks has been raised again at a senior level at the FIFA Executive Committee" and that "[t]he issue is, unfortunately, a highly emotive one for FIFA." (Pl. Ex. 32).  He added:  "In fact it is such an emotive issue that, regardless of the negotiated compromise, the agreement has not been ratified by the Executive Committee."   (Pl. Ex. 32). Further, to Mr. Valcke's objective of "stringing MasterCard along [to] keep them in play" until the VISA Board ratified the contract, Mr. Houseman falsely reported to Mr. Stuart that "Jerome [Valcke] has been asked to revert to MasterCard to determine whether MasterCard's challenges to the FIFA Brand trademark cannot be dropped."  (Pl. Ex. 32).   Mr. Houseman advised Mr. Stuart "to take the appropriate advice internally as to whether this would ever be acceptable to MasterCard" and told him that he "look[ed] forward to hearing from you once you have discussed this issue internally."  (Pl. Ex. 32).

   232. In fact, as FIFA's witnesses all but admitted, the "highly emotive" trademark issue that the Executive Committee cited as the basis for not ratifying the contract with MasterCard was a pretext.   Mr. Blatter, Chairman of the Executive Committee, admitted that he has been aware of the trademark dispute since "about the year 2000 or 2001," that is, prior to FIFA's entering into the Agreement, and that the dispute was not "highly emotive" enough to prevent him from signing, or the Executive Committee from approving, the

sponsorship agreement with MasterCard in 2002 for the 2006 FIFA World Cup.  (Blatter Tr. 158/6-159/14; Valcke Tr. 169/2-170/11).   FIFA's representatives acknowledged that, throughout their negotiations with MasterCard in 2005 and 2006, they never presented the trademark issue as "a deal breaker" (Pl. Ex. 93; Pl. Ex. 16; Valcke Tr. 282/14-284/2) and that, in all events, the issue had been resolved to the parties' satisfaction by no later than the beginning of March 2006. (Houseman Tr. 211/16-211/21; Schuster Tr. 221/11-221/14; Valcke Tr. 328/17-328/20). Furthermore, Messrs. Blatter and Valcke each admitted that if VISA had not agreed to increase its bid at the last minute to $180 million, the "highly emotive" trademark dispute would not have been an obstacle to FIFA's approving MasterCard as the sponsor.  (Blatter Tr. 198/3-198/8; Valcke Tr. 463/12-463/24).  Indeed, Mr. Valcke's credibility on the trademark issue was entirely destroyed at trial.  The trademark issue was, in fact, only a pretext for rejecting MasterCard in favor of VISA.  (See, e.g., Trial Tr. p. 397, l. 18 – p. 406, l. 17)[13]

233.    Additionally, and significantly, when Mr. Blatter chose to comment publicly in late April 2006 on the reasons why FIFA approved VISA instead of MasterCard as the financial services sponsor, he did not even mention the trademark dispute.  Instead, he said (as FIFA reports on its website):  "We went through all FIFA's structures to go into such a deal [with Visa].   We have informed MasterCard when they had two opportunities to present offers. Then the Visa we received was a higher one.  Our different committees took the decision not to

---

[13] Mr. Valcke admitted at trial that "on March 10, 2006, even before VISA had raised its offer to $180 million, [he] and his team were already talking about using the trademark issue as a reason for going with VISA."  (Trial Tr. p. 404, l. 4-8).

go on with MasterCard."  (Pl. Ex. 14; Blatter Tr. 223/23-224/8, 224/16-224/17; *also* 218/15-218/21, 219/16-219/18, 222/2-223/8; Pl. Ex. 13).[14]

234.    None of this was known at the time to Mr. Stuart, however, who urgently asked Mr. Valcke to arrange a meeting between Mr. Blatter and MasterCard's Chief Marketing Officer, Lawrence Flanagan, to discuss the trademark issue.  (Stuart Decl. ¶ 70).  Mr. Valcke agreed to arrange the meeting but told Mr. Stuart that Mr. Blatter was not available until April 6, 2006.  (Stuart Decl. ¶ 70; Valcke Tr. 328/22-329/5).   He confirmed the April 6 meeting on March 28, 2006, one day before the VISA Board was scheduled to meet.  (Stuart Decl. ¶ 70; Pl. Ex. 392).

235.    Mr. Valcke admitted that instead of truthfully telling Mr. Stuart that the decision of the Executive Committee was "over and . . . done, [he] led [Mr. Stuart] to believe that [he was] going to have this meeting and schedule the meeting with Blatter, and work everything out and give MasterCard another chance to come in and reacquire its rights in order to keep MasterCard in play, just in case the VISA Board said no."  (Valcke Tr. 328/22-329/21, also 330/14-331/8).   Indeed, at trial, Mr. Valcke freely admitted to lying to both sides in order to "keep them in play."  (E.g., Trial Tr. p. 412, l. 6 – p. 413, l. 24).

236.    On March 29, 2006, the day after Mr. Valcke confirmed the April 6th meeting between Messrs. Blatter and Flanagan, the VISA Board voted to ratify the FIFA World Cup sponsorship agreement.   (Pl. Exs. 171, 187 & 188).  The next day, with no more reason to "string along" and "keep in play" MasterCard, Mr. Valcke notified Mr. Stuart by telephone that the Executive Committee had decided to finalize an agreement with VISA.  (Stuart Decl. ¶ 71).

---

[14] The one area of Mr. Blazer's testimony that does lend itself to belief based on all the other evidence in the case is his testimony that Mr. Blatter's statement that the reason FIFA signed VISA to the financial services light package is not that VISA's offer was higher.  (See, e.g., Pl. Ex. 13 (April 25 Bloomberg piece); Pl. Ex. 14 (FIFA.com article)).

In a subsequent e-mail, he wrote: "I would like to confirm FIFA's decision to finalize with Visa for the financial services category for 2007/2014." (Pl. Ex. 168). Mr. Valcke thanked Mr. Stuart for a "fair negotiation and agreement" but added that "what has happened in some countries, the dispute on the two globes vs. Mastercard logo became a major issue"; thus "the main reason for FIFA's choice is the issue between MasterCard and FIFA on the mark." (Pl. Ex. 168). That was, of course, a falsehood.

***FIFA's Staff Violates FIFA's Own Standards of Conduct***

237. FIFA's slogan is "fair play." (Pl. Ex. 6). In that spirit, according to FIFA's President, FIFA "requires its negotiators to deal honourably with its business partners." (Blatter Tr. 209/11-209/13). He acknowledged that it would not be "fair play," for example, for a FIFA negotiator to disclose to one sponsorship candidate the bid of another sponsorship candidate, unless both candidates were equally informed of the other's bid. (Blatter Tr. 206/4-206/15). As Mr. Blatter admitted, "if you tell one you should tell the other," "[b]ut you shouldn't tell one and not tell the other." (Blatter Tr. 206/10-206/15). Mr. Blatter testified that "[i]f there is an evidence [of] non-accomplishment in morality or ethic of an employee of FIFA then there are sanctions," including "[s]uspension, expulsion." (Blatter Tr. 209/11-209/21).

238. As noted above, Mr. Valcke constantly updated VISA about the details of FIFA's negotiations with MasterCard but "never gave Mr. Stuart updates or blow-by-blow descriptions about what VISA was offering. (Trial Tr. p. 391, l. 6-8). Mr. Valcke's and his team's dealings with FIFA's long-standing "partner" MasterCard constitutes the opposite of "fair play" and violates FIFA's own requirement that "its negotiators deal honourably with its business partners."

***MasterCard Puts FIFA and VISA on Notice of a Claim  -- April 4, 2006***

239.    Upon learning from Mr. Valcke that FIFA had decided to finalize with VISA for the financial services category, Mr. Stuart and MasterCard's Chief Marketing Officer, Mr. Flanagan, immediately brought FIFA's conduct to the attention of MasterCard's Chief Executive Officer, Mr. Selander, who called Mr. Blatter that same day, on March 30, 2006. (Stuart Decl. ¶ 72; Blatter Tr. 107/8-108/7, 110/8-110/24).   Mr. Selander was told that Mr. Blatter was out of the office but would return shortly.  (Stuart Decl. ¶ 72; Blatter Tr. 107/8-108/7).  Mr. Blatter did not return the call.   (Stuart Decl. ¶ 72; Blatter Tr. 107/8-108/7, 110/8-110/24).  Mr. Selander followed up with another telephone call to Mr. Blatter the next day, on March 31, 2006, and, again, left a message.  Mr. Blatter, again, did not call back.  (Stuart Decl. ¶ 72; Blatter Tr. 107/8-108/7, 110/8-110/24).

240.    Consequently, on April 4, 2006, two business days later, Mr. Selander faxed a letter to Mr. Blatter advising him that "unless FIFA immediately agrees to refrain from making any announcement of its plans with our competitor and further agrees to honor the terms of the 2007-2014 sponsorship agreement that was fully agreed between MasterCard and FIFA, we intend to pursue all appropriate legal remedies available to MasterCard."  (Pl. Ex. 3; Blatter Tr. 111/25-112/5).

241.    That same day, MasterCard's General Counsel, Noah Hanft, Esq., called the General Counsel's office of VISA and spoke with one of VISA's in-house attorneys.  (Stuart Decl. ¶ 73).  Mr. Hanft notified VISA's counsel that, pursuant to a right of first refusal in its then-existing contract with FIFA, MasterCard had negotiated and consummated with FIFA a World Cup sponsorship agreement for the 2007-2014 time period.   He thus advised VISA's

counsel not to proceed with any planned announcement that FIFA and VISA had entered into agreement for the same sponsorship rights.  (Pl. Ex. 428).

242.   By no later than April 4, 2006, therefore, both FIFA and VISA were on notice of MasterCard's claim that any sponsorship agreement between them would violate MasterCard's rights.

***FIFA and VISA Execute the Sponsorship Agreement -- April 6, 2006***

243.   Mr. Blatter's response, dated April 5, 2006, to Mr. Selander's "notice" letter -- a response that Mr. Blatter admitted he did not compose, may not even have read before it was transmitted and bore only his "stamp" signature (Blatter Tr. 113/14-113/17, 123/14-123/21, 124/3-124/7, 125/1-125/10) -- states, among other things, that "FIFA has entered into a sponsorship agreement with Visa International covering the years 2007-2014" and that "FIFA will not, therefore, be in a position to extend the current agreement with MasterCard."  (Pl. Ex. 4).

244.   In fact, as FIFA's representatives admit, the original contract between FIFA and VISA had not been signed by the time of Mr. Blatter's response on April 5.  (Blatter Tr. 120/25-121/1; Houseman Tr. 204/5-204/10; Valcke Tr. 258/13-259/13).   Rather, Mr. Blatter, President of FIFA, and Mr. Rodrigues, President of VISA, signed two originals of the contract (the "VISA Agreement") on April 6, 2006, two days after Mr. Selander's letter, at a private ceremony in FIFA's offices.  (Houseman Tr. 204/5-204/10; Valcke Tr. 258/13-259/13).

245.   The copy of the original contract produced by VISA in this lawsuit, accordingly, states on its front page:  "This Agreement is made this 6 day of APRIL 2006."  (Pl. Ex. 425).

246.   The purported copy of the original contract produced by FIFA, however, states:  "This Agreement is made this 3 day of April 2006."  (Pl. Ex. 45).   In addition, the

signature page contains, underneath the signatures (which include a signature of Mr. Rodrigues that, to the untrained eye, appears noticeably different from the signature of Mr. Rodrigues on the VISA-produced version of the contract), the handwritten date (in European format) "03.04.06," that is, April 3, 2006. (Pl. Ex. 45).

247.    No FIFA witness has provided an explanation for why the version of the VISA Agreement FIFA produced in this action is dated April 3, 2006 or why the signature blocks on the April 6 copy appear on page 30 of the document while the signature blocks on the April 3 document appear on page 31. (Transcript of conference on September 6, 2006, at p. 30; Trial Tr. p. 480-484 (summation)). To the extent that FIFA posits a "good faith" exchange of signature pages before the VISA Board approved the agreement, Mr. Shepard had already warned that there could be no agreement prior to the Board approval. (See Pl. Ex. 48). To the extent counsel posits counterpart signatures, "forepapers," and changing fonts, (see Trial Tr. p. 482, l. 14 – p. 483, l. 13), there is no basis in the record for such speculation. The only reasonable inference to be drawn, without benefit of adverse inference, is that someone at FIFA dated the contract April 3, 2006. With an adverse inference based on the lack of explanation, it is reasonable to infer that someone at FIFA dated the document April 3 after receiving Mr. Selander's demand letter of April 4, 2006 in order to create the appearance, for purposes of this lawsuit, that, by the time Mr. Selander transmitted his letter, the original VISA contract already had been executed.

### The Rights Granted to VISA Materially Differ from Rights Granted to MasterCard

248.    It is undisputed that the VISA Agreement contains terms that are "not comparable" to the terms originally "offered" to MasterCard in February 2005 in connection with the "financial services" package. (Valcke Tr. 164/16-164/24).

249.   The terms of the VISA Agreement (Pl. Ex. 425) also differ in several respects from those included in the 2007-2014 MasterCard Agreement and grant rights to VISA that were not offered to MasterCard.

250.   First, the consideration is different.  While both the VISA Agreement and the 2007-2014 MasterCard Agreement provide for total cash consideration of $180 million to be paid to FIFA in unequal, annual installments over eight years, the VISA Agreement permits VISA to credit $2.5 million of that total amount toward the purchase of sponsorship rights "in relation to qualifying competition of the FIFA World Cup," which sponsorship rights, under the VISA Agreement, "FIFA will make good faith efforts to acquire."  (Contrast Pl. Ex. 425, § 7 & Appdx. B, with Pl. Ex. 206, § 7 & Appdx. B).   No similar credit or offset is provided to MasterCard in the 2007-2014 Agreement.  (Contrast Pl. Ex. 425, § 7 & Appdx. B, with Pl. Ex. 206, § 7 & Appdx. B).   In addition, the VISA Agreement includes non-cash consideration in the form of "marketing in kind by way of promotional and media opportunities" having a "verifiable value of US $15,000,000."   FIFA did not grant or offer to MasterCard the right to enhance its total consideration with a non-cash component comparable to "marketing in kind."  (Contrast Pl. Ex. 425, § 7 & Appdx. B & K, with Pl. Ex. 206, § 7 & Appdx. B).[15]

251.   Second, rights with respect to ATMs placed "on-SITE" during FIFA World Cup competitions are different.   The VISA Agreement guarantees VISA that any ATMs placed on-SITE "will only accept VISA and/or VISA SUBSIDIARY PRODUCTS."  (Pl. Ex. 425, § 5.10).   In contrast, the 2007-2014 MasterCard Agreement provides that ATMs on-SITE "may accept a range of card PRODUCTS but may, subject to applicable laws, only identify MASTERCARD PRODUCT brands to communicate acceptance."  (Pl. Ex. 206, § 5.15).

---

[15] As noted above, Mr. Valcke determined not to seek additional consideration from Mastercard in order to protect his position.

252.    Third, VISA received superior protections from FIFA against "ambush marketing" by competitors that improperly seek to associate themselves with FIFA or the FIFA World Cup.   The VISA Agreement commits FIFA to more extensive and detailed protections than FIFA committed to in the 2007-2014 MasterCard Agreement.   (Contrast Pl. Ex. 425, § 6.1, with Pl. Ex. 206, § 6.1).

253.    Fourth, whereas FIFA granted the right to VISA to "distribute VISA PRODUCTS" at FIFA COMPETITION SITES in the VISA Agreement, it granted the right to MasterCard only to "demonstrate[e] and/or display" MASTERCARD PRODUCTS at FIFA COMPETITION SITES.   (Contrast Pl. Ex. 425, Appdx. C, § 9 with Pl. Ex. 206, Appdx. C, § 9).

254.    Fifth, FIFA granted to VISA, but not to MasterCard, (i) "a license to syndicate limited and agreed content from FIFA.com to official VISA websites," (ii) its "reasonable efforts to secure for the use of VISA to promote PRODUCTS collective image rights for participating player groups," and (iii) "access to a digital library of still images, taken by or on behalf of FIFA, and comprising a selection of images taken at selected FIFA COMPETITIONS."   (Contrast Pl. Ex. 425, Appdx. C, §§ 5.7, 10.6, 19.9, with Pl. Ex. 206, Appdx C, §§ 5, 10 & 20.4).

255.    And sixth, FIFA granted to VISA a more detailed and extensive "Super-Preference Program" than it granted to MasterCard.   (Contrast Pl. Ex. 425, Appdx. H with Pl. Ex. 206).

***VISA's Performance under the VISA Agreement Has Yet to Begin, but Is Imminent***

256.    The VISA Agreement, by its terms, does not permit VISA to exercise any rights thereunder until January 1, 2007.  The agreement states that its term "commences on the date of its execution and will expire on 31 December 2014, unless previously terminated."  (Pl.

Ex. 425, § 9).   But it then clarifies that "[f]or the avoidance of doubt, VISA's rights with respect

to FIFA and each FIFA COMPETITION commence on 1 January 2007 and shall, subject to

Clause 10, expire with respect to each FIFA COMPETITION three (3) months after the end of

the FIFA COMPETITION."  (Pl. Ex. 425, § 9).

      257.   Despite the clear language of the agreement, and in the face of

MasterCard's pending application for injunctive relief, FIFA has been giving VISA "passive

recognition" as a sponsor, by "allowing Visa to appear on LOC print materials (ticket

promotions, letterhead etc.)," and has "informally agreed that Visa's 'active recognition,' i.e.,

[its] ability to start using the marks publicly in promotions and advertising starts 11 October

2006."  (Pl. Ex. 310).  Thus, formal performance of the VISA Agreement is imminent, i.e., it will

commence in a few weeks.

### FIFA's Post-Litigation Termination Letter

      258.   At trial, Mr. Houseman admitted that he began asking around FIFA to see

whether there were any instances of MasterCard's not complying with the Agreement so that

FIFA could argue that MasterCard had forfeited its rights under Section 9.2 by breaching the

Agreement.  (Trial Tr. p. 342, l. 11-21).

      259.   On September 20, 2006, after the commencement of this action, FIFA's

Swiss counsel wrote to MasterCard's Swiss Counsel stating that FIFA was providing notice of

"immediate termination of the Agreement without notice due to important reasons."  (D.

Ex. 144).  In the letter, FIFA claims that the important reason was that its contractual partner had

destroyed the basis of trust necessary for the relationship through various actions.  (D. Ex. 144).

One of the major claims in the letter is that MasterCard breached the Agreement by instituting

legal action against FIFA on the trademark issue.  (D. Ex. 144).  FIFA also relied on MasterCard's conduct of this lawsuit.

260.    At trial, however, Mr. Houseman admitted that FIFA, despite knowing about MasterCard's action and supposedly considering it in a breach, never notified MasterCard of the breach in the form required by section 15 of the Agreement.  (Trial Tr. p. 341, l. 3-7).  Instead, what FIFA claims as "notice" consisted of Mr. Houseman's mentioning the alleged breach issue to Mr. Dobbyn within an e-mail in which Mr. Houseman and Mr. Dobbyn were negotiating the terms of the post-2006 sponsorship contract relating to the trademark dispute. (Trial Tr. p 341, l. 8-14).

261.    Mr. Houseman also acknowledged at trial that even though FIFA supposedly believed in early 2006 that MasterCard had breached the Agreement, FIFA still wanted to go forward with MasterCard in 2007-2014 and maintained active and friendly negotiations with MasterCard.  (Trial Tr. p. 341, l. 15 – p. 342, l. 1).  FIFA did not see MasterCard's legal actions with regard to the trademark issue as problematic until FIFA was looking for a way to explain why it rejected MasterCard in favor of VISA.  It was not until seven or eight months after the supposed breach that FIFA actually sent a letter to MasterCard about the supposed breach.  (Trial Tr. p. 342, l. 6-10).

***The Parties Were and Are Not Antagonistic***

262.    MasterCard and FIFA were not antagonistic parties; rather they were and are longstanding business partners who have had a successful relationship over some sixteen years.  FIFA representatives repeatedly noted the value they placed on their relationship with MasterCard throughout the negotiations.  In fact, FIFA relied on this relationship when explaining to MasterCard why FIFA did not feel a need to enter a binding letter of intent with

regard to the "financial services light" package as MasterCard had requested.  Instead, Mr.
Houseman assured MasterCard's counsel that "our relationship with MasterCard is strong
enough for us to be able to lend credibility, weight, and support in our Board presentations to
reflect what will hopefully be a broad understanding across all key business points."  (Stuart
Decl. ¶ 57; Pl. Ex. 31).

      263.    On October 26, 2005, the FIFA Board unanimously agreed, as the minutes
of the meeting demonstrate, to move forward with MasterCard as the chosen sponsor for the
2007-2014 sponsorship period.  (Pl. Ex. 184).  Mr. Valcke testified that he had recommended to
the Board at that point that it proceed with MasterCard.  (Valcke, Trial Tr. p. 381, l. 11-19).  At
that point, FIFA never communicated or intimated that MasterCard was anything other than a
respected and valued business partner.  MasterCard, throughout the negotiations, remained
positive towards concluding a deal and never displayed antagonistic actions, but instead simply
acted in accordance with the Agreement and trademark statutes to enforce its invaluable
intellectual property rights.  As noted, both MasterCard and FIFA had agreed to put the
trademark issues aside for the duration of the 2007-2014 agreement.

      264.    The FIFA marketing team believed that MasterCard deserved the post-
2006 sponsorship as Mr. Lampman noted in an e-mail to Mr.Valcke on March 10, 2006:  "In
closing . . . I think MC has done everything right in this process, they are a longstanding Partner
that came to the party when we needed them to.  If I had a vote, I think there is something to be
said for the way we conduct business therefore I vote MC."  (Pl. Ex. 58).  Furthermore, in an e-
mail listing the pros and cons of concluding the deal with either MasterCard or VISA, Mr.
Schuster believed that "FIFA's word is honored at MC – and in the market" and proffered this as
a pro of concluding the deal with MasterCard.  (Pl. Ex. 60).  Mr. Schuster listed far more pros

than cons in working with MasterCard. (Pl. Ex. 60). As noted above, even after the FIFA Board approved VISA, the FIFA marketing team pressed Mr. Valcke to seek reconsideration of the issue and to choose MasterCard.

### *The Harm to MasterCard Resulting from the Loss of Its Long-Standing FIFA World Cup Sponsorship*

265.   Loss of the FIFA World Cup sponsorship, particularly to its primary competitor, VISA, would harm MasterCard in several respects other than the loss of revenues.

266.   First, MasterCard would lose a "unique property" for which no replacement is available in the sports sponsorship arena.   In the case of the FIFA World Cup, the whole is greater than the sum of its parts.  Other sports properties, individually or collectively, cannot replicate the brand exposure and marketing opportunity presented by a single event that attracts a worldwide television audience of billions of viewers. (Stuart Decl. ¶ 78).   The only comparable sponsorship property is the Olympic Games, which indisputably is unavailable to MasterCard, as it is committed to VISA through 2012. (Stuart Decl. ¶ 78).

267.   Second, MasterCard's competitive position vis-à-vis VISA would be negatively impacted. (Bonfiglioli Decl. ¶ 17; Stuart Decl. ¶ 78).   In regions like Latin America, where soccer is widely and passionately followed, MasterCard's sponsorship of the FIFA World Cup has been pivotal to its ability to compete effectively. (Bonfiglioli Decl. ¶¶ 5-9; Stuart Decl. ¶ 78).  VISA's Executive Vice President, Global Merchant Partnerships & Global Sponsorship, Mr. Shepard, effectively acknowledged this fact, when he testified that obtaining sponsorship to the FIFA World Cup, in addition to the Olympic Games, "would give us [VISA] a tremendous point of differentiation" from MasterCard. (Shepard Tr. 35/8-36/17).  Indeed, in its papers seeking to intervene in this action, VISA agreed with MasterCard, specifically Mr. Stuart's

testimony, that the FIFA World Cup sponsorship offers "[u]nrivaled exposure from a five-star platform."  (Letter of Marc E. Ackerman to the Court dated September 22, 2006, at p. 2).

268.    Third, MasterCard would lose immeasurable goodwill built up over the past 16 years of sponsoring the FIFA World Cup.   In various regions around the world where soccer is extremely popular, MasterCard has been able to enhance relationships with banks, merchants and cardholders -- for which there is significant competition from other payment solution companies -- on the basis of MasterCard's sponsorship of the FIFA World Cup. (Bonfiglioli Decl. ¶¶ 13-16; Stuart Decl. ¶ 77).  That goodwill, resulting from the continuity of sponsoring five FIFA World Cups with the expectation of more, would be eroded if MasterCard were unable to retain its sponsorship.  (Bonfiglioli Decl. ¶¶ 13-16; Stuart Decl. ¶ 77).   There is no way to quantify the impact to MasterCard if MasterCard were to lose the sponsorship. (Bonfiglioli Decl. ¶¶ 13-16; Stuart Decl. ¶ 79).  Mr. Stuart testified convincingly at trial about the "soft side" of the value of the FIFA sponsorship to MasterCard, as opposed to the hard numbers "you can put a sharp pencil to."  He described the "halo effect that accompanies the world's most prestigious grand scale event," the competitive advantage by differentiation and goodwill that accompany this sponsorship and which cannot be quantified.  (Trial Tr. p. 76, l. 10-p. 77, l. 24)

## CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

1.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that this is a civil action between a citizen of a state and a citizen or subject of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Venue is proper in this district under (i) 28 U.S.C. § 1391(d) because the defendant is an alien, and (ii) under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

3.      For the reasons stated in the Opinion and Order dated August 10, 2006, the Court has jurisdiction over defendant FIFA.

***The Standard for Consolidating a Preliminary Injunction Hearing with a Trial on the Merits***

4.      Rule 65(a)(2) of the Federal Rules of Civil Procedure provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

5.      Under the rule, the Court has "broad discretion" to order consolidation. Abraham Zion Corp. v. Lebow, 761 F.2d 93, 101 (2d Cir. 1985).   All that is required is that the Court "give the parties notice of such consolidation to give them an adequate opportunity to present their case." Id.

6.      In an endorsement dated September 25, 2006, the Court noted that the parties' discovery and briefing in preparation for the preliminary injunction hearing was very complete and gave notice of the Court's intention to consolidate the preliminary injunction hearing with the trial on the merits.  MasterCard agreed to such consolidation, but FIFA stated two objections, (1) that such consolidation might deprive the arbitrators in Zurich of the ability to resolve the dispute, and (2) that MasterCard had not specified clearly what relief it was seeking.

7.      However, as noted in the order dated November 14, 2006, both objections were found to be without merit.  FIFA's motion to compel arbitration on the merits of this action had already been denied, and the Court ruled that it had the authority to issue both preliminary

94

and permanent injunctive relief pursuant to Section 22 of the Agreement ("However, if either party materially breaches this agreement, the other party will be entitled to seek and obtain from any Court or arbitrator having competent jurisdiction, any and all equitable relief, including an injunction . . . ."). The order also found that MasterCard's Complaint and Plaintiff's Proposed Conclusions of Law sufficiently disclosed the relief sought. In addition, the Court noted that a district court has broad discretion to fashion equitable relief at any time during these proceedings. Accordingly, consolidation was ordered.

### The Standard for Permanent Injunctive Relief

8. At a trial on the merits for a permanent injunction, the party seeking relief is required to prove by a preponderance of the evidence that a violation of some legal right will result in irreparable injury to it. See, e.g., Corenco Corp. v. Schiavone & Sons, Inc., 362 F. Supp. 939, 944 (S.D.N.Y. 1973).

9. "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion after it weighs the potential benefits and harms to be incurred by the parties from the granting or denying of such relief." Ticor Title Insurance Co. v. Cohen, 173 F.3d 63, 68 (2d Cir. 1999) (affirming grant of a permanent injunction enforcing a contractual covenant not to compete). "A permanent injunction is an extraordinary remedy, which is not lightly imposed." Basquiat v. Baghoomian, No. 90 Civ. 3853 (LFJ), 1992 WL 125529, at *3 (S.D.N.Y. May 22, 1992). "An order involving injunctive relief will not be reversed unless it is contrary to some rule of equity or results from a discretion improvidently exercised." Ticor Title, 173 F.3d at 68.

10.     It is well-settled that "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959).  "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  New York State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989); see also Ticor Title, 173 F.3d at 68.

11.     A showing of irreparable harm is required for both preliminary and permanent injunctive relief.  See, e.g., Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); Lusk v. Village of Cold Spring, 418 F. Supp. 2d 314, 318 (S.D.N.Y. 2005) (same).  The Court of Appeals has stated that a showing of "probable irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Bell & Howell:  Mamiya Co. v. Masel Co., 719 F.2d 42, 45 (2d Cir. 1983)).  Accordingly, the element of irreparable harm is considered first.

**MasterCard Has Shown That It Would Be Irreparably Harmed In the Absence of an Injunction**

12.     "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'"  Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995).  Each of the following has been found to satisfy this definition:

- the loss of a unique product or property, see Tom Doherty Assocs. Inc. v. Saban Entm't, Inc., 869 F. Supp. 1130, 1141 (S.D.N.Y. 1994), aff'd, 60 F.3d 27 (2d Cir. 1995) (enforcing a publisher's right of first refusal with

respect to the Power Rangers, on the grounds that when "the supplier of a unique, lucrative and possibly short-lived property refuses to supply that property in breach of a contract, the distributor is entitled to an injunction compelling performance"); Reuters, 903 F.2d at 907-08 (preliminarily enjoining a news service from ceasing its supply of photographs because "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor");[16]

- a "loss of prospective goodwill that is both imminent and non-quantifiable," Doherty, 60 F.3d at 38 ("we hold that a loss of prospective goodwill can constitute irreparable harm");

- a "potential loss of market advantage," Muze v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) (citing Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir. 1981);

- and, above all else, "a threatened imminent loss that will be very difficult to quantify at trial," Doherty, 60 F.3d at 38; Muze, 123 F. Supp. 2d at 131 (granting injunction where "short- and long-term harm" was not "precisely calculable in money damages").

13.     Here, in the absence of an injunction, MasterCard would suffer *each* of these forms of irreparable harm.

14.     First, in the absence of an injunction, MasterCard would lose, for at least the next eight years, an undisputedly unique and irreplaceable sponsorship property.

---

[16] See also Alcatel Space, S.A. v. Loral Space & Commc'ns Ltd., 154 F. Supp. 2d 570, 584 (S.D.N.Y. 2001) (granting preliminary injunction requiring specific performance of certain obligations under various satellite agreements, in part, because although depriving the movant of its contractual rights, in the absence of an injunction, "may not destroy [movant's] business, the limited number of satellite opportunities available warrants a finding of irreparable harm"), aff'd, 25 F. App'x. 83 (2d Cir. 2002); Space Imaging Europe, Ltd. v. Space Imaging L.P., No. 98 Civ. 2291 (DC), 1998 WL 190356, at *2 (S.D.N.Y. Apr. 21, 1998) (granting preliminary injunctive relief on the grounds, among others, that "[g]iven the uniqueness of the technology at issue here, I find that plaintiffs did miss out on a valuable business opportunity that monetary compensation is not likely to redress.").

15.     Second, in the absence of an injunction, MasterCard would lose indeterminate existing and prospective goodwill.

16.     Third, in the absence of an injunction, MasterCard would lose a significant competitive advantage.

17.     As Mr. Stuart testified convincingly, each of these three harms is very difficult to quantify.

18.     These are precisely the sorts of harms that MasterCard specifically sought to guard against by bargaining for a "first right to acquire" and that courts have found to be irreparable.

19.     The United States District Court for the Southern District of Florida, addressing strikingly similar facts, found that MasterCard's loss of a far less significant soccer sponsorship than the FIFA World Cup gave rise to irreparable harm warranting preliminary injunctive relief.   In MasterCard International, Inc. v. Inter/Forever Sports, Inc., No. 97 Civ. 0134 (EBD) (S.D. Fla. Nov. 10, 1997), the court observed that MasterCard's loss of the Copa America Games, an international soccer tournament held once every two years in South America, resulting from an alleged violation of a right of first refusal had presented "a classic case of irreparable harm."  It found:

> MasterCard has submitted ample evidence that should it not get an injunction and lose its opportunity to sponsor the 1997 Games, it will suffer a potential loss of goodwill and business reputation that is impossible to calculate.  Copa America promoters estimate that 600,000 fans will attend the 1997 Games, and that the television audience could reach into the billions.  Without an injunction, MasterCard will lose the unique ability to market itself and its products to this massive audience.  MasterCard's marketing activities have shown that soccer sponsorships of this type substantially increase MasterCard's name recognition, membership and credit card usage.  It is virtually impossible to put a price on this kind of name recognition or opportunity to attract new customers.  Without an injunction, MasterCard will lose that opportunity, as well as the goodwill and loyalty of customers who associate MasterCard with world class soccer events.

(Id. at 13-14.)  See also Tom Doherty Assocs., 60 F.3d at 32 (granting preliminary injunctive relief enforcing a publisher's right of first refusal with respect to Mighty Morphin Power Ranger books, on grounds that the "Power Rangers presented a unique opportunity" and the publisher would suffer irreparable injury if deprived of that opportunity).

20.     The showing of irreparable harm here -- arising from the loss of sponsorship rights to the greatest sports spectacle in the world after a sponsorship of sixteen years -- is even stronger than the "classic case of irreparable harm" found in Inter/Forever.  It follows *a fortiori* that in the absence of the requested injunctive relief, MasterCard would suffer "actual and imminent" harm "for which a monetary award cannot be adequate compensation." Id.

21.     MasterCard's loss of the next FIFA World Cup sponsorship would be, in is now-famous words, "Priceless."

22.     Moreover, the harm that MasterCard would suffer in the absence of an injunction is no less actual or imminent simply because the next FIFA World Cup is four years away.   If FIFA commences full performance under its purported sponsorship agreement with VISA when the term of the agreement begins in a few weeks in January 2007, the status quo will have been altered, and MasterCard will have irreversibly lost its right of first refusal with respect to the next FIFA World Cup sponsorship cycle.[17]   Accordingly, while the next FIFA World Cup may seem distant, the harm that MasterCard would suffer in the absence of an injunction is clear and present and increases daily.

---

[17] See Foxboro Co. v. Soft Sys. Eng'g, Inc., 894 F. Supp. 48, 51-52 (D. Mass. 1995) (finding irreparable harm and granting a preliminary injunction enjoining the sale of a business in violation of a right of first refusal, in part, because "if [defendant] were to go through with the sale . . . , [plaintiff] will be forever deprived of its right of first refusal under the Agreement").

23.    MasterCard has easily satisfied the irreparable harm requirement for permanent injunctive relief.

**MasterCard Has Proven by a Preponderance of the Evidence that FIFA Has Breached Section 9.2 of the Agreement**

24.    To obtain permanent injunctive relief, a plaintiff must prove its claim "by a preponderance of the evidence."  McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1548 (2d Cir. 1991); Corenco Corp., 362 F. Supp. at 944.

A.    *The Governing Law*

25.    The interpretation and enforcement of section 9.2 is governed by the laws of Switzerland.  (See Pl. Ex. 206, § 21).

26.    Rule 44.1 provides that "[t]he court, in determining foreign law may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  Rule 44.1 grants the district court wide latitude in resolving issues of foreign law and the court's determination shall be treated as a ruling on a question of law. See Rutgerswerke AG & Frendo S.P.A. v. Abex Corp., No. 93-2914, 2002 WL 1203836 (S.D.N.Y. June 4, 2002).  In acting under Rule 44.1, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. Id. at *16.  The Court of Appeals has urged district courts to "invoke the flexible provisions of Rule 44.1" to determine issues of foreign law. Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998).

27.    The Court's interpretation of Swiss law, set forth below, is based on the expert declarations submitted by both parties.  Upon review, the conclusions of Dr. Franz H.G. Werro are found to be the most persuasive and informative, and it is the "persuasive force of the opinions" expressed that is conclusive under Rule 44.1. Itar-Tass Russian News Agency v.

Russian Kurier, Inc., 153 F.3d 82, 92 (2d Cir. 1998).  Dr. Werro has published numerous articles on contract law and is a professor at the Faculte de droit, University of Fribourg, as well as a tenured professor at Georgetown University Law Center and, as demonstrated by his curriculum vitae, is eminently qualified to opine on the issues presented.  His opinions and conclusions are adopted in their entirety.  In addition, the opinions and conclusions of Dr. Hans Caspar von der Crone are persuasive and thus are adopted in their entirety.  Dr. Caspar von der Crone is a professor of private, commercial, and corporate law at the University of Zurich, has numerous publications in these areas, and is similarly qualified to opine on the issues presented.

28.     One of FIFA's Swiss law experts, Dr. Wolfgang Wiegand, who does have a background in contract law, agrees with Professor Werro on many of the governing principles of Swiss law, even though he comes to different conclusions.  To the extent that Dr. Weigand agrees with Professor Werro as to the law, his conclusions are accepted.  His conclusions and his plentiful advocacy – as opposed to expert opinion –are rejected as unpersuasive.

29.     Another of FIFA's Swiss law experts, Professor Baudenbacher (an apparent expert on competition law with little, if any, known expertise on contract law), opines that, notwithstanding that the parties specifically contracted that "if either party materially breaches this Agreement, the other party will be entitled to seek and obtain . . . any and all equitable relief," "[a]ny interference of an instrument of foreign law would be unlawful with regard to Swiss Law as long as it does not correspond with the specific solution Swiss Law provides in that specific case."  (Declaration of Dr. Carl Baudenbacher, executed on September 16, 2006, ("Baudenbacher Decl.") ¶ 8).  He then concedes that Swiss law provides for specific performance as a remedy, but concludes that such a remedy is not available in this instance because "all obligations deriving from Sec. 9.2 are ancillary obligations."  (Baudenbacher Decl.

¶ 13).  He also opines that specific performance "can only be granted if the respective obligation of a party is explicitly and precisely described in a contract," but that, here, in Professor Baudenbacher's view, section 9.2 does not impose any "specific contractual obligation" on FIFA.  Professor Baudenbacher also opines – without any authority whatsoever – that the "autonomy of the individuals who are parties to a contract . . . prohibits the substitution of the meeting of the minds with a mandatory intervention of a judge."  (Baudenbacher Decl. ¶ 14).  Professor Baudenbacher's opinions are rejected for lack of apparent expertise in contract law and because they are not persuasive.

      30.     Another FIFA expert, Dr. Alfons Burge, a professor of "Roman law" (the historical underpinning for civil law) in Germany with no apparent credentials as an expert on Swiss contract law, opines that section 9.2 "infringe[s] upon the principle of restriction on self-commitment stated in art. 27 of the Swiss Civil Code," which provides, in relevant part, that "[n]o person can alienate his personal liberty nor impose any restrictions on his own enjoyment thereof which are contrary to law or morality."  (Declaration of Dr. Alfons Burge, executed on September 20, 2006, ("Burge Decl.") ¶ 4).  In essence, Professor Burge espouses the rather remarkable opinion that a statute declaring unenforceable contracts that offend morality (such as a contract to enslave or prostitute oneself) applies to the FIFA-MasterCard sponsorship agreement, such that, in Professor Burge's opinion, "it is factually impossible to force FIFA to continue to contractual relationship with MasterCard." (Burge Decl. ¶ 21).  Professor Burge's opinions are rejected for lack of apparent expertise in contract law and because they are not persuasive.

      31.     Another of FIFA's experts, Dr. Francois Dessemontet, opines that a "Swiss court would not grant specific performance against FIFA" because in Switzerland, "a

prayer for injunctive relief has to specify the details of the acts which a party is enjoined to do" and, here, in Professor Dessemontet's opinion, MasterCard's complaint is deficient. (Declaration of Dr. Francois Dessemontet, executed on September 20, 2006, ("Dessemontet Decl.") ¶ 2(B)). Professor Dessemontet also offers the unsupported opinion that Article 404 of the Swiss Code of Obligations, which provides that personal service agreements (or "mandates") are not subject to specific performance, applies to the FIFA-MasterCard sponsorship contract, even though he acknowledges that the FIFA-MasterCard contract is a "sui generis" contract, not a "mandate" covered by Article 404. (Dessemontet Decl. ¶ 2(B)(1)). In addition, Professor Dessemontet opines that because MasterCard's rights under section 9.2 are "so-called law modifying rights," such rights "can be exercised only once" – a remarkable position that not even FIFA has adopted in this case. (Dessemontet Decl. ¶ 10). Finally, Professor Dessemontet offers the unsupported view that MasterCard's "first right to acquire" under section 9.2 was merely a "pre-contract" right that gave MasterCard no more than the "right to negotiate" a contract. (Dessemontet Decl. ¶ 10). Professor Dessemontet's opinions are rejected as wholly unpersuasive.

### *Interpreting a Contract under Article 18 of the Swiss Code of Obligations*

32. The primary place to begin examining a contract under Swiss law, according to Article 18(1) of the Swiss Code of Obligations ("CO"), is the wording of the agreement, interpreting the words according to the usual meaning of the words and expressions used. (Declaration of Dr. Franz H.G. Werro, executed on June 6, 2006, ("Werro Decl.") ¶¶ 8-9). Notably, if a word with a legal meaning has been used, it can be assumed that the parties meant for the word to have its usual legal meaning, unless the legal meaning of the word is ambiguous and subject to different interpretations. (Werro Decl. ¶ 9).

33.     Swiss law does not limit interpretation of the contract to the wording of the text of the contract; that is, there is no equivalent of the parol evidence rule in Swiss law. (Werro Decl. ¶ 10).  Thus, a court may inquire into all circumstances surrounding the expression of intent that may assist the court in determining the real intention of the parties, beyond the words of the contract. (Werro Decl. ¶ 10).

34.     Dr. Wiegand agrees, stating that Swiss courts will now use "additional means" to interpret a contract, "even if the text is clear." (Declaration of Dr. Wolfgang Wiegand, executed on June 19, 2006 ("Wiegand Decl.") ¶ 19).  If the subjective intention of the parties cannot be determined from the contract itself, Swiss courts will turn to "objective interpretation" in order to determine the meaning of a contract, which includes evaluating the history of the contract and/or the behavior of the parties before and after the conclusion of the contract. (Wiegand Decl. ¶ 19).

35.     There are two additional principles introduced by case law that may give guidance to contract interpretation. One principle is <u>favor</u> <u>negotii</u>, which states: "In case an interpretation leads to several possible meanings, the judge has to favor the one that confirms the existence of a contract." (Werro Decl. ¶ 14).  The other principle is <u>in</u> <u>dubio</u> <u>contra</u> <u>stipulatorem</u>, which states: "[W]here a clause is ambiguous, the unfavorable meaning of this clause must be imposed to the drafting party." (Werro Decl. ¶ 14).

36.     Thus, it is appropriate for the Court to consider sources of information extrinsic to the contract to determine the real intention of the parties and, therefore, the meaning of the contract between the parties, including evaluating the conduct of the parties before and after the formation of the contract. (Werro Decl. ¶¶ 6-17; Fourth Declaration of Dr. Wolfgang Wiegand, executed on September 21, 2006, ("Wiegand Sept. 21 Decl.") ¶ 38).

*Good Faith under Article 2 of the Swiss Civil Code*

37.     Both Dr. Wiegand and Dr. Werro conclude that Article 2(1) of the Swiss

Civil Code ("CC") applies to the Agreement between Mastercard and FIFA and provides that

every person is bound to exercise his rights and fulfill his obligations according to the principles

of good faith. (Werro Decl. ¶ 21; Wiegand Sept. 21 Decl. ¶ 14).

38.     This principle of good faith is "used by Swiss courts to interpret contracts

and to imply terms where necessary." (Werro Decl. ¶ 23).  Thus, Swiss courts have "imposed

liability on parties who were not seriously considering the contract that they were negotiating or

broke off the negotiation process in an untimely manner." (Werro Decl. ¶ 23).

39.     Notably, Dr. Werro explains that in some cases courts have "imposed to

parties negotiating a contract the duty to be forthcoming and to tell the truth." (Werro Decl. ¶

23).

40.     Dr. Werro also explains that "Art. 2(2) CC prohibits the abuse of a right.

This rule means that no one should be able to use his or her rights to harm somebody else.

Paragraph 2 of Art. 2 CC is hence applicable in cases where there is a discrepancy between

apparent right and justice.  In a nutshell, Art. 2(1) CC obliges the parties to fair behavior, Art.

2(2) CC prohibits the misuse of a right to the detriment of another party." (Werro Decl. ¶ 24).

41.     Similarly, Dr. Wiegand notes that the principle of good faith applies for

the <u>entire</u> <u>term</u> of the legal relationship and does not even require the existence of a respective

agreement of the parties in a contract; it is a "vital part of every contractual relationship."

(Wiegand Sept. 21 Decl. ¶ 14) (emphasis added).

42.     The principle of good faith is paramount when interpreting a contract and when the real intent of the parties cannot be determined subjectively, it is then appropriate to read the contract objectively, based on reasonable parties who are assumed to have acted in good faith. (Werro Decl. ¶ 26).  This method of interpretation, determining what reasonable and loyal parties would have intended, is founded on the "principle of confidence," which has its legal basis in Article 2 CC. (Wiegand Decl. ¶ 26).  Similarly, if a term is missing in a contract, the court must supply the term using the standard of reasonable parties acting under good faith. (Werro Decl. ¶ 26).

43.     Good faith under Swiss law also evaluates a party's current behavior by comparison to its previous behavior with the other party. (Werro Decl. ¶ 26).  Under Article 2(2), a party who acts in contradiction with its prior behavior may be liable to a party who was entitled to rely on that previous behavior. (Werro Decl. ¶ 26).

44.     "Based on the principle of good faith, the rule is that enforcement of contractual rights does not grant the other party the right to terminate the contract and certainly not the right to terminate immediately at least where a party fighting for its rights is not doing so in an abusive manner." (Second Declaration of Dr. Franz H.G. Werro, executed on October 6, 2006, ("Werro Oct. 6 Decl."), ¶ 26).

45.     A termination of a contract is considered abusive if it is expressed because the other party asserts claims arising out of the contract in good faith. (Werro Oct. 6 Decl. ¶ 25).

46.     Thus, both parties' experts agree that good faith is a controlling principle that guides conduct of contract interpretation, performance and negotiation.

*Modification of Contracts under Swiss law*

47.     Article 12 CO states that where the law requires a contract to be in writing that requirement also applies to any modification of the contract. (Werro Decl. ¶ 19). But, if the law does not impose any particular form for the contract, which is true for most contracts under Swiss law, then Article 12 CO and its requirements do not apply even if the parties adopt a written form. (Werro Decl. ¶ 19).

48.     Dr. Wiegand notes that Swiss law does not provide for form requirements for the grant of marketing and sponsorship rights, which are the subject of the contracts at issue in this action, and reaches the same conclusion as Dr. Werro that Article 12 CO does not apply in a case where the parties, and not the law, have reserved compliance with a certain form. (Wiegand Sept. 21 Decl. ¶ 13).

49.     "Even if a contract contains a provision which states that any amendment to the contract has to be in writing, this does not preclude the parties from modifying the contract in any other way.  They always have the possibility to waive the contractual form provision including by conclusive behavior." (Werro Decl. ¶ 20).

50.     Article 16(1) CO creates a presumption that if a form requirement is established by the parties for modification of the contract, then it must be assumed that the observance of such form is considered a prerequisite for the validity of the modification. (Wiegand Sept. 21 Decl. ¶ 13).  However, Dr. Wiegand admits, in accordance with Dr. Werro's statements, that this presumption may be overturned by showing that the contract or its modification was concluded by a "congruent declaration of wills" without adhering to the agreed form. (Wiegand Sept. 21 Decl. ¶ 13).

51.     It does not matter whether the parties realize that their behavior may modify the contract, it only matters that the parties' behavior reveals that they have abandoned the form requirements that were earlier agreed to in the contract. (Werro Decl. ¶ 20).

**Termination of a Contract of Duration with Immediate Effect is a Last Resort**

52.     Under a contract of duration the performance owed by the parties is to be rendered over a certain period of time, and the overall duration of the contact is defined by the time during which the main obligation has to be rendered. (Werro Oct. 6 Decl. ¶ 21).

53.     Swiss law provides for the right of parties to terminate a contract of duration for an important cause even if the right has not been stipulated by the parties. (Werro Oct. 6 Decl. ¶ 21).  This provision is justified because contracts of duration require a certain level of ongoing trust between the parties and if that trust is compromised, the law must make it possible to terminate the relationship immediately. (Werro Oct. 6 Decl. ¶ 23).

54.     However, the right to terminate a contract with immediate effect is considered the last resort and is subject to strict conditions. (Werro Oct. 6 Decl. ¶ 23).  The terminating party must be able to prove important, serious reasons that render the continuation of the contract intolerable. (Werro Oct. 6 Decl. ¶ 23).

55.     The Swiss Federal Supreme Court has held that intolerability is found only if the relationship of trust between the parties is compromised in such a way that makes immediate termination the only way to move forward. (Werro Oct. 6 Decl. ¶ 21).  The circumstances underlying the situation causing the contract to become intolerable must not have been known to the terminating party at the time of the making of the contract, nor can they have been foreseeable or caused by the terminating party. (Werro Oct. 6 Decl. ¶ 21).  The Swiss Federal Supreme Court requires that the loss of trust must be invoked immediately by the

terminating party as the loss of trust occurs, and if the contract is not immediately terminated, then it is assumed that the party accepts the continuation of the contract and waives its right to terminate it. (Werro Oct. 6 Decl. ¶ 24).

***Taking Action to Enforce a Party's Rights Pursuant to a Contract or Statute Does Not Give the Other Party the Right to Terminate the Contract Immediately***

56.     A party's taking good faith measures to enforce its rights under a contract, to protect its position with regard to its contract partner cannot be a valid cause for immediate termination by the other party. (Werro Oct. 6 Decl. ¶ 25).

57.     "Based on the principle of good faith, the rule is that the enforcement of contractual rights does not grant the other party the right to terminate the contract. . . . This is even more so where a party is motivated to enforce its rights by contract violations by the other party." (Werro Oct. 6 Decl. ¶ 25).

58.     If a party is acting in good faith and does not attempt to enforce its statutory rights in an abusive way, its actions in this regard cannot compromise the special trust between parties to a contract so as to render the continuation of the relationship intolerable. (Werro Oct. 6 Decl. ¶ 28).

59.     According to Swiss case law, circumstances that are known at the time of the making of the contract may never be the basis for termination for an important cause. (Werro Oct. 6 Decl. ¶ 30).

***Article 404 of the Swiss Code of Obligations***

60.     Article 404 CO is applicable to mandate agreements or any contract that may be considered comparable to typical mandates based on common elements in the contract. (Werro Oct. 6 Decl. ¶¶ 4-6).  Under Article 404 CO the right to terminate a contract is mandatory, but Article 404 CO applies only to contracts that fit the description of mandate,

namely where the contract involves a particular level of trust between mandator and mandatee, and depends on the personal services of the mandatee. (Werro Oct. 6 Decl. ¶¶ 7-11).

61.     Typically, mandate contracts revolve around the provision of personal services and access to personal matters of the mandator, such as a contract between doctor and patient or lawyer and client. (Werro Oct. 6 Decl. ¶¶ 7-11).

62.     Swiss law grants parties the freedom to determine the content of a contract within the limits of the law, and may construct the contract without using the legislative default rules. (Werro Oct. 6 Decl. ¶ 12).  Such contracts are called innominate contracts, which may contain some elements regulated by the CO as well as other elements. (Werro Oct. 6 Decl. ¶ 12).

63.     Among innominate cases, there is a distinction between mixed contracts and contracts sui generis, where mixed contracts combine elements of different types of contracts. (Werro Oct. 6 Decl. ¶ 13).

64.     Dr. Wiegand notes that the Federal Court of Switzerland has applied Article 404 CO to "mixed" contracts (mixti iuris) if the provisions of the law of mandate seem appropriate with regard to the duration of the contractual connection between the parties. (Third Declaration of Dr. Wolfgang Wiegand, executed on September 12, 2006, "Wiegand Sept. 12 Decl.") ¶ 13).  If mandate elements are considered dominant in a mixed contract (an intense focus on personality and a strong component of trust), then Article 404 CO applies, but without a dominance of such elements Article 404 CO does not apply. (Werro Oct. 6 Decl. ¶¶ 13-14; Declaration of Hans Caspar von der Crone, executed on October 6, 2006, ("Caspar von der Crone Decl.") ¶ 13).

65.     In addition, parties may specifically exclude Article 404 CO from applying to their contract even in mixed contracts where the mandate element is considered dominant. (Werro Oct. 6 Decl. ¶ 14).

66.     For a contract <u>sui</u> <u>generis</u>, the Federal Supreme Court has held that the parties enjoy broad freedom to determine the modalities of the termination of the agreement, and Article 404 CO is not applicable to such contracts since the parties make the determination of how long they wish to bind themselves. (Werro Oct. 6 Decl. ¶ 15).

67.     A sports sponsoring contract is not considered a typical mandate but instead, is generally considered a contract <u>sui</u> <u>generis</u>, which, as noted above, is not specifically regulated in the CO and is not subject to Article 404. (Caspar von der Crone Decl. ¶¶ 13-14, 18).

68.     Dr. Werro and Professor von der Crone are persuasive in their conclusions that sports sponsoring contracts or similar agreements are not similar to the personal service contracts that are the typical mandates to which Article 404 CO applies.  Therefore Article 404 CO does not apply to such agreements, and the right to terminate is not mandatory.

***Specific Performance as an Available Remedy under Swiss Law***

69.     The contract experts from both parties agree that under Swiss law, specific performance is an equitable remedy and is available provided that such performance remains possible. (Werro Decl. ¶ 40; Wiegand Sept. 21 Decl. ¶¶ 28, 51).  The fact that a party must breach an obligation to a third party in order to execute specific performance on its contract with the first party does not render performance either subjectively or objectively impossible. (Werro Oct. 6 Decl. ¶ 62).

70.     Specific performance is regarded as a natural element of each contractual claim, and there are only a few exceptions where specific performance is not available, including

mandates or similar agreements to which Article 404 CO applies, which, as noted, do not apply to the contract at issue in this action. (Werro Oct. 6 Decl. ¶¶ 56-57).

71.     Specific performance exists in cases in which the obligation at issue can only be performed by a specific party. (Werro Oct. 6 Decl. ¶ 58).

72.     Dr. Carl Baudenbacher, an expert presented by FIFA, states that specific performance may only be granted if the respective obligation of a party is explicitly and precisely described in a contract but that does not eliminate specific performance as an available remedy under Swiss law. (Baudenbacher Decl. ¶ 13).

73.     The experts on both sides agree that when specific performance is available in a contract, it is available as a right unless it is impossible. (Werro Decl. ¶ 42) (Wiegand Sept. 21 Decl. ¶¶ 28-29).  Dr. Werro states that specific performance becomes unavailable when performance is objectively impossible, meaning that nobody, not even a third party, is capable of performing the obligation. (Werro Oct. 6 Decl. ¶ 60).  Dr. Wiegand states that specific performance becomes unavailable when it is unenforceable by means of judicial execution. (Wiegand Sept. 21 Decl. ¶ 29).

74.     "[T]here is no clear-cut definition" of the term "impossibility," and therefore a court must examine each contract and the context on a case by case basis. (Wiegand Sept. 21 Decl. ¶ 29).

75.     "The right to obtain specific performance also includes an actionable claim to preclude the other party from doing something, if such act would result in a breach of such other party's contractual obligations." (Werro Oct. 6 Decl. ¶ 64).

76.     As Dr. Werro explains, freedom of contract under Swiss contract law includes the right to determine the content of the contractual provisions as well as the consequences of non-performance. (Werro Oct. 6 Decl. ¶¶ 73-74).

77.     Thus, as Dr. Werro concludes, "[b]ased on this freedom FIFA and MasterCard were free to contractually provide for 'equitable relief' as understood in US law as a possible remedy under the Agreement." (Werro Oct. 6 Decl. ¶ 75).

***Freedom of Parties to Contract***

78.     Swiss law embraces the idea that parties are free to contract and undertake binding commitment, and the law places few limitations on this freedom. (Werro Oct. 6 Decl. ¶ 32).

79.     Article 27 CC limits the freedom to contract by stating that no person, by contract, may renounce his fundamental personal liberty or the enjoyment of his human condition. (Werro Oct. 6 Decl. ¶ 33).  This limitation applies typically to personal matters of physical persons. (Werro Oct. 6 Decl. ¶ 34).

80.     Swiss courts only very reluctantly apply Article 27 CC to the area of economic limitations and only in extreme cases where the parties are judged to have unequal bargaining power, (Caspar von der Crone Decl. ¶¶ 34, 38), a situation that does not apply here.

81.     It is possible under Swiss law to enjoin a party from entering into or performing an agreement with a third party even if such agreement would constitute a breach of contract. (Werro Oct. 6 Decl. ¶¶ 64-72).

82.     So long as the third party has not performed its obligations under the subsequent (or obtained judgment for performance), a party may enjoin its counterparty from performing the subsequent agreement and require specific performance of its agreement with the

counterparty.  (Werro Oct.6 Decl. ¶¶ 67-72).   Applying that law here, MasterCard may enjoin FIFA from performing its 2006 agreement with VISA and obtain from FIFA specific performance of MasterCard's first right to acquire 2006-2014 sponsorship rights under section 9.2 of the Agreement.

> B.      *Construction of Section 9.2 Applying Swiss Law*

83.     The parties do not materially dispute the meaning and operation of section 9.2.  It should be noted, however, that the parties' interpretation is fully supported by principles of contract construction under Swiss law.

84.     It is clear from the plain language of the clause that if, after MasterCard has declined the terms of a properly presented "written offer" of sponsorship, FIFA changes the rights or terms of the sponsorship, then MasterCard's rights under section 9.2 remain intact, and FIFA must offer in writing such changed rights or terms to MasterCard first, before FIFA would be free to grant such rights and terms to anyone else.   By its plain terms, section 9.2 ensures that FIFA cannot grant any sponsorship rights in MasterCard's product category for the next sponsorship cycle, unless FIFA has first offered such rights on comparable terms to MasterCard, in accordance with the procedures of section 9.2, and MasterCard has declined them.

85.     Any other interpretation would render illusory MasterCard's rights under section 9.2:  It would enable FIFA to make an inflated or otherwise unacceptable sponsorship offer to MasterCard, await MasterCard's anticipated rejection, change the terms and then grant sponsorship rights to a competitor of MasterCard on terms that MasterCard was never even given the opportunity to consider.   Under Swiss law, to interpret section 9.2 in such a fashion would be entirely unreasonable, and thus any such interpretation should be rejected.  (See Werro Decl. ¶¶ 28-32.)

86.     Although resort to extrinsic evidence is unnecessary to interpret section 9.2, the extrinsic evidence in the record here also fully supports interpreting the clause as providing an ongoing right of first refusal that is re-triggered each time FIFA changes the terms of its offer.

87.     Accordingly, both the plain language of, and extrinsic evidence concerning, section 9.2 support the parties' interpretation of the clause, as well as Professor Werro's opinion that: "Under Swiss law, Section 9.2 of the Agreement has the following meaning:  MasterCard has the right to accept or reject the offer.  If MasterCard rejects the offer, FIFA is free to grant the package of rights at comparable terms to a third party.  If FIFA offers a package of rights at comparable terms to a third party and that third party accepts it, MasterCard loses the benefit of the offer.  Instead, if the third party rejects the package, FIFA has the duty, if it intends to offer a different package of rights at different terms to potential partners, to submit that new offer first to MasterCard." (Werro Decl. ¶ 29).

88.     Such an interpretation would not result in an unreasonable open-ended option for MasterCard. As FIFA promised MasterCard here; it is only until the parties are unable to agree that FIFA would be precluded from granting the rights to another bidder.  Here, that situation did not come to pass because, as noted above, FIFA and MasterCard agreed to all terms, FIFA sent MasterCard the "FINAL version" of the 2007-2014 agreement which MasterCard executed and returned.

89.     Section 9.2 is not similar to a personal services contract or mandate to which Article 404 CO applies.

*C.*     *FIFA Has Materially Breached Section 9.2*

90.     MasterCard has proven by a preponderance of the evidence that FIFA materially breached section 9.2.

91.     The conclusions set out in Professor Werro's Declarations are adopted in their entirety, including his conclusions that "MasterCard bargained for the possibility to keep the [FIFA sponsorship] rights if it was willing to pay as much as any third party.  From FIFA's perspective, it seems to have been important that FIFA would be free to have the possibility to negotiate with third parties if specific terms were rejected by MasterCard, in order to find out whether FIFA was able to obtain such price from a third party.  However, if and to the extent MasterCard accepted the terms proposed by FIFA, FIFA was bound to grant the rights to MasterCard."  (Werro Decl. ¶ 32).

92.     Section 9.2 was a material right and obligation.

93.     With respect to the "financial services light" offer, the parties, by their conclusive behavior, agreed not to be bound by either of the 90-day time requirements.  (See Werro Decl. ¶ 33).  As Professor Werro explained, aside from FIFA's never indicating to MasterCard that the 90-day acceptance period was applicable and the parties' "negotiating for several months without following the 90-day requirement" (Werro Decl. ¶ 33), the parties' waiver of the 90-day requirements "is also supported by the fact that, in contrast to what it had done with respect to the 'financial services' package, FIFA failed to give MasterCard, the Section 9.2 90 days' written notice of its intent to offer the new 'financial services light' package.  It is further supported by the fact that FIFA assured MasterCard that a letter of intent was not necessary and that FIFA would not sign a deal with anyone else unless it was unable to reach agreement with MasterCard. . . . [B]y acting like this, FIFA and MasterCard modified or

waived the 90 day requirement according to section 9.2, notwithstanding Section 20 of the Agreement, which states that any amendment to the Agreement must be in writing and signed by both parties."  (Werro Decl. ¶ 34).

        94.    Even if there were no modification of the Agreement by conclusive behavior, "FIFA would violate the principle of good faith, respectively the prohibition of *venire contra factum proprium*, by now insisting on the 90-day requirement when it did not do so in 2005.  FIFA's behavior with regard to the 'financial services light' package in May 2005 and during the following months as described in the facts let MasterCard  reasonably think that FIFA – notwithstanding Section  9.2 of the Agreement – did not insist on the 90-day requirement anymore."  (Werro Decl. ¶ 35)

        95.    "In contrast to what happened in the negotiations regarding the 'financial service' package, FIFA never indicated to MasterCard in any way that it must accept the 'financial service light' package within 90 days.  Rather, FIFA negotiated with MasterCard during several months without following or referring to the time requirements according to Section 9.2 of the Agreement.  Moreover, . . . FIFA indicated to MasterCard at various occasions that the negotiations were going well, as for example in September 2005, when FIFA assured that it would not sign a deal with anybody before knowing if a deal with MasterCard could be reached.  Likewise, FIFA's lawyer wrote to MasterCard in October 2005 that 'there are no "insurmountables" left.'  Finally, in March 2006, FIFA transmitted to MasterCard the "FINAL version" of the long-form sponsorship agreement for MasterCard's execution, still without showing the slightest concerns with regard to any time requirements.  It is my opinion that based on this behavior MasterCard could reasonably assume that – notwithstanding Section 9.2 of the

Agreement – it did not have to follow the 90-day requirement anymore." (Werro Decl. ¶ 36, (emphasis added)).

       96.    "Based on this reliance, MasterCard continued its contractual negotiations with FIFA without caring, and without the need to care, about the 90-day requirement.  If FIFA now invokes the 90-day requirement ex post, this contradicts its previous behavior and violates MasterCard's confidence.  In my opinion, FIFA's inconsistent behavior constitutes a classical case of *venire contra factum proprium*, contrary to the principle of good faith as set forth in Art. 2 CC(2).  Consequently, according to Swiss law, <u>FIFA is not allowed to invoke the 90-day requirement according to Section 9.2 of the Agreement anymore</u>." (Werro Decl. ¶ 37, (emphasis added)).

       97.    "Finally, it is my opinion that the modification or waiver or the 90-day requirement according to section 9.2 of the Agreement does not mean a modification or waiver of MasterCard's right of first refusal. . . . [T]he parties can waive and amend contractual provisions to any extent by conclusive behavior, which means that they can also waive or amend part of such provision.  The behavior of FIFA and MasterCard in May 2005 and during the following months reveals that they only modified the formal requirement of acceptance within the 90 days according to section 9.2, but not MasterCard's right of first refusal.  <u>While not insisting or referring to the 90-day requirement anymore, FIFA never indicated to MasterCard that it would not be in an exclusive position anymore</u>.  Rather, MasterCard insisted on its exclusive position and FIFA, confronted with rumors that it had entered into discussions about a sponsorship agreement with VISA, assured MasterCard that it would not sign a deal with anyone else unless it was unable to reach an agreement with MasterCard.  <u>This behavior leads me to conclude that the parties always negotiated under exclusive conditions and did not waive the</u>

<u>right of first refusal according to Section 9.2 of the Agreement</u>.  Moreover, the modification of a contractual provision by conclusive behavior can only be approved if both parties' behavior reveals that they wanted such amendment.  The facts do not contain any indications that MasterCard was willing to give up its right of first refusal."  (Werro Decl. ¶ 38, (emphasis added)).

98.    Additionally, even if the parties did not waive the 90-day requirements of Section 9.2, FIFA did not actually present MasterCard with a written "offer" within the meaning of section 9.2 (*i.e.,* as the parties agree, a document capable, upon acceptance, of creating a binding obligation) concerning the "financial services light package," until 2006, when it supplied a long-form contract containing definite terms.  (Munson Decl. ¶¶ 34-40.)  MasterCard accepted that "written offer" within 90 days.

99.    Together with his other conclusions, Professor Werro's summary conclusions are adopted including his conclusion that:  "The behavior of both FIFA and MasterCard with regard to the 'financial services light' package in May 2005 and during the following months shows that they amended section 9.2 of the Agreement by conclusive behavior with the effect that they waived the 90-day requirement, and not the right of first refusal.  Even if there was not an amendment of the Agreement, FIFA would violate the principle of good faith by insisting on the 90-day requirement.  Consequently, FIFA is not allowed to claim that MasterCard did not accept the offer within 90 days."  (Werro Decl. ¶ 39).  In addition, I adopt Professor Werro's conclusions that specific performance is available as a remedy.  (Werro Decl. ¶¶ 40-43).  "In other words, by entering into the agreement with VISA, FIFA has created a situation in which it has conflicting obligations vis-à-vis two different parties, but it does not render performance of its obligation vis-à-vis MasterCard and thereby MasterCard's primary

claim for specific performance objectively or subjectively impossible."  (Werro Oct. 6 Decl. ¶ 63).

100.    Accordingly, MasterCard has proven by a preponderance of the evidence that, by not granting the package of post-2006 rights offered to, and accepted by, MasterCard at FIFA's asking price and instead purporting to grant them to VISA, FIFA has breached section 9.2 under Swiss contract law.

101.    Furthermore, and independently of the foregoing breach, MasterCard has proven by a preponderance of the evidence that FIFA's conduct in performing its obligations under Section 9.2 and in its negotiations relating to the sponsorship rights covered by that section breached the obligation of good faith imposed by Swiss law, and thus FIFA breached the Agreement.

102.    Furthermore, and independently of the foregoing breaches, FIFA has breached section 9.2 of the Agreement by granting to VISA rights that are not "on comparable terms" to those offered to MasterCard.

103.     The Agreement is not a mandate agreement under Article 404 CO.

***FIFA's Post-Litigation Termination Letter is Inoperative***

104.    MasterCard's actions to protect its rights under the trademark statutes from violations by FIFA were taken in good faith and may not, under Swiss law, constitute cause for immediate termination of the Agreement.  This is particularly so because, as Mr. Blatter testified, FIFA knew of the trademark issue with MasterCard since 2000 or 2001, that is, prior to FIFA's entering into the Agrement.

105.    MasterCard's prosecution of this lawsuit, with which the Court is familiar, has not demonstrated abusive behavior sufficient to constitute cause for immediate termination of the Agreement.

106.    Accordingly, FIFA's September 20, 2006 letter purporting to terminate the Agreement is null and void.

***MasterCard Has Demonstrated That the Balance
Of Hardships Decidedly Tips in Its Favor***

107.    Because MasterCard has proved actual success on the merits, the Court need not balance the hardships in order to grant MasterCard the injunctive relief it seeks.  If the Court were to undertake that task, however, MasterCard would still be entitled to the relief sought.

108.    As MasterCard has shown, in the absence of an injunction, it would suffer irreparable harm for which money damages could not adequately compensate it.  Among other things, MasterCard would lose, for at least the next eight years and likely longer the unique opportunity to sponsor the most popular and widely viewed sporting event in the world; an indeterminate amount of both existing and prospective goodwill from consumers, merchants and member financial institutions; and its relative global competitive position vis-à-vis VISA.

109.    In contrast, FIFA would suffer no discernible harm from an injunction, other than potential liability to VISA -- potential liability for which FIFA is solely to blame. Even if an injunction is issued enjoining FIFA from proceeding with VISA and directing it to perform its contract with MasterCard, FIFA will still have a "financial services" sponsor for the next two World Cups at its asking price.   That the sponsor would be MasterCard instead of VISA is of no measurable difference.   Moreover, given that FIFA was put on notice of

MasterCard's claim before it executed the original VISA Agreement, FIFA may not now complain of any hardship that may arise from being enjoined from proceeding with that contract.

110.    Nor would any hardship that VISA (to the extent its interests should be considered at all) might suffer in the face of the requested prohibitory injunctive relief even approximate the irreparable harm that MasterCard would suffer in the absence of an injunction. Given that VISA is not currently, and, at least within the past sixteen years, has never been, a sponsor of FIFA events, an injunction enjoining FIFA from proceeding with its purported World Cup sponsorship agreement with VISA would merely preserve the status quo.   Under these circumstances, VISA's injury from FIFA's breach is more easily quantifiable.  Furthermore, VISA would have a breach of representation and warranty remedy against FIFA (a remedy that those parties have discussed and that FIFA has acknowledged) for any harm that it would suffer from FIFA's inability to perform under the VISA Agreement.   Additionally, like FIFA, VISA was on notice of MasterCard's claim when it executed the VISA Agreement.  Hence, it may not now complain of the consequences of its decision to proceed with executing the contract in the face of such notice.

111.    Accordingly, to the extent relevant, the balance of hardships tips decidedly in MasterCard's favor.

112.    Because the commencement date of the VISA Agreement is January 1, 2007, the parties have not commenced performance.  Permitting FIFA to perform the VISA Agreement would constitute a breach by FIFA of section 9.2 of the Agreement.

113.    Accordingly, MasterCard may enjoin FIFA from performing the VISA Agreement and obtain from FIFA specific performance of MasterCard's first right to acquire the post-2006 sponsorship rights under section 9.2 of the Agreement.

114.    Because the parties are not antagonistic they may be required to continue working together.

115.    Although section 9.2 gives MasterCard the first right to acquire sponsorship rights in connection with football competitions "which will be held during the period 2007-2010,"  because the only post-2006 rights offered by FIFA were rights for the period 2007-2014, and because FIFA rejected MasterCard's request for an offer of rights for 2007-2010, and because the parties' words and conclusive conduct demonstrate that the parties considered the bundle of rights contained in the "financial services" offer (for 2007-2014) and in the "financial services light" offer (for 2007-2014) to be made pursuant to section 9.2 (although that bundle of rights was broader than that referred to in section 9.2), it is fair and equitable that specific performance relate to the package of sponsorship rights included in the "financial services light" offer and to football competitions included in that offer, which will be held during the period 2007-2014.

116.    Because MasterCard and FIFA agreed on all terms of the 2007-2014 MasterCard Agreement and the "FINAL version" of that agreement was sent by FIFA to MasterCard for execution, and the duly executed agreement returned to FIFA, it is fair and equitable that FIFA be required to specifically perform the 2007-2014 MasterCard Agreement.

***The Remedy***

117.    Because the commencement date of the VISA Agreement is January 1, 2007, the parties have not commenced performance, permitting FIFA to perform the VISA Agreement would constitute a breach by FIFA of section 9.2 of the Agreement.

118.    Accordingly, MasterCard may enjoin FIFA from performing the VISA Agreement and obtain from FIFA specific performance of MasterCard's first right to acquire the post-2006 sponsorship rights under section 9.2 of the Agreement.

119.    Because the parties are not antagonistic they may be required to continue working together.

120.    Because MasterCard and FIFA agreed on all terms of the 2007-2014 MasterCard Agreement and the "FINAL version" of that agreement was sent by FIFA to MasterCard for execution, and the duly executed agreement returned to FIFA, it is fair and equitable that FIFA be required to specifically perform the 2007-2014 MasterCard Agreement.

***MasterCard Is Entitled to Permanent Injunctive Relief***

121.    For the foregoing reasons, MasterCard is entitled to:

a) a permanent injunction enjoining defendant Fédération Internationale de Football Association ("FIFA") from implementing or otherwise proceeding with its purported 2007-14 "FIFA World Cup" sponsorship agreement with VISA or otherwise granting to VISA, or any other entity, any package of advertising and sponsorship rights, with respect to payment solutions products or services, in connection with FIFA soccer competitions during the period 2007 to 2014; and

b) a permanent injunction directing FIFA to specifically perform its obligations under section 9.2 of the Agreement by granting to MasterCard the package of advertising and sponsorship rights, which previously was offered to and accepted by MasterCard, with respect to payment solutions products or services, in connection with FIFA soccer competitions during the period 2007 to 2014; and

      c) in accordance with section 22 of the Agreement, judgment granting

MasterCard  all of its "costs and expenses in connection with its enforcement of its rights,

including all reasonable legal fees, costs and disbursements."

      Counsel shall confer and submit a form of injunction by 9:00 a.m. on

December 8, 2006.


Dated:   New York, New York          SO ORDERED:
        December 6, 2006



_____
LORETTA A. PRESKA, U.S.D.J.